

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELA TYLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIZ CLAIBORNE, INC., TRUDY F. SULLIVAN, AND WILLIAM L. MCCOMB,<br><br>Defendants. | Case No. 1:09-cv-4147-RJH<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff James Metz, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Liz Claiborne, Inc. ("Liz Claiborne," "LIZ,"or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Liz Claiborne; and (c) review of other publicly available information concerning Liz Claiborne.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Liz Claiborne's securities between January 16, 2007, and April 30, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). During the Class Period, Liz Claiborne was engaged primarily in the design and marketing of a broad range of apparel, accessories, and fragrances. Liz Claiborne's largest customer was, at all relevant times, Macy's, Inc.



("Macy's").  In the fall of 2006, the Company announced an exclusive, long-term deal with Macy's

rival, J.C. Penney Company, Inc. ("JCPenney's").  When investment analysts questioned the effect

of the deal on the Company's relationship with Macy's, defendants assured the market that different

brands would be sold at Macy's and JCPenney's *and* that both retailers were on board with this

concept.  This was not the case:  In late November 2006, in a face-to-face meeting, Macy's CEO told

Liz Claiborne's CEO that he was "furious" because products would be sold at JCPenney's that

directly competed with those sold at Macy's; Macy's orders were significantly slashed to punish Liz

Claiborne.  Nevertheless, when repeatedly asked, defendants continued to publicly represent that the

Company's relationship with Macy's was not endangered by the JCPenney's deal.  On May 1, 2007,

the Company announced catastrophic first quarter 2007 ("Q1'07") results and projected declines in

sales of core Liz Claiborne brand items, *inter alia*, for the latter part of 2007—which defendants

attributed in large part to deep cuts in Macy's orders and other fairly-recent events.   LIZ's share

price tumbled by $7.72, more than 17%, in a single day.  Although surprised by the bad news, the

market did not believe the factors leading to the crisis were either recent or unforeseeable.  One

analyst stated: "Coming from industry, this analyst is extremely skeptical that the confluence of

factors all occurred in the past 60 days."  CEO McComb's description of the fateful November 22,

2006, meeting, in subsequent interviews demonstrates that the analyst was correct.  Defendants'

material misrepresentations and omissions during the Class Period injured investors; Lead Plaintiff

and the Class are entitled to redress.

2.      Although the Class Period is relatively short, it followed the culmination of several

years of major retail industry changes which resulted in Macy's and JCPenney's coming into direct

competition.  The most significant event was the blockbuster merger, in the summer of 2005,

between department-store industry giants the Federated Group and May Department Stores. Immediately thereafter, Macy's became the proverbial 800-pound gorilla. With nearly 900 stores nationwide, Macy's began to flex its muscle with apparel designers. In particular, because it did not compete on price, Macy's was focused upon exclusivity, with its selling point to shoppers being that Macy's offerings were unique and could not be purchased elsewhere.

3.    One year earlier, starting in 2004, JCPenney's sought to remake its image. Seeking expansion opportunities not tied to the building of new shopping malls, JCPenney's ended its heavy presence in malls by embarking on a campaign to build a new kind of stand-alone store. Plans were for seven new off-mall sites in 2004 and for the majority of the 75-100 planned new stores in the next few years to be in the new off-mall format as well. By early 2006, according to an article published by *USA Today* in March 2006, JCPenney's, with a growing presence as a destination department store, was sitting in a sweet spot—ready to pick off customers as several dozen stores were shut down or underwent name changes as a result of the Federated-May merger.

4.    On October 5, 2006, during a month where JCPenney's increased its total number of new format off-mall stores to 45, Liz Claiborne and JCPenney's issued a press release announcing the introduction of a new brand of clothing and accessories for women called "Liz & Co." and one for men called "CONCEPTS by Claiborne," a wide array of merchandise that would be sold exclusively at JCPenney's.

5.    Until several years earlier, when it was absorbed into the core brand, "Liz & Co." had been a "sub-brand" sold at Macy's and other high-end department stores. For this reason, from the day the deal was announced until the end of the Class Period, the Company fielded questions from analysts and reporters who expressed concern that high-end retail customers, such as Macy's, would

react negatively to a deal which put Liz & Co. exclusively in JCPenney's. On each occasion, defendants assured investors both that they had explained to the Company's high-end department store customers that the JCPenney's lines would be different from and not in competition with the Liz Claiborne brand sold in department stores *and* that the high-end retailers and JCPenney's were going along with this plan. This was not the case.

6.      According to a *Fortune* magazine interview published two years later, on Wednesday, November 22, 2006, CEO William McComb went to Macy's Herald Square to meet with the CEO of Macy's, Terry Lundgren. McComb indicated that Lundgren was "furious" with the Company for "creating a less expensive line for JCPenney's that directly competed directly with products sold in Macy's stores." According to McComb: "Terry wanted to teach us a lesson." (Without stating when it occurred, McComb had earlier discussed this same conversation with the *New York Times*, in July 2007. He explained that it was the "use of that precious capital 'L' [in 'Liz & Co.'] that made them crazy.") Although Lundgren was teaching the Company a harsh lesson, defendant McComb did not share what he learned with the public.

7.      The Class Period begins on January 16, 2007. On that day, *Women's Wear Daily* ran a biographical story on the Company's new CEO, entitled "Meet Bill McComb: Claiborne's New CEO Up For The Challenge." The story began by describing the JCPenney's deal as having the potential to cause McComb's "first major crisis": Sources told *WWD* that Macy's is purportedly "miffed" that the Liz & Co. and CONCEPTS by Claiborne brands to be sold by JCPenney's could "denigrate" the Liz Claiborne brand and is considering cutting back space or dropping the Liz Claiborne brand. When asked about this, McComb responded: "You would have to ask Federated, but I would be surprised if that was the case because it is a long-standing and important relationship

for both of us."

8.     One month later, during a February 28, 2007, conference call—after the sales launches of the two lines at JCPenney's—defendant Trudy Sullivan, then-Company President, reiterated the Company's public position, stating, *inter alia*: "Our department store partners realize these new launches are geared toward a distinct and separate customer ... They acknowledge our intent to preserve the marked differences in the product offerings ... [They] remain committed to servicing these loyal brand customers."  On March 21, 2007, when asked whether the high-end department stores were responsive to the Company's strategy, Sullivan replied "absolutely."

9.     Thus, on May 1, 2007, Liz Claiborne shocked the market when the Company reported an approximately 65 percent drop in earnings, forecasted an unexpected decline in annual profit, and disclosed massive cutbacks in orders from Macy's.  Moreover, the Company specifically attributed the very sharp reduction in Macy's orders to the new Liz & Co. and CONCEPTS by Claiborne brands launched at JCPenney's.

10.     On this news, shares of Liz Claiborne declined $7.72 per share on unusually heavy volume, to close on May 1, 2007 at $37.00 per share. The analyst who questioned defendants' claim that negative events only unfolded over the prior 60 days, stated  "we can't help but think that LIZ saw the writing on the wall" back in October 2006 when it announced the deal with JCPenney's. In particular, the analyst noted that LIZ had "halted its share repurchase about the same time it launched Liz & Co. at JCP."

11.     Days later, the *New York Post* reported that Macy's had conducted store checks of Liz & Co. and CONCEPTS by Claiborne lines at JCPenney's (which first appeared in January 2007) and complained that "some of the JCPenney merchandise ... looks too similar to products carried in

its Macy's stores." After detailing areas of similarity, the author noted: "Federated has moved to curtail products that are widely distributed elsewhere, especially in JCPenney's ..." While defendant Trudy Sullivan once again repeated the Company line, stating that the clothing lines were targeted to different customer groups, the author discussed similarities between a number of clothing items and accessories—with the JCPenney's offering priced more moderately than its Macy's counterpart. Expressly noting a greater variation among Liz Claiborne, Jones New York and Charter Club offerings at Macy's, the author stated "To an untrained eye, the Liz Claiborne and Liz & Co. lines could have been more differentiated."

12.     During the Class Period, defendants knew, or recklessly disregarded, that Macy's was going to significantly cut orders of Liz Claiborne brand merchandise as a result of the JCPenney's deal. Rather than coming clean when expressly asked, they continued to assure the market that the Company's high-end wholesale customers understood there were real differences between the Liz Claiborne and the Liz & Co. and CONCEPTS by Claiborne brands. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, Liz Claiborne maintains its principal executive offices within this Judicial District.

16.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.    Lead Plaintiff James Metz, as set forth in the certification accompanying his motion to be appointed Lead Plaintiff, purchased Liz Claiborne common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  Initial plaintiff Angela Tyler purchased Liz Claiborne common stock during the Class Period and similarly suffered damages.

18.    Defendant Liz Claiborne is a Delaware corporation and maintains its principal executive offices at 1441 Broadway, New York, New York 10018.  During the Class Period, the Company operated in the following business segments: Wholesale Apparel, Wholesale Non-Apparel, and Retail.  The Company trades on the NYSE under the symbol "LIZ".

19.    Defendant Trudy F. Sullivan ("Sullivan") was, at all relevant times, President of Liz Claiborne.  On June 29, 2007, the Company announced that after six years, Sullivan would leave

her position at Liz Claiborne to "assume a leadership position at another company." (Ms. Sullivan became the CEO of retailer Talbots in August 2007.)

20.    Defendant William L. McComb ("McComb") was, at all relevant times, CEO and a director of Liz Claiborne since November 6, 2006.

21.    Defendants Sullivan and McComb are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Liz Claiborne's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

22.    Liz Claiborne is engaged primarily in the design and marketing of a broad range of apparel, accessories, and fragrances. During the Class Period, Liz Claiborne's retail business included outlet stores as well as brand name stores, such as Juicy Couture Lucky Brand and Kate Spade. Wholesale sales of clothing and jewelry, under a variety of brand names, were made to

retailers catering to upscale, mid-tier, moderate and contemporary markets.

23.     In the 18 months just prior to the Class Period, the industry was undergoing a sea change.  Two of the country's largest department store chains, Federated Department Stores, Inc. ("Federated") and May Department Stores Company ("May"), merged in 2005 and completely changed the retail shopping landscape.  (In 2007, survivor Federated changed its name to Macy's.) For years, major metropolitan areas were dominated by local department stores.  Even though numerous stores became associated with one of the larger chains,  many retained their names and their regional character.  In the year following the Federated-May merger, that changed: Most of the stores in the May group would become Macy's, which was being branded and marketed as the premier national department store.

24.     Macy's business was very significant to Liz Claiborne.  Macy's accounted for approximately 22% of Liz Claiborne's 2006 and 24% of its 2005 wholesale sales, (including sales to May group stores prior to the August 2005 merger).  Including the Company's retail stores, Macy's accounted for 16% of 2006 and 18% of 2005 total sales.

25.     After the Federated and May merger in late August 2005, with approximately 900 department stores in 49 states and overseas, the $30 billion retail giant became the industry's dominant player.  Within a few months, it became clear that Macy's was, more than ever before, calling all the shots with apparel designers.  Macy's demanded merchandise that was unique or exclusive, items that were not available at other stores.

26.     In a November 21, 2005, article entitled: "Racing to Please Macy's," *Crain's Chicago Business* reported that 100 apparel marketers faced "banishment" from Macy's if they did not "meet Federated's upmarket strategy to differentiate [themselves] from mid-tier retailers, such as J. C.

Penney, where their brands are also carried." A vice president at one such clothing maker, Plugg Jeans, explained: "Macy's management, even before the merger, was starting to scale back vendors with a mid-tier distribution. And now that Federated is bigger than God, they can stand up even more for what they want." While Liz Claiborne was singled out as one of the "status brands" that Federated would retain because consumers "expected to see them," a spokesman indicated that Federated was challenging vendors to come up with merchandise that is "new and distinctive to us."

27.    By late November 2005, the article noted, "[r]oughly a third of merchandise sold in Macy's is exclusive to Macy's." As Macy's market power grew stronger, this trend continued. In April of 2006, for example, Macy's announced an exclusive arrangement with Martha Stewart Living for an upscale home wares collection to debut in the fall of 2007.

28.    By 2006, dozens of stores owned by Federated and May prior to the merger had closed, a side-effect of the massive merger. As of September 9, 2006, all of the former May stores would officially become Macy's stores—including such iconic regional department stores as Chicago's Marshall Field and Pittsburgh's Kaufmann's. As a result, as the title of an article appearing in *USA Today* on August 28, 2006, explained "Competition Grows as Brands Lose Places to Hang Their Wares." The article noted that "[s]ome of the best known clothing and accessory companies, such as Jones Apparel and Liz Claiborne, are dealing with fewer outlets to sell in, thanks to department store consolidation." Moreover, department stores "largely control how merchandise is displayed in their stores, how often it is promoted, and at what prices." However, because Liz Claiborne had opened more of its own stores and diversified its brands, reducing the percentage of its revenue derived from department store sales, former CEO Paul Charron downplayed the impact of the Federated-May store closings: "I've got to bite a short-term bullet ... But those were not the

best stores ... or the more profitable. I do not lay awake at night and worry."

29.     Also in late August 2006, high-end fashion designer Vera Wang responded to high-end department store consolidation by entering into a licensing agreement with Kohl's, a mid-tier department store, to create an exclusive line of lingerie, sportswear and accessories.

30.     On September 7, 2006, on the eve of the name change that would add 400 new Macy's stores to the shopping landscape, making it the nation's largest chain, the Chairman and CEO of Federated, Terry Lundgren, was interviewed on PBS's "Nightly Business Report" by Susie Gharib. When asked about the company's growth strategy, Lundgren responded: "We're trying to fill our stores with exciting merchandise. More and more of that merchandise is becoming unique to us because we are the primary seller of department store goods." Lundgren again emphasized Macy's desire for unique merchandise in the following exchange:

> Gharib:     What about the discounters? They are continuing to upgrade their image with designer labels, whether you are talking about Target or Chico's or Kohl's that now is teaming up with Vera Wang. Are you concerned that those discounters are going to eat away at your market share?
>
> Lundgren:   This has been going on for a long, long time. And it will continue to go on. And what we have to continue to do is evolve. But, ultimately, again, it doesn't really matter what the name of the product is. There has to be the customer demand. In our case, I always look at supply and demand. And if a product is available everywhere, then it is really much less interesting to most consumers. But if you've got the right product and its uniquely yours, that is a big draw and that is what we have in our stores.

31.     When asked whether the model of an all-purpose department store was outdated, he reiterated the importance of unique product offerings, stating: "And so when you put [national branding] together with the products that we stand for, which are clearly different than most of these

other stores that we've talked about, I think that is going to be a magic combination." In closing, Lundgren stated: "...[P]art of this is to launch the brand in a very big and powerful way. I don't think there is going to be many households around the country, and even around the world in major cities that aren't going to know the name Macy's by the end of December of this year."

32.     By 2006, JCPenney's was well into a resurgence after a period of slumping sales in the early part of the decade. An article in *USA Today* on March 2, 2006, noted that JCPenney's was the beneficiary of the "retail industry chaos" which followed the Federated-May and Kmart-Sears mergers in 2005: "J.C. Penney is re-energizing at a time of turmoil in the department store landscape, as two mega-mergers cause name changes and some confusion at malls." In particular, JCPenney's began expanding its "off mall," stand-alone store presence, because "shoppers are heading for stand-alone stores," where sales per square foot averaged almost $100 more for JCPenney's than in its mall stores. The article quoted a knowledgeable high-end department store veteran: "'Penney's has gone after a huge chunk of customers that department stores had given away to Wal-Mart and Target,' says Dan Skoda, a retail consultant who used to be president of Marshall Field's. 'They are people who want to shop at a real department store.'"

33.     By late 2006, JCPenney's announced continued expansion plans, including many in its new "off-mall" format. Seventeen such stores opened in October 2006, bringing the total to 45. JCPenney's also announced that it would add 50 stores a year in 2007, 2008 and 2009.

34.     On October 5, 2006, Liz Claiborne and JCPenney's issued a press release entitled, "JCPenney to Introduce Exclusive New Brands for Women and Men from Liz Claiborne Inc. Liz & Co. and CONCEPTS by Claiborne Designed to Provide Refined Casual Style and Quality for JCPenney Customers Spring 2007 Introduction in Stores and on JCP.com." Therein, in relevant part,

Liz Claiborne and JCPenney, stated:

> J. C. Penney Company, Inc. (NYSE: JCP) and Liz Claiborne Inc. (NYSE: LIZ) announce the launch of Liz & Co. for women and CONCEPTS by Claiborne for men to be sold exclusively at JCPenney. The new lines, designed for the casual needs of JCPenney's customers, will launch in JCPenney stores and online at jcp.com in spring 2007.
>
> Targeting JCPenney's traditional female customer, Liz & Co. features a range of refined casual, versatile sportswear, along with handbags and fashion jewelry and accessories. The CONCEPTS by Claiborne line will also feature casual sportswear as well as a collection of suits, suit separates, dress pants, dress shirts, neckwear, belts and outerwear, targeting JCPenney's modern male customer.
>
> "As we continue to refine our merchandise assortments, we see a big opportunity to further expand our traditional and modern lifestyle segments," said Ken Hicks, JCPenney president and chief merchandising officer. "Liz & Co. and CONCEPTS by Claiborne reflect the quality and value our customers have come to expect from JCPenney and will further reinforce us as a key shopping destination for exclusive and private brands."
>
> Trudy Sullivan, president of Liz Claiborne Inc., commented: "The core of our business strategy at Liz Claiborne Inc. is to offer a diverse portfolio of quality brands that meets the widest range of consumers' fashion needs. The new Liz & Co. and CONCEPTS by Claiborne lines are designed to address the style and value preferences of JCPenney customers, and as such, they will be complete lifestyle offerings of refined casual styles in a wide range of merchandise including apparel, accessories and jewelry, all priced approximately 20 percent to 30 percent lower than our Liz Claiborne and Claiborne lines."

35.     CW1 was a former Vice President and General Manager at Liz Claiborne for a number of years, including throughout the Class Period. CW1's area of responsibility included wholesale sales of the Liz Claiborne brand, and, in particular, sales to Macy's. CW1 was surprised when Charron and Sullivan announced the JCPenney's deal. According to CW1, the relationship with Macy's was already precarious, with Liz Claiborne brand sales slumping for some time. For the Company to allow JCPenney's to use the valuable "Liz" name—diminishing its uniqueness—was simply "the straw that broke the camel's back" as far as Macy's was concerned. (As explained

at ¶¶37 and 53, below, after the class period, McComb publicly admitted that this was true.)  Based upon CW1's relationship with senior personnel at Macy's, CW1 indicated that Lundgren knew that JCPenney's was becoming a big competitor to Macy's.

36.     The history of the brand at issue was also significant.  Liz & Co. was not a new brand. CW1 indicated that the Liz & Co. "sub brand" was sold at Macy's from 1996 until approximately 2002, during the same time frame, in part, that JCPenney's was selling the Crazy Horse brand (the Liz Claiborne brand planned for phase out as a result of the October 2006 deal).  CW1 indicated that the "Liz" name was very important in the industry.  Suddenly, Liz & Co., a brand that had once sold at Macy's, would be an exclusive to JCPenney's.

37.     In fact, a Prudential Equity Group analyst report dated October 5, 2006, made the same point as CW1: "We note that LIZ is replacing a long-standing exclusive distribution agreement under the Crazy Horse label with a dormant department store brand.  We are concerned that the core Liz Claiborne's brand image may suffer longer term by having Liz branded product at lower price points in a more moderately priced channel."  After the Class Period, McComb admitted, in a July 31, 2007, *New York Times* article, that this was exactly what happened: "Liz Claiborne had sold clothes to J. C. Penney for years, under the name Crazy Horse. But the new Liz & Co. name sounded an awful lot like the legacy Liz Claiborne brand.  'It was the use of that precious capital "L" that made them crazy,' Mr. McComb said, speaking of Macy's."

38.     CW1 also explained that while there was some degree of corporate arrogance, a notion that Liz Claiborne was too big to fail, everyone at the Company knew that Liz Claiborne brand sales to Macy's had been falling.  However, combined with sales in other categories, the Company still did very significant business with Macy's.

39.     CW2 worked in the Fragrance Division of Liz Claiborne for many years, including during the Class Period. Although the launch had been rumored for several months, CW2 recalled that the Company held a town hall meeting for employees, just prior to the public announcement, wherein the details of the deal with JCPenney's were provided. CW2 indicated that everyone was startled, because Macy's was the Company's biggest customer: In the world of apparel, if you launch a major line for a competitor, you have to consider how Macy's will react. CW2 discussed the deal with CW2's immediate supervisor, a Vice President, and the person to whom they both reported. CW2 recalled they were also concerned about a bad reaction to the Liz & Co. line.

40.     Because the relationship with Macy's was so important to Liz Claiborne, even before his official first day at the Company, according to CW1, CEO McComb must have known about the ongoing problems. McComb's comments during the conference call at which he was introduced confirm his efforts, especially as a fashion-industry outsider, to get up to speed.

41.     On October 16, 2006, departing CEO Charron introduced the Company's selection for Chief Executive Officer, defendant McComb, who came to Liz Claiborne from Johnson & Johnson, where he was Company Group Chairman, responsible for marketing some of that company's largest-name consumer brands. McComb would assume his position on November 6, 2006. While not a fashion-industry insider, McComb explained why he was well-suited for the job stating, *inter alia*, "[M]y branding work has included major repositioning efforts to update or modernize a brand."

42.     Preparing to hit the ground running on November 6, 2006, McComb indicated that he began meeting with his team, with his "immediate priority" to learn about "the organization, including its culture, its relationship with customers, suppliers and other parties and the financial

underpinnings of the business." After stating "I look forward to sitting down with our customers," McComb added: "I'm particularly interested in the input of our customers and their prospective on how we can continue to work together to develop mutually productive growth strategies, real win-win strategies."

43.     On October 26, 2006, Liz Claiborne held a conference call with analysts to discuss the Company's financial results for Q3'06, announced in a press release issued by the Company that day.  At the outset, former CEO Paul Charron commented: "Of late, we have seen the retail environment begin to improve and consumer confidence increase ... That said, the retail industry still looks to be behaving conservatively in the near-to-mid term as consolidation plays out and retailers focus on inventory management and invest heavily in private-label brands and exclusives."

44.     Also in his initial comments, Charron highlighted the deal struck earlier in the month with JCPenney's:

> We recently announced the launch of two new brands to be sold exclusively at JCPenney beginning in spring 2007, Liz & Co. for women and CONCEPTS by Claiborne for men.  Both lines are designed to be complete lifestyle offerings of refined casual styles in a wide range of merchandise, including apparel, accessories, and jewelry.  This is a big deal with substantial opportunities for volume and profit beginning next year.  It also creates a much more substantial partnership platform from which to launch additional branded initiatives with a retailer like JCPenney, which is winning in today's marketplace.

45.     Defendants Sullivan discussed the success of various retail and wholesale brands during Q3'06:

> In our better area, we continue to be very optimistic about the turnaround of our core Liz Claiborne brand ... Consumers and retailers are responding to our continued efforts to elevate the brand, embracing the noticeably better fabrics and trims, greater attention to detail, more flattering and consistent fits and markedly enhanced value.

*     *     *

Within the men's world, we have been aggressively managing the impact of the Federated-May integration on our businesses.

46.     Questioners were focused both upon the health of the Liz Claiborne brand and the impact of the JCPenney's deal on the Company's relationship with its high-end customers:

| | |
|---|---|
| Kate McShane: | With the Liz Claiborne brand it was very encouraging to hear your comments this morning .... How soon can we expect positive growth in 2007 for this brand? |
| Paul Charron: | ...[T]hings are looking up for the Liz Claiborne brand.  We are not prepared to declare victory on this ... versus calls in the year-ago period .... We are seeing [] progress in the form of receptivity of our key customers to this very important brand. |

47.     Asked about marketing efforts for the Liz Claiborne brand for spring and summer of 2007, both Charron and Sullivan were extremely positive, with Charron underscoring "improved price value" and Sullivan indicating that the Company was "encouraged by our retail accounts' reaction ... It is ... thankfully, a positive dynamic situation in that brand right now."

48.     The Company also provided additional information with respect to the JCPenney's deal announced three weeks earlier.  In particular, what the scope of the "big deal" entailed:

| | |
|---|---|
| Margaret Mager: | [A]bout JCPenney, JCPenney Paul, you said it was a big deal that you were doing Liz & Co.  Can you give us some sense of magnitude? |
| Trudy Sullivan: | It is a big deal from a brand positioning perspective ... [I]t really cleans up or eliminates confusion between Liz Claiborne the department store brand and the brands that are offered into the channel because Crazy Horse had a Liz Claiborne Company notated on the brands ... [W]e have what we think is just a terrific understanding with them in terms of the presentation and the marketing of these brands and their space ... |
| Paul Charron: | The bottom line, Margaret, is that JCPenney is winning at retail.  They are going to be a survivor.  They are going to be a winner, and our approach is to win with the winners ... You should assume this is |

a long-term commitment .... So we're not looking for fewer people to do business with. If you believe that JCPenney is a winner, that this enhancement of our standing with JCPenney augurs well for 2007 and 2008, and 2009 and on into the future. So, that is why I said this is a big deal. And it goes hand in glove with what we are doing in the department stores to differentiate the Liz Claiborne brand. This is not going to be Liz Claiborne knocked off and done at lower price points ...

49.    Recognizing that traditional wholesale purchasers of the Liz Claiborne brand might not see the JCPenney's deal as portrayed—expansion into new channels with new lines, not in competition with established brands—analysts sought additional details:

Lizabeth Dunn:    Okay. And then my second question is related to the Liz & Co launch. Has there been any—I definitely agree with you that JCPenney is a winner in this landscape as it consolidates and has been tremendously impressed with a lot of things they have done on the brand side. Has there been any pushback from the better department stores or comments, one way or another, that you are taking a brand that used to sell in Federated to the Penney's level?

Trudy Sullivan:    Liz, we have had a lot of dialogue with our department store partners. We have explained exactly what our intentions with Liz & Co. They remembered when we discontinued these brands because we they had very low awareness in their space and we were consolidating to the big brand, which is the Liz Claiborne brand. We explained at great length our strategy here, in no way does this impede our strategy for the core Liz Claiborne brand. We will continue to elevate and market aggressively and really treat the Liz Claiborne brand as the premium brand in the better zone in their space, as it deserves to be. And there are a number of examples. This is not a new event in the firmament. There are a number of brands that have successful businesses, both in the traditional department stores and in the mid-tier laying. And so this is not a new concept in terms of how the industry is performing these days.

50.    When asked whether Liz & Co. would be on a par with the Crazy Horse brand it would replace in the spring of 2007, Sullivan and Charron emphatically stated it would be far bigger:

Trudy Sullivan:        You can assume that the launch of Liz & Co. is a pretty significant launch across multiple categories ... [I]t has a pretty big footprint in the JCPenney stores.  And then hopefully, both JCPenney and Liz Claiborne—hope that it will continue to grow over time.  But it is a pretty compelling brand launch, and we have got some exciting plans for it.

Robert Ohmes:        So Liz & Co. Year One should be bigger than Crazy Horse?

Trudy Sullivan:        Yes.

Paul Charron:        Very definitely.

Trudy Sullivan:        Definitely.

Paul Charron:        And in Year Two and Year Three, much bigger.

51.      Reaction to the portions of the conference call concerning improvements in sales of the core Liz Claiborne brand and the new deal with JCPenney's appeared positive:

a.      In an October 26, 2006, report, analyst Cowen & Co. rated LIZ an "outperform,"  stating, in part: "we believe the co[mpany] remains poised to drive accelerating rev[enue] and EPS growth in FY07 and l[ong]-term through a greater mix of higher-margin lifestyle brands..."  The analyst also noted "improvements in sell-through in the core Liz Claiborne brand" and "LIZ's progress in partnering with successful retailers on new brand development (notably JCP and KSS);"

b.      On October 27, 2006, a JP Morgan analyst report rated the stock "neutral," with its positive notes including "we are encouraged by upcoming new product launches;" and

c.      A Morgan Keegan report, dated October 27, 2006, rated LIZ "market perform."  While conservative FY07 guidance due to changes in management and concerns

about the Company's retail business "leaves us on the sidelines," the report stated that one

reason to "get on board" would be "stabilization in the core brand"—which the analysts

believed was, in fact, occurring.

52.     The following week, during a November 2, 2006, Sales Call, Ed Merritt of

JCPenney's Investor Relations, discussed the deal with Liz Claiborne and JCPenney's rapid

expansion:

> On October 5 with Liz Claiborne, we jointly announced the launch of two new exclusive brands at JCPenney available at spring 2007. Liz & Co. is our traditional women customers and features a range of refined casual, versatile sportswear, along with handbags, fashion jewelry and accessories. And CONCEPTS by Claiborne for our modern male customers will feature casual sportswear, as well as a collection [sic] suits, suits and separates, dress pants, dress shirts, neckware, belts and outerwear. These brands are an ideal complement for their respective customer, and amongst several, we have or will add to our assortments to further enhance our position as the number one choice for the modern customer. Our Ambrielle intimates line, which we announced in late September, is another example of how we are making this connection with our current customers and working to attract new customers.

*     *     *

> This past month was also a period of accelerated store growth for us. On October 6, we opened 20 new stores of which 17 were in our new off-mall format. We now operate 45 off-mall stores. So, in total, we opened 28 new stores this year in markets throughout the United States.

> And beginning in 2007, we plan to open about 50 new stores per year through 2009, primarily in our off-mall format.

53.     Defendant McComb's infamous November 22, 2006, meeting with Macy's CEO

Lundgren was recounted by McComb in an article which appeared in *Fortune* on December 4, 2008:

> Back in 2006, on the Wednesday before Thanksgiving, [McComb] left his office at 1441 Broadway and walked the six blocks to Macy's Herald Square for his first meeting with CEO Terry Lundgren. Macy's is Claiborne's largest customer, and Lundgren was furious at the apparel maker for creating a less expensive line for J.C.

Penney (JCP, Fortune 500) that competed directly with products sold in Macy's stores.

No matter that Claiborne's prior management had created the new label, Liz & Co., McComb took the beating. A few months later, Macy's slashed orders for the spring season. That devastated Claiborne's earnings, which plunged 65% and wiped out $785 million in market capitalization overnight. "Terry wanted to teach us a lesson"; McComb says. Macy's declined to comment for this story.

McComb's solution to the Macy's problem was to pluck [Isaac] Mizrahi from Target .... the new Liz line that Mizrahi would create would not be offered at J.C. Penney's ... ensuring that Macy's and a few regional stores would have unique merchandise. Within an hour of signing Mizrahi, McComb received a congratulatory call from Lundgren.

The *Fortune* article confirmed statements previously published in a *New York Times* article on July 31, 2007. Specifically, in addition to the meeting on November 22, 2006, CEO Lundgren apparently made his point on more than one occasion: " 'You have lost your most-favored-nation status' at Macy's, Mr. Lundgren told executives at the clothing company, according to people who witnessed the conversations." In an email explaining that remark, CEO Lundgren told the *Times* reporter: "[O]ur customers come to Macy's expecting to find merchandise that is not widely available."

54.     Less than one month after he ripped into CEO McComb for launching competitive lines to the Liz Claiborne brand at JCPenney's, Lundgren was interviewed by the *Wall Street Journal*. On December 17, 2006, in an article entitled "Miracle on 34th Street Terry Lundgren: The Man at the Top of the Retail Heap," Lundgren continued to tie what the author described as "department store revivalism" to brand exclusivity. Explaining how Macy's would define itself in the next five years, Lundgren stated: "In our case ... it's defined by the brands we carry, and more and more of our brands will be unique to Macy's or Bloomingdale's." After discussing the exclusive housewares deal with Martha Stewart, the article continues: "These exclusive arrangements are

another sign of Macy's resurgence, Mr. Lundgren argues." The author adds: "The motive behind offering fashionable, exclusive merchandise is, of course, to attract more buyers and move the basis of competition with other stores away from price." Elsewhere in the article, Lundgren stressed: "We have more fashion than the off-the-mall stores, the discounters, the other guys." However, Lundgren himself admitted that JCPenney's was hot on Macy's heels. When discussing the relative hierarchy of department stores, the pecking order was listed as Bloomingdale's and Nieman Marcus, then Nordstrom, Macy's, JCPenney and Kohl's "and so on, down to Wal-Mart."

## Class Period Misstatements and Omissions

55.    On January 16, 2007, a lengthy article was published by *Women's Wear Daily* profiling defendant McComb. The article's lead concerns big trouble potentially brewing between Liz Claiborne and Macy's:

> After a mere two months in the job, William L. McComb could be facing his first major crisis as the new chief executive officer of Liz Claiborne Inc. And its involves no less a customer than Federated Department Stores Inc.

> Sources said that the $22.4 billion Federated is miffed that J.C. Penney plans to launch the Liz & Co. brand throughout its stores, which Federated feels denigrates the Liz Claiborne brand. Starting this spring, the Liz & Co. casual line will be sold exclusively in all 1,021 Penney's stores. Sources say Federated may be looking to cut back space for the Claiborne brand as the retailer focuses more on exclusive collections and its private label business—or it could drop Claiborne's licensed products.

> When asked in December about whether Federated was considering dropping the Liz Claiborne brand McComb responded: "You would have to ask Federated, but I would be surprised if that was the case because it is a long-standing and important relationship for both of us." A spokesman for Federated said, "Liz Claiborne will continue to be an ongoing brand at Federated," but declined to comment further.

> The industry will be watching closely as to how the ceo uses his marketing background, resounding optimism and team-building philosophy to deal with Federated's pique—and the impact it will have on the company's core Liz Claiborne

brand, which has been struggling for several years.

56.    McComb's statement was false and/or materially misleading for the following reasons:

a.    As CW1 explained, the relationship was deteriorating, as sales of the Liz Claiborne brand had been slumping for some time;

b.    As CW2 indicated, Liz Claiborne employees were surprised by the JCPenney's deal as they were concerned about how it would affect the relationship with Macy's;

c.    On November 22, 2006, Macy's CEO Terry Lundgren had already told McComb he was "furious" about the Company launching new lines that would directly compete with products sold at Macy's. Specifically, as later admitted by McComb, although Liz Claiborne had the Crazy Horse brand at JCPenney's for years, the "Liz & Co." name was a big problem: "It was the use of that precious capital 'L' that made them crazy;" and

d.    At the November 22, 2006, meeting, and possibly others, witnesses heard Macy's CEO Lundgren tell McComb "you have lost your most-favored nation status" at Macy's. As explained in ¶26, above, shortly after the Federated-May merger, Macy's wielded enormous power and decided to cut many designers. At that time, Macy's had treated Liz Claiborne as a "status brand" that would remain on the selling floor.

57.    The statements and/or material omissions were made with scienter because:

a.    McComb was made aware, in a face-to-face meeting, of Lundgren's fury at the JCPenney's deal. McComb stated that Lundgren was going to "teach us a lesson;"

b.    Lundgren, the very public face of Macy's, repeatedly emphasized—for more

than a year—that Macy's sought to make its mark with shoppers by carrying exclusive and unique products. It was widely discussed in the media that after the Federated-May merger, that Macy's had become "bigger than God" and was in a position to call all the shots with apparel makers. *See* ¶¶2, 23, 25-27, and 31 *supra*; and

       c.     McComb indicated when he took the reigns as CEO of the Company that he would learn all about Liz Claiborne's customer relationships. ¶42, *supra*. Lundgren made it clear in both his September 2006 interview (¶30:"[I]f a product is available everywhere, then it is really much less interesting to most consumers. But if you've got the right product and its uniquely yours, that is a big draw and that is what we have in our stores.") and his December 2006 interview (¶54: "The motive behind offering fashionable, exclusive merchandise is, of course, to attract more buyers and move the basis of competition with other stores away from price.") that Macy's had no interest in selling items that were readily available in many other locations. The "big deal" the Company made with JCPenney's was going to put competing products in 1,021 JCPenney's locations, *see* ¶¶34, 44, 48, and 50, *supra*—and even more as JCPenney's opened 50 new stores a year from 2007 through 2009 (¶¶3, 33, 52, 60, *supra*).

58.     On February 8, 2007, JCPenney's conducted its January Sales Call. Therein, Ed Merritt, Manager of Investor Relations, stated: "[W]e're seeing a favorable early response to Liz & Co. in traditional women's apparel and Concepts By Claiborne and men's modern apparel. Both brands will officially launch in mid-February across stores, jcp.com and catalog."

59.     On February 21, 2007, the Buckingham Research Group published an analyst report a week in advance of the Company's reporting of Q4'06 operating results. While issuing a "neutral"

rating because of the transition to new management, the analyst expected the Company to give initial

sales and earnings guidance for 2007 during the conference call.  The analyst expected conservative

figures for several reasons, one of which was: "[O]ur industry sources indicate that F[ederated]

D[epartment Stores] may start to cut back on the core Liz Claiborne business due to LIZ's decision

to sell Liz & Co into JCP."

60.     On February 22, 2007, JCPenney's held its Q4'06 earnings call with investors and

analysts.  Highlights included statements from President Ken C. Hicks and Chairman and CEO

Myron E. Ullman which stress both the Liz Claiborne name on new, exclusive product lines and

JCPenney's direct competition with Macy's—particularly in the wake of the industry mergers and

consolidations in 2005-2006:

| Ken C. Hicks: | [W]e have just launched two great exclusive brands for JCPenney with one of the most important lifestyle brands in America, Liz Claiborne and Company. Liz & Co. is being carried in our women's apparel accessories and shoe areas and Concepts by Claiborne can be found in men's. We are pleased to offer thee two brands, which arrived in stores in mid-February and initial results confirm that our customers think they're great and truly reflect the qualities they told us that they want. |
|---|---|
| | *          *          * |
| | Liz Claiborne, Sephora, American Living [an exclusive Polo Ralph Lauren brand], all powerful brands that differentiate JCPenney from our competitors and are integral to our focus on making an emotional connection with our customer. |
| Myron E. Ullman: | The addition of Ambrielle, Liz & Co., Concepts by Claiborne, and American Living will further differentiate and solidify JCPenney as the lifestyle shopping destination for style and quality at smart prices. |
| | ... [W]e added 28 new store locations in 2006, mostly in our off-mall format. |

Q: Adrianne Shapira:    ...Mike, just looking out to the year can you share with us any thoughts in terms of how you plan to anniversary the closures of some of those Federated doors that clearly helped your comps last year.

A: Myron E. Ullman:    Well, we feel that we are open every day for business and we'll take customers from any place we can attract them ... We think we have compelling assortments, differentiated ideas, and engaging our associates to have relationships with customers ... will, in fact, differentiate us from most of our competitors.

                                    *        *        *

Q: Jeff Klinefelder:    One quick follow-up in terms of market share gains that you are likely receiving as a result of consolidation .... increasingly, Penneys is being referred as the place that a lot of volume is going, any volume that is lost in the department store channel, traditional department store channel is being picked up by Penney's and maybe a competitor or two ... Any perspective you could add on that would be helpful? Thank you.

A: Myron E. Ullman:    There are certainly vendors that were dropped by competitors during consolidation that we have been in close contact for years and wanted to do business with. And that was a unique opportunity for us to say we have got a lot of customer[s] that really appreciate your products. And we have seen great responses when we have put it in, make sure we have the sizes and the assortment that they are looking for ...We have comparable quality, comparable style at smarter prices. So we believe that we can compete effectively with our department store competitors ...

61.    On February 28, 2007, Liz Claiborne held a conference call with analysts to discuss the Company's financial results for Q4'06 and FY'06, amplifying on the figures contained in a press release issued by the Company that day. In that release, the Company noted that not only would it delay full-year guidance to July, but that it would discontinue its practice of providing quarterly guidance.

62.     During the presentation portion of the conference call held on the morning of

February 28, 2007, defendants stated, in relevant part:

McComb:          We have been pleased with the performance of our wholesale apparel
                 business and we have taken steps to further improve in this area.  We recently
                 launched our Liz & Co. and CONCEPTS by Claiborne brands exclusively at
                 JCPenney.  Penney stores have consistently performed well in the market
                 place and we believe this new relationship has the potential for tremendous
                 upside.

                              *          *          *

Sullivan:        Moving to our core Liz Claiborne brand, we continue to be encouraged by the
                 brand's performance.  We sustained the positive momentum from the third
                 quarter with the domestic wholesale apparel business posting low double-
                 digit net sales gain ...

                 Recently, we announced the launch of Liz & Co. and CONCEPTS by
                 Claiborne, which are debuting this spring in JCPenney. We remain focused
                 on maintaining a clear distinction between these core brands and the diffusion
                 line by continuing to elevate the product offering for department stores, and
                 by enhancing the image of the core brands through greater marketing
                 commitments, both in in-store support as well as a meaningful increase in
                 national advertising.

                 Our department store partners realize these new launches are geared toward
                 a distinct and separate consumer, one who shops in a different venue and in
                 a different price zone. They acknowledge our intent to preserve the marked
                 differences in the product offering, as well as the consumer's esteem and
                 desire for both Liz Claiborne and Claiborne in store stores. It is precisely for
                 these reasons that our department store accounts remain focused on the
                 performance of these businesses, and remain committed to servicing these
                 brand-loyal consumers.

63.     Sullivan's statements in the last two paragraphs—to the effect that both JCPenney's

and high-end department stores were on-board with the idea of selling and marketing distinct product

lines for different customer bases—made on behalf of the Company and not corrected by McComb,

although he had a duty to do so, were false and materially misleading when made, and made with

scienter, because:

        a.      As set forth in ¶¶56-57, Macy's CEO, Terry Lundgren, was one department store partner who did not "realize" the launches were geared to separate customers and told McComb that he was furious at Liz Claiborne for launching lines at JCPenney's that competed directly with products sold in Macy's stores;

        b.      Due to the fact that Macy's was the Company's largest customer, Sullivan and McComb knew or should have known that Macy's CEO Lundgren viewed JCPenney's as a rival. *See* ¶¶35 and 54;

        c.      Having entered into a "big" long-term deal with JCPenney's, a deal with a "tremendous upside," Sullivan and McComb knew or should have known that JCPenney's had stated its intent to use Liz Claiborne and Ralph Lauren product lines, *inter alia*, to compete head-to-head with traditional department stores such as Macy's, particularly after the consolidation arising from the Federated-May merger (*see* ¶¶3, 28, 32, 34, 52, and 60). At the end of the Class Period, McComb expressly acknowledged this fact (¶83);

        d.      Even assuming that defendants had intended to create and market distinct product lines, analysts (¶¶37 and 59), and an industry publication (¶55) had already expressed concern that the mere use of the former department store "Liz & Co." brand at JCPenney's could be seen as detrimental to the core Liz Claiborne brand; and

        e.      As McComb admitted at the end of the Class Period, *see* ¶83, the "front-loaded" advertising campaign for the core Liz Claiborne brand was "designed to support all of the Liz brands, including Liz & Co.," as the Company and Sullivan made the "very smart [decision], in being solid brand managers," to replace "Crazy Horse" with "Liz & Co." and

to "make the investments on the floor and create the kind of brand halo that frankly the Liz Claiborne brand deserves to have."

64.    During the February 28, 2007 conference call, McComb and Sullivan responded to analysts' questions:

Jeffery Edelman:    Bill, a simple question for you—what was your single biggest takeaway after meeting with your larger customers? Are they looking to do more business with you? Is it going to be a struggle to maintain your business relationship? If they want diversification and differentiation, can Liz provide it, or are they going elsewhere?

McComb:    I think that our customers—there are always I will call it executional or tactical or even specific strategic issue with one brand or another brand, and there's always attention back and forth about distribution. But by and large, what my biggest takeaway is that our customers see the vast capability that we have and our ability to buy brands, to market brands, to take them globally and to build brand power. So I see a significant openness and eagerness to partner with our company, in spite of any specific tensions that might exist on a given brand or on a given issue.

So I would say that we remain very well-regarded as a partner, and the conversations that I have had are very, very future-oriented and talking about what we can do to power up their particular strategies. I think that that's the way the conversations need to go.

I will say that you do here a strong theme in my conversation with you about the emphasis on building irresistible product. That comes out of the number-one point that our wholesale customers have to say to me is that more than anything, that's what they need our company to do. They want us to deliver strong brand propositions, because that helps deliver customers in their stores.

Unlike the packaged goods environment that I come from, we reinvent our product lines at least five times a year. The product is the brand, and having a very strong capability and

culture around product is what the retailers are looking for us to do. Therefore, you're seeing that emphasis in the conversations that I'm having.

65.    With respect to the relationship with Macy's, this response was materially false and/or misleading when made, and made with scienter, because McComb knew, or should have known, that the problem with Macy's was not merely strategic or tactical execution issue, there was going to be a struggle to maintain the Macy's relationship with respect to the core Liz Claiborne brand, and the Company was not currently a "well-regarded partner." As set forth in ¶¶53, 56-57, and 63, CEO Lundgren was "furious" about the JCPenney's deal and Liz Claiborne was going to "lose its most-favored nation status," to make room for unique and exclusive fashions on its selling floor.

66.    Near the end of the call, an analyst again asked defendants about the impact of the Liz & Co. launch on sales of the Liz Claiborne brand, which had just begun to rebound:

David Glick:   Just a few follow-up questions on the core Liz Claiborne brand. First of all, Trudy, congratulations on the great progress you all made in the Liz Claiborne wholesale sales in Q4.

Sullivan:   Thank you David.

David Glick:   However, do you have some potential concerns, or are there concerns over the Liz & Co. launch in Penney's among other departments store executives? Can you sustain the same kind of momentum you saw in the Liz Claiborne wholesale business in Q4 throughout 2007? What is the tone of the—you alluded to it in your opening comments. What's the tone now among other retailers? Are they still concerned, are they over it, are they encouraged by the selling, are there any floor space or quality-of-location issues as potential fallout? I just wanted to get a little more color on that.

Sullivan:   ...[K]ind of all of the above. I think that there's a tremendous, you know, initially, there was a lot of what I would call robust discussion around the wisdom of it. I think our department store accounts are pleased with what they're seeing about Liz Claiborne. They want to see it sustainable over time, as do we, so we are pleased with where we have brought it. They clearly know the esteem and regard that their customers have for both Claiborne and

Liz Claiborne, and that has never been in question. And so, our commitment to them is that we will have very separate and distinct and elevated lines in department stores that are absolutely suitable for what our customers are telling us they want to find in their stores, and I would say, for the most part, they are tracking right along with us. That's a very valuable consumer to them, and they want this consumer well-served. They want us to do a good job in terms of the lines that we put into the market. That's what we're focused on doing, and so I would say that it certainly is our intention to maintain this momentum.

McComb:    It does look—reflect back on the Group President realignment, though. I mean, central to this initiative, in theory, is segmentation. As Trudy said, the Liz Claiborne apparel lines in the traditional department stores have a distinctive and elevated product presentation versus what we're doing with the diffused line.

Sullivan:    It's important also to understand that there's a very attractive consumer in the mid-tier world, that shops at a different price level and is in a different consumer segment, and that these brands are strong enough to be able to pursue this kind of segmentation approach. You could certainly look at the market and see that there are other strong brands that have successfully done this as well. So we are equally as excited about the quality of what we're putting into the market under Liz & Co. and Concepts by Claiborne, and we're very committed to the success of those lines for JCPenney as well.

67.    Sullivan's and McComb's responses were false and/or materially misleading, each breached their duty to correct the other's misstatement, and the statements were made with scienter, for the reasons set forth in ¶¶53, 56-57, 63 and 65, above. Additionally:

a.    Witnesses heard Macy's CEO Lundgren make the remark to CEO McComb "you have lost your most-favored nation status."—a remark he did not deny making. Therefore, defendants knew yet failed to disclose there was, in fact, a floor space and/or quality-of-floor space impact at Macy's from the launches at JCPenney's—something they eventually admitted at the end of the Class Period. Not only would certain Macy's stores not carry the Liz Claiborne brand at all, there would be floor reductions at other Macy's stores

as well. *See* ¶¶79-80.

      b.    Defendants also materially misled the market about using a "segmentation approach" to target the core Liz Claiborne brand and Liz & Co. to different segments of the market; they knew or recklessly disregarded, as admitted at the end of the Class Period, *see* ¶83, that the advertising campaign for the core Liz Claiborne brand was intended to support Liz & Co. sales as well, with the change from "Crazy Horse" to "Liz & Co." intended to create a "brand halo" around the Liz Claiborne brand.

      68.    Analysts' reactions to the Company's operating results were cautiously optimistic about LIZ's long-term prospects and looked forward to FY'07 guidance in July. Morgan Stanley raised its price target by $3 to $43, based upon confidence that changes in 2007 will reap rewards in 2008. Citing primarily the same reasons, Cowen and Company, rated LIZ an "outperform" "over the next year to year-and-a-half." Cowen noted that the "long-awaited turnaround of the core Liz brand ... should boost mgt credibility." Also noting improving trends in the core Liz Claiborne brand and expenditures on "power brands" to fuel long-term growth, Credit Suisse raised its price target for LIZ from $42 to $47. However, Morgan Keegan pointed to a lack of visibility and lack of reliability to only retain a "market perform" rating. That analyst noted that the Company had not repurchased any of its stock in Q4'06, for the first time in two years.

      69.    On March 1, 2007, JCPenney's Chairman and CEO Myron Ullman was featured in a Management Discussion session at the Bear Stearns Retail, Restaurants & Consumer Conference. When asked whether a JCPenney's core customer would reject Sephora, American Living and Liz & Co. brands, Ullman responded: "[I] think the issue is not about raising the price. The issue is style, quality, price, balance and earning it ... [Our] success for the last couple of years kind of

---

validates that customer is willing to pay more when we get it right."

70.     The questioner noted that during JCPenney's turnaround period, one key competitor was Kohl's and asked who JCPenney's was currently benchmarking against. Ullman responded: "[T]o do the same thing that Kohl's does is really not an objective. I think putting the attractions in the store, the difference is I think Sephora inside JCPenney .... American Living will turn out to be, across the store, the single biggest branded lifestyle statement in the store and we'll be distinctive and different than you'll find in our key competitors. I think Macy's is probably a great idea to be combined to [sic] companies and have 800 plus stores across America ... We compete with everybody..."

71.     On March 2, 2007, JCPenney's conducted its February sales call. Investor Relations Manager Ed Merritt reported the early success of the two new lines: "Customer response [to] Ambrielle, our new private brand in lingerie, and our new Liz Claiborne lines, Liz & Co. in women's and Concepts [by] Claiborne in men's which all launched in February have been very strong where sales are way ahead of our expectations..."

72.     On March 21, 2007, Liz Claiborne participated at the Merrill Lynch Retailing Leaders Conference and made a presentation to research analysts, investors, and other market participants. Therein, in relevant part, defendants McComb and Sullivan, stated:

> Q:      I was asking about the Liz Claiborne brand and the thing I want to get a sense from you guys as how you revitalizing it—I meant still selling through department stores? What is the long-term potential for this brand?
>
> Sullivan:   No, we are extremely pleased with the progress that's made in the Liz Claiborne brand ... But the response to the upgrades, I know a number of you who at the channel sector is hearing the same thing we had some incredibly positive feedback on what is happening with the Liz brand right now so we tend to keep going.

\*    \*    \*

Q:      Going back to the wholesale channel, can you just discuss some of the opportunities and challenges with Federated, now that they're such a big part of the department store world?

McComb:   Yes. I think that we probably said, and you have heard over and over, that their integration of the May stores was significant and nothing else—no other consolidation like it in its history. And as they go through the process of integrating, as their partner, we and all of our other wholesale competitors go through those ups and downs. I think that—I'll tell you—I may give you a slightly different answer—I think the real question is how can we help Macy's in particular? Macy's which is the business in the most transition, how can we support them as a vendor? How can we continue to engineer a supply chain and deliver brand propositions to them that help them with their goal of driving more traffic into stores? And doing in effect for Macy's what we plan to do in our doing with our own specialty retail stores.

And so I think that there are opportunities to have some pretty compelling conversations and the deployment of our own resources to step away from this model that we've had historically that can be win/lose or lose/win, and talk about really helping them even more accelerate their front-end consumer goals by bringing to the table what we can bring to the table, which is product flow and speed, quality of product and design, and brand power. And that's what we're doing. I think that they—the department store world, I think if I traced analysts' reports of that industry going back to the 90s, early 90s, every quarter looks the same, there's a tremendous amount of challenge from other channels, it's an industry in flux, there's no question. But Macy's is now on a pretty special strategy that's tied to their brand power and national advertising. I think we as a vendor that has supported them and they've supported us, I think that we need to frame the question that way that I just did, and that's what we're doing.

And that's the Macy's Federated piece. We feel the same way about Belk, about Bon-Ton Carsons, and Dillards, and those principals are very engaged in those conversations with us and we care a lot about their businesses and we want to know—I mean, Dillards has a great vision for their company and we want to be right there supporting it. And doing it in a different way than we have before.

So I will tell you that the real answer to your question, it's about innovation and it's not about tricky margin management or those games that we've been playing in the past.

Q:      Just following on that, Trudy, how would you sort of characterize your relationship today with the department stores and the national chain? Are you —how would you characterize the relationship? Is it improving? There's a case to be made out there that they're all going vertical, where they want special stuff and that's just to mediate [phonetic] the historical big guys. Can you talk a little bit about it?

Sullivan:    Bill's comments are exactly right on. We're looking to continue to innovate with—these are tremendous trading partners for us. And for the most part they had great relationships [we're] both on a quest for innovation, we're both on a quest to really delight consumer that is go into those spaces. We think we have tremendous brand capabilities we can bring whether it's to a JCPenney or a Macy's. So I think we're on a quest to innovate and to continue to grow our businesses together.

We would like to evolve away from the classic buy/sell model that has been so characteristic of this industry and we believe that we have insights from our direct-to-consumer experience that we can bring over into this world, as well as our brand development capabilities. In every case, we work on big, successful brands with a number of these partners. So we are really on a quest to continue and actually increase the pace of innovation and how we actually conduct business together. That's a very exciting topic.

Q:      Are they more responsive to that message?

Sullivan:    I'd say absolutely as a—potentially a principal on high-level absolutely. I mean they are fully engaged in these discussions with us since. And these are, big cultural changes and it takes [indiscernable] in order to bring it to there.

73.     The statements contained in ¶72 were materially false and/or misleading when made because defendants gave the false impression that: (1) they were working well with Macy's, "supporting" Macy's with its "very special strategy that's tied to their [sic] brand power and national advertising;" (2) that the Company's relationships with national chains were "great;" (3) that department stores are "absolutely" responsive to the Company's innovative approach to growing