their businesses together; and (4) that there was renewed interest in the core Liz Claiborne brand at department stores.

74.     The false and/or materially misleading statements contained in ¶72 were made with scienter for the reasons set forth in ¶67.  In addition, defendants ultimately attributed a substantial part of the Company's disastrous Q1'07 and declining orders for the second half of 2007 to significant cutbacks by Macy's.  By March 21, 2007—ten days before the end of the quarter—defendants knew or should have known the extent to which Macy's Q1'07 Liz Claiborne brand orders had already been scaled back, as Macy's CEO Lundgren had months earlier indicated. (Indeed, when defendants finally admitted what had happened, they claimed that the negative events occurred in the last 60 days, *i.e.*, between the February 28th and May 1st conference calls.  With respect to Q1'07 sales, however, almost the entire quarter had elapsed by the time of the Merrill Lynch conference on March 21st.)

## Disclosures at the End of the Class Period

75.     On May 1, 2007, Liz Claiborne shocked investors when it issued a press release entitled, "Liz Claiborne Inc. Reports 1st Quarter Sales And EPS."  The Company reported that its first-quarter earnings had plunged approximately 65% and forecasted an unexpected decline in annual profit.  For the first-quarter, Liz Claiborne reported net income of $16.2 million, or $0.16 per share, a significant decline from $46.9 million, or $0.45 per share, reported a year earlier.  The Company said that clothing sales to chains such as Federated Department Stores Inc.'s Macy's declined 7.4% and that first-quarter sales fell 1.6% to $1.15 billion.  Excluding some expenses, profit was $0.22 per share, well below the consensus estimate of analysts for a profit of $0.60 per share on sales of $1.26 billion.  The Company forecasted profit for 2007, excluding restructuring costs,

---

between $1.90 and $2.05 per share, which was well below the average estimate of $3.13 per share

among eight analysts surveyed by Bloomberg. In the press release, Defendant McComb, in relevant

part, stated:

> Clearly, we wish we could have reported better first quarter earnings and provided
> a stronger outlook for the year. Our first quarter results reflect significant challenges
> in our domestic wholesale business, partially offset by improved direct to consumer
> performance. Results were driven by lower than anticipated domestic wholesale
> re-orders, higher levels of markdowns across the domestic wholesale channel and
> changes in the retail calendar that shifted some shipments into the second quarter.
> Beyond these first quarter results, we have seen an acceleration of many of the
> negative trends that have impacted our wholesale business over the past few years,
> resulting in Fall orders that are substantially below those levels originally discussed
> with several of our major retail partners. Due to this increasing pressure in our
> domestic wholesale business, we now expect a significant shortfall in projected 2007
> earnings compared to both our internal plan and last year's results.

> McComb continued, "At the same time, we have many bright spots in our portfolio,
> including retail sales growth in the mid-teens for the quarter, reflecting strong results
> from our Juicy Couture and Lucky Brand businesses, as well as our newly acquired
> Kate Spade business. We also benefitted from improved margins in our outlet and
> Mexx Europe business and the highly successful launch of Liz & Co. at J C Penney,
> which is trending ahead of plan and is an emerging growth brand."

> Mr. McComb concluded, "It is clear that these projected results mark a sea change
> in how we must run our wholesale business. We must evolve our operating platform
> to deal with near-term challenges and achieve sustainable growth. We expect to build
> on our strengths, particularly our high-potential brands and rapidly growing retail
> segment. The actions we are taking are aimed at building the business not for one
> quarter but for the long haul."

76.    On May 1, 2007, Liz Claiborne held a conference call with analysts to discuss the

Company's financial results for Q1'07 announced in the press release issued that day. Therein, in

relevant part, the Company stated:

> McComb:    It's clear from this analysis that we have a tale of two cities on our hands.
> There are some remarkable bright spots in our portfolio; lifestyle brands that
> span men's and women's, multiple product classifications in multiple
> geographies, brands that are growing and have significant profit potential. At

the same time, ***the pressure on our Wholesale portfolio from industry trends has intensified significantly***. It's time we take action to address these issues head on, swiftly and intelligently.

*     *     *

The outlook in our Wholesale portfolio has changed since our business plan was developed last fall and refined in the first quarter of this year. In the past 60 days, we have seen an acceleration in many of the negative trends which have impacted our department store business over the past few years. The result is fall 2007 orders that are substantially below those levels originally discussed with several of our major retail partners during the end of the year and even during our market meeting. ***These negative trends within the wholesale space include a greater reliance on private brands magnified by retail consolidation***; a squeeze on moderate brands like Emma James, J.H. Collectibles and Tapemeasure; a ***reduction in sales plans and consumer demand for the traditional*** and bridge ***brands, like*** Sigrid Olsen, ***Liz Claiborne***, Ellen Tracy and Dana Buchman; and ever-growing demands for increased margin. But there are other burning issues in the channel that are impacting our business model with greater urgency and intensity than ever before requiring a sea change in how we operate this Wholesale business, and these include an aggressive call to action from the retailers to improve inventory turns and natural margins on branded goods. This would mean less reliance on an end of season check to achieve artificial profitability. ***An increasing demand by retailers for exclusively branded labels for their floors***, coupled with a reduced reliance on more broadly distributed lines. ***Specifically Macy's, their stated strategy is to continue to raise the penetration of private, exclusive and limited distribution brands which they have indicated already exceeds 80% of their sales.***

*     *     *

***Macy's too is right-sizing orders for a leaner and more productive inventory management, but it is also taking that further step of reducing the sales plan for the Liz Claiborne apparel brand in the back half. We believe that our decision to launch Liz & Co. at JC Penney's was a contributing factor to this reduction, regardless of the fact that the Liz & Co. brand offering differs in targeted consumer, product, price point and promotion strategy. The combined impact at Macy's accounts for approximately 50% of our overall reduced fall bookings corporately.***

Notwithstanding this news, we believe Liz Claiborne apparel can remain an important brand for Macy's, a view supported by consumer research that shows that some of Macy's most loyal and valuable shoppers favor the Liz Claiborne brand. We realize, however, that we will have to make changes in how we do business. To that end, we are rethinking our market cycles, we're refining our sales and shipping models and reviewing our product strategy again. While it will take time to adapt our Wholesale business model, these changes will enhance our ability to serve that retailer. And in the mean time, our product must deliver and we will focus intently on making that happen. We will have more to say in July about the role the Liz Claiborne brand will play in our portfolio. That said, we will continue to support the successful Liz & Co. initiative which is going exceedingly well; even in investment mode, Liz & Co. will be profitable in 2007.

But as I said at the beginning of the discussion, this is a tale of two cities.

\*        \*        \*

Moving forward to meet the challenges and demands of the transforming department store business head on, we will revamp our structure and management of the channel. If we're going to be effective trading partners, we have to help the wholesale accounts deliver best-in-class inventory turn and margin performance.

\*        \*        \*

Sullivan:    In our Liz Claiborne brand, we continue to elevate the product and positioning and are pleased to see the progress we're making this quarter ....But, as Bill discussed earlier, we are now faced with significant new challenges as retailers raise the bar on margin, turn, and sell-through requirements. So despite the progress we've made, this business is projected down in the back half of 2007.

Notwithstanding these pressures, retailers acknowledge the role that well-known national brands such as Liz Claiborne plays with our loyal customers in their stores. Our ultimate objective is to have our brand well represented ... across all of the channels in which we are represented today, Macy's included. We will continue to partner across our account base to ensure we provide this loyal consumer with the newness she wants and products she can't resist.

> A testament to the consumer's affinity for this brand has been the success of our newly launched Liz & Co. exclusive with JCPenney. We remain committed to maintaining a clear distinction between the two lines, offering irresistible product for two different consumers shopping in two different channels.

(Emphasis supplied.)

77.     Defendants finally acknowledged to investors what they knew privately ever since McComb's meeting with Macy's CEO Terry Lundgren in late November 2006: The sharp reduction in Macy's orders of the Liz Claiborne brand was due to the launch of Liz & Co. at JCPenney's. Not coincidentally, right after each defendant spoke about the fate of the Liz Claiborne core brand at Macy's both brought up the successful launch of Liz & Co. at JCPenney's. Despite the assurances that they gave—and continued to give—that both retailers were on board with the concept that the lines were different and the target customers were different, they were forced to admit that Macy's never saw it that way. (As McComb's remarks about JCPenney's during the question and answer portion of the call reveal, *see* ¶83, below, neither did JCPenney's.)

78.     In addition to the stark admission that the Liz & Co. line at JCPenney's cost the Company dearly with Macy's on sales of the Liz Claiborne core brand, which defendants had been seeking to revitalize, the truth about other false and/or materially misleading statements was revealed in defendants' prepared remarks. For example, McComb's statement on March 21, 2007, that "it's about innovation and it's not about tricky margin management" (¶72) was proved incorrect, as Sullivan was forced to admit: "If we're going to be effective trading partners, we have to help the wholesale accounts deliver best-in-class inventory turn and margin performance." Other true facts came to light during the question and answer portion of the call.

79.    Right off the bat, questioners were very concerned about the situation with Macy's.

The first question, was from Margaret Mager with Goldman, Sachs:

Mager:    I have a question on what's going on with your wholesale business and Federated. Can you talk about how this is coming about in terms of executing the reduction in the business? Are you going to be actually exiting some doors or do you stay in all the doors and you just reduce the amount of product in every door? Can you give a little more color around what is exactly going on at Federated? And then, secondly, the rollout at JCPenney and the offset there, could we interpret this as a bit of timing difference as you curtail Federated you ramp up JCPenney and the outlook for 2008 could be more favorable in the Wholesale business ...?

Sullivan:    First of all, talk to you about Macy's. As we look at Macy's refining their really sales [sic] to receipt plans ... we will be exiting a small number of doors at the very bottom end of the performance range ... The stores that we're staying in, which is the majority of them, we really don't have any serious dislocation or space issues that we're dealing with as well.

\*        \*        \*

McComb:    ... I think that, Margaret, the right-sizing of the Liz Claiborne brand sales plan reflects the change in how they intend for the resource to perform for them. Of course, our product has to perform. There is no discussion about significantly decreased retail pad space in the average Macy's store. I think that's an important point to add that gets to what you're asking.

Mager:    It's painful medicine, but it sounds like you're doing what you have to and I wish you the best going forward.

80.    Previously, when asked on February 28, 2007, whether there was any floor space or quality-of-floor-space fallout from the JCPenney's deal, defendants maintained the party line, *to wit,* they were committed to working with their department store partners on an elevated Liz Claiborne line. *See* ¶66. However, defendants knew since November 2006 that the Company had lost its "most-favored nation" status on Macy's selling floor; only during this conference call did defendants finally admit that the Liz Claiborne brand would exit some stores and that space in the average store

would be decreased (albeit not "significantly").

81.    When asked about the future with Macy's, defendants finally painted a realistic picture, revealing that they were not equal partners trying to "grow our businesses together" (¶72). Rather, having lost its "most-favored nation status," defendants admitted that they would now have to convince Macy's—by working on door-by-door assortments—that customers will still come to Macy's to purchase Liz Claiborne brand merchandise:

Mager:          One last question on the JC Penney-Federated situation. As JC Penney rolls up, would we expect, or should we expect, that there will be further reductions in the amount of business done with Federated, or do you think that this is the bottom in terms of your business levels with Federated? Thanks.

Sullivan:        You know, it's difficult to project whether this is the bottom. I have to say, we're taking the opportunity with Federated to do things in a much more evolved fashion in terms of how we handle the Liz Claiborne brand. We are actually partnering with them on door-by-door assortments. I think there's a very good open dialogue. What we have asked is that the brand be well represented in their stores, and so let the consumers vote and so far we have been seeing, even with the launch of Liz & Co. at JC Penney, we have been seeing improving metrics at Federated. So we think there is definitely a wisdom here regardless of anybody's brand that we try to leave the days where we're trying to force into that channel two and three times receipts to sales. It just doesn't promote profitability and we're taking every step we can at this stage to approach this in a much more rational manner with a brand that by everybody's affirmation, their research and our research, has tremendous regard for the customer that shop in their store.

82.    Defendants stated that they had not planned to take such a large hit on second half orders. In the following colloquy with a Merrill Lynch analyst, defendants claimed to have been blind-sided by Macy's move:

V. Genereux:      Trudy, you said that sort of 50% of the planned wholesale reduction was Federated and then I think you mentioned another 20% was Dillard's. Did you have those businesses planned flat or up? Can you tell us where you thought they were going to be?

| | |
|---|---|
| Sullivan: | We actually thought they would be flat to slightly less than flat because we see retailers really tightening up the inventory requirements as it relates to sales. And we have actually seen—Bill mentioned is opening remarks, we've seen Dillard's has been on this bandwagon for a little bit longer and has actually gotten some positive results from it. So they are—not accelerating, but they continue to see how they can continue to improve on already-improving inventory metrics. |
| McComb: | But we were planning, Virginia, traditional first-half/second-half type splits. |
| Sullivan: | Right. Exactly. |
| Michael Scarpa, COO: | And, obviously, we look at where the spring bookings came in and the conversations that our sales executive and general management has with the retailers would indicate that the bookings we received were—obviously was a bit of a surprise to us. |
| V. Genereux: | Tell me about that, Mike, because that's—I feel like this business is, everybody has less visibility these days, but deterioration in sort of the last six weeks, Bill, you mentioned it. *I feel like in our conference, you guys sort of said, the outlook for the year is not going to be scary. And can you just walk us through what happened in sort of last six weeks, 60 days, and what do you think is driving that? Is it Federated saying, we don't like Liz & Co. at JC Penney? It is Federated saying, we have to get more margin focus for the back half because sales may not be as robust?* |
| McComb: | You're giving a pretty good answer to a little bit of all of those. I think that, first, let me acknowledge that I *did say at that March conference, which was mid-March, that in fact we didn't anticipate anything scary.* This was in response to queries from the audience that—those that were yearning for guidance. But to be frank, we said in February, on February 28, that we needed to—I said that I wanted to do and conduct a pretty significant analysis of the business to understand what was happening and that we had flagged certain pressures, *certain pressures had been flagged even in the press around this Liz & Co. Liz Claiborne brand at Federated-Macy's-Penney's situation, and we didn't see anything scary at that time coming out of that.* I will tell you, as I laid out in my presentation just a few minutes ago this morning, if you want to bucket the pressures. |

Number one, we said, Dillard's began it a year ago, Macy's is now doing it more aggressively maybe in part because of the consolidation and the opportunity that comes from consolidating a big operator like May, but a focus on inventory productivity. And we are hearing that that focus is being applied to vendors beyond Liz Claiborne Inc. *And it certainly is being applied to brands across our portfolio, not just the Liz Claiborne apparel brand. For that reason, we don't believe that that is a punitive pressure.* We believe that that is a—let's make business work more efficiently. *The conversations around that are, we expect your product to deliver a natural margin that is higher,* and that should result in lower end-of-season checks or [assisted] profitability from an end-of-season vendor reconciliation perspective.

I will be honest and tell you, I personally embrace that. I embrace it because it does not make sense to significantly over-shift goods just for the measure of collecting receipts, and that creates a real pressure on the 2007 P&L. But honestly, Virginia, you asked the question that's on everybody's mind—what changed, what changed? *We said that when buyers were in our showrooms and even prior to that at end of year last year, we were getting signals for a receipt pattern that not only mirrors the same front-half/back-half splits that we've seen in previous years, but one that was very close to what our plan was calling for.* When the actual final orders came in and we had visibility to them across the line for fall, we went through the process of anticipating additional markdowns, and frankly, having to project what holiday could look like to close the whole second half. And it was at that point that we realized that we either needed to go down the path of going on a major receipt kick in trying to drive additional orders or draw a line in the sand and own into the fact that we're going to run this businesses as healthy as it can be and put all of our management and people's attention into chasing the winners when we're in-season and optimizing these sales once we get in there and not pushing and going back to the showrooms and driving harder and harder and harder for what I will call—it would be the wrong leading metric.

(Emphasis added).

83.     Additionally, despite repeatedly representing that the Liz Claiborne brand and Liz & Co. were being designed for and marketed to different target consumer groups, *see* ¶¶48-49, 62 and 66, when asked about marketing and advertising expenditures, McComb admitted that the

Company's strategy was not to have a "clear distinction," as previously represented, but a "brand halo" effect from the Liz Claiborne brand to Liz & Co. McComb also acknowledged that, contrary to earlier class period representations, *e.g.*, ¶¶62 and 66, JCPenney's was competing with Macy's for the same customers:

> The spending on the Liz Claiborne brand was front-loaded, I will call it with a focus in print advertising, with a campaign that would support all of the Liz brands, including Liz & Co.

*     *     *

> [A]s a guy that came after the decision was made, I can tell you one of the things that was very smart about it, in ***being solid brand managers these folks no longer wanted to have "Crazy Horse, a Liz Claiborne Company" be the statement for a Liz Claiborne brand. And by going Liz & Co. it has given them permission to do, to make the investments on the floor and create the kind of brand halo that frankly the Liz Claiborne brand deserves to have***. With that though came, what I would call a strategic plan that was inspiring. I wouldn't be looking to the Crazy Horse footprint to measure how big Liz & Co. can get. I think that the more interesting question, which was asked earlier, is how big could it get relative to the Liz Claiborne Apparel brand in some of the light department stores. I think one of the things you all need to focus on is what are the dynamics with Penney over the course of the next five years. I mean we categorize them as a mid-tier player, but the reality I think when you listen closely to Mike Ullman and Ken Hicks's vision, in fact where their stores are located and who they go up against in malls, ***I in fact would argue that it is possible to think about them more increasingly as a traditional department store, and in time competing more and more for the same kind of foot traffic.*** So, I think that we are in this period where there is a real—a dynamic of let's call it a transition between who you categorize in what channel.

(Emphasis supplied.)

84.    The "earlier question" (and answers) referenced above presaged things to come:

> J. Black:    [I]t appears as though—that your Penney's business could actually be much greater than all of the Federated Liz business longer term? Is that a fair comment.
>
> McComb:    Yes, it is.

---

Sullivan:     Yes, it is.

McComb:     It is a fair comment.

85.     In October 2009, the Liz Claiborne core brand became exclusive to JCPenney's.

86.     On the missed estimates and significantly lowered guidance, shares of Liz Claiborne declined $7.72 per share, or 17.26%, to close on May 1, 2007 at $37.00 per share, on unusually heavy volume. As reported by *The Wall Street Journal*, the steep decline contrasted with the general market: "As the Dow Jones Industrial Average closed at a record [13,136, up 72], ... Liz Claiborne . . . moved sharply lower."

87.     Analysts' take-aways from the conference call were consistent. Negative reaction to the Liz & Co. launch and higher margin requirements decimated both the first quarter and fall orders. Importantly, they did not believe that all of this occurred in the past 45-60 days, with no prior notice to defendants.

88.     Buckingham Research, on May 2, 2007, reported:

a.     "LIZ reports Q1 results which are a huge disappointment; initial FY 2007 guidance also comes in dramatically below expectations."

b.     "FD [Macy's] and DDS [Dillard's] account for 70% of LIZ's top line erosion in 2007 as these retailers look to increase turns, margin requirements, and pull back on core Liz Claiborne business in response to LIZ launch of Liz & Co. at JCP."

c.     "While we expected that an adverse reaction to the JCP launch could negatively impact second half earnings as retailers cut Fall 2007 plans in the core Liz Claiborne brand, we are surprised that the first quarter deteriorated as dramatically as it did, particularly since LIZ reported Q4 earnings on February 28th (two months into Q1) without

giving investors any visibility to the challenges they were facing early in the fiscal year."

d.      "The impact of these challenges is a reduction of $150 million in sales and a $150 in operating income in 2007, of which 50% is coming out of FD. While the company cited higher turnover and margin requirements as the source of these challenges, clearly these retailers desire to pull back on the Liz Claiborne due to the Liz & Co. launch was a contributing factor." However, in a conference call held several weeks later, on May 16, 2007, when asked to comment upon Liz Claiborne's statement that Macy's was requiring higher margins, Federated flatly denied it:

> FD:"I don't think they've said that we're requiring higher margins. We're requiring higher margins than their product has been producing. But that doesn't mean higher margins from what we've always expected.

> Q: Okay, interesting. Their press release just said that retailers are demanding higher margins.

> FD: Well we are than what they have been producing.

> Q: Okay, not historic levels?

> FD: Correct.

e.      "LIZ attributed the lower guidance to a number of factors, most notably the changing landscape and demands of retailers ... including: (1) Department stores are focusing more and more on private and exclusive brands .... (3) FD and DDS pulling back on sales and receipt plans (as well as cutting doors) in Liz Claiborne due to LIZ launch of Liz & Co. in J.C. Penney. FD has publicly been very clear about their drive to increase the penetration of private, exclusive and limited distribution merchandise. By utilizing the Liz name on JCP exclusive LIZ brand, Liz Claiborne is unlikely to be a pure "limited distribution" brand. We

would not rule out the possibility of the Liz Claiborne brand ultimately being phased out of many "better" department stores, particularly, FD."

89.     In an analyst report entitled "LIZ: The Worst of Times" Morgan Keegan reported, on May 2, 2007, that it was "shocked by the magnitude of the revision." However, the analysts clearly believed that defendants knew this was coming as early as the fall of 2006:

  a.  "The list of reasons for the revision (increased private label, decreases in moderate, traditional and bridge brands, and increased turnover requirements) are far from new, and we can't help but think LIZ saw the writing on the wall as the company halted its share repurchase about the same time it launched Liz & Co. at JCP and underwent numerous management changes.  Given this analyst's background in department store merchandising, we're hesitant to believe all of the above issues came to roost over the past 60 days;"

  b.  "...[W]e're not completely convinced that the deterioration that allegedly occurred over the past 60 days wasn't seen coming by LIZ's management team ... In our view, the decision to launch Liz & Co. at JC Penney ... was the catalyst FD needed to more aggressively cut orders of the core brand.  We believe FD tried to treat LIZ as a partner, somewhat ignoring the fact that the core brand had been underperforming the department for some time."

  c.  "Coming from industry, this analyst is extremely skeptical that the confluence of factors all occurred over the past 60 days.  From our experience, the buying function is much more dynamic than this time frame suggests.  We remember walking booths at the MAGIC show in February and talking to industry contacts that suggested rockiness existed in the LIZ-FD relationship.  We can't believe that the moderate and private label issues

---

occurred out of left field...";

       d.     "Last year, at that start of October, LIZ announced the launch of Liz & Co. at JCP. After buying back [approximately] 7 mm shares for well in excess of $260mm over the TTM, the company halted its repurchase after the October quarter ... We don't think all of these issues are a coincidence, and we have a really hard time believing they came up over the past 60 days. That said, we think management is about as smart as they come in the apparel industry, and we can't help but believe they understood the long-term potential at JCP with Liz & Co. was greater than the long-term potential at FD with the core brand."

### Disclosures After the Class Period

90.     Although defendants tried to spin the Macy's cuts as higher margin requirements on all of the Company's brands, and not a punitive measure for the JCPenney's deal (something the industry, investors and analysts did not believe, even before Macy's flatly denied it several weeks later), the truth was quite the contrary—and was repeatedly confirmed over time.

91.     On May 10, 2007, the *New York Post* published a story written by Suzanne Kapner entitled, "MACY'S, LIZ FIZZLE":

> ***The relationship between Liz Claiborne and its largest customer, Federated Department Stores, has grown increasingly strained over the apparel-maker's decision to launch a new line with J.C. Penney.***
>
> The tensions underscore the difficulties facing clothing manufacturers as they try to expand in the face of demands for exclusivity from increasingly powerful department stores.
>
> ***Federated executives have privately complained that some of the J.C. Penney merchandise, sold under the Liz & Co. name for women and Concepts by Claiborne for men, looks too similar to products carried in its Macy's stores.***

Store checks turned up several similarities, including an almost identical eyelet pattern; button-down linen shirts with a distinctive rolled sleeve; an abundance of seersucker; and the recurrence of a similar black and white floral print.

Federated has moved to curtail products that are widely distributed elsewhere, especially in J.C. Penney and Kohl's, which cater to a slightly less affluent customer than do Macy's stores.

Federated spokesman Jim Sluzewski declined to comment on the company's relationship with Liz Claiborne.

Liz Claiborne President Trudy Sullivan said the lines were targeted to different customer groups.

Liz & Co. is more casual and uses less expensive fabrics like linen and nylon blends, so the clothes cost less.

Liz Claiborne merchandise commands higher prices, because of richer fabrics and more career items like blazers.

"That doesn't mean that Macy's is 100 percent happy about this," Sullivan said.

When Liz Claiborne reported a 63 percent drop in earnings last week, it blamed a chunk of the shortfall on cutbacks by Macy's. The retailer has been reducing inventory across the board, not just of Liz Claiborne items. Still, the apparel maker told analysts that the "decision to launch Liz & Co. at J.C. Penney's was a contributing factor to this reduction."

To an untrained eye, the Liz Claiborne and Liz & Co. lines could have been more differentiated.

Though a Liz Claiborne shirt is made of 100 percent linen and sells for $59, while the Liz & Co. version, made of a linen/nylon blend, was on sale for $21.99 (originally $44), both share a key design element: The sleeves are rolled up and fastened with a buttoned-down flap.

A distinctive eyelet fabric is used for a Liz Claiborne jacket ($59) as well as a J.C. Penney sleeveless top ($44).

Sullivan countered that linen and eyelet lace are common fabrics in spring and summer collections.

Yet, a walk through of labels that sit near Liz Claiborne in Macy's stores, such as Jones New York and Charter Club, turned up a greater amount of variation on these themes.

Other items that drew scrutiny were men's dress shirts, of which about half the styles sold at J.C. Penney seemed very close to those at Macy's.

Macy's stores in the Midwest were spotted carrying a near identical faux croc bag sold at J.C. Penney for $45.

(Emphasis added).

92.     On May 17, 2007, JCPenney's held its Q1'07 conference call with investors and investment analysts. In addition to reporting a department stores sales increase of 4.4%, the company reported its 16th straight quarter of increased comparable stores sales. Liz & Co. and CONCEPTS by Claiborne were described as "off to a strong start and performing above initial expectations." When asked if there was any slowdown in the business originally generated in markets where Federated closed stores in 2006, Myron Ullman responded: "Just getting started ... Federated has 850 stores that are open so we are willing to compete in those markets and we think we compete very well."

93.     On May 18, 2007, the *New York Post* published a story written by Suzanne Kapner entitled, "CLOTHING DRIVE." Therein, the story, in relevant part, stated:

Liz Claiborne's gamble might just pay off.

*The large apparel maker made a bet that it could increase sales with J.C. Penney by offering a new line called Liz & Co., even at the risk of hurting its relationship with Federated Department Stores, which sells Liz Claiborne sportswear at its Macy's stores.*

That calculation seemed to bear out yesterday, when J.C. Penney reported a 13 percent increase in first-quarter sales and raised its annual earnings forecast, largely because of strong sales of new lines such as Liz & Co. among others.

Manufacturers like Liz Claiborne have been forced to walk a tightrope as they balance department store demands for exclusive merchandise with their need to grow by launching new lines.

***Federated executives were not happy about Liz Claiborne's partnership with J.C. Penney. When Liz Claiborne reported a shortfall in earnings recently, reduced orders from Federated were largely to blame.***

Manufacturers are typically loath to cross Federated, which became the nation's second-largest department store chain behind Sears with its 2005 purchase of the May Department Stores Co., although that is changing as J.C. Penney and Kohl's close the gap.

In another move that displeased Federated, designer Vera Wang is launching a lower-priced line to be sold at Kohl's under the Simply Vera Vera Wang name.

Sales of Liz Claiborne sportswear at Macy's stores have languished for years. ***Sources said that Liz Claiborne considered it worth the risk to potentially alienate Federated if it could jump-start sales at J.C. Penney.***

J.C. Penney has been in an expansion mode with plans to open 250 stores over the next five years. Sales and earnings have rebounded as the company adds more branded merchandise such as Bisou Bisou and Nicole Miller. This summer, J.C. Penney will introduce a line of jeans by Chip & Pepper that will sell for roughly one-fifth of the typical $160 price tag commanded at upscale stores like Barneys New York.

In contrast, Federated reported on Wednesday that first-quarter sales and earnings came in shy of analyst estimates as it struggles to improve business at the former May stores.

(Emphasis added).

94.     On July 31, 2007, *The New York Times* published a story written by Michael Barbaro

entitled, "At Liz Claiborne, a Bold Fashion Statement."  Therein, the story, in relevant part, stated:

In mid-April, as orders for fall clothing began pouring into the headquarters of Liz Claiborne—the apparel giant behind Juicy Couture, Kate Spade and Lucky Brand Jeans—executives paid unusually close attention to one buyer, Macy's.

***Liz Claiborne's decision to develop a new product line for J. C. Penney had infuriated Macy's chief executive, Terry J. Lundgren, company officials said.***

---

*Executives expected small cuts in Macy's orders for fall—punishment, in their eyes, for cheating on their biggest client—but what arrived "shocked us," said the new chief executive of Liz Claiborne, William L. McComb.*

Macy's slashed orders for the Liz Claiborne brand by millions of dollars. *"You have lost your most-favored-nation status" at Macy's, Mr. Lundgren told executives at the clothing company, according to people who witnessed the conversations.*

The impact was disastrous. Liz Claiborne's first-quarter earnings plunged 65 percent and Wall Street pummeled the stock, knocking it down more than 17 percent, to $37 from $45.

*    *    *

In 2005, the nation's two biggest department stores, Federated and May, merged, turning local chains like Marshall Field's and Filene's into Macy's, which had been under the Federated umbrella. The combined company, now called Macy's Inc., closed dozens of stores, leaving Liz Claiborne with fewer places to sell its wares.

The flagship Liz Claiborne clothing brand, a nearly $2 billion business within the company, was hard hit by the merger. Weak sales of the classic-looking clothing had left it vulnerable, and the agreement last year to develop a line for J. C. Penney's, called Liz & Co., appeared to worsen matters.

Liz Claiborne had sold clothes to J. C. Penney for years, under the name Crazy Horse. But the new Liz & Co. name sounded an awful lot like the legacy Liz Claiborne brand. *"It was the use of that precious capital 'L' that made them crazy," Mr. McComb said, speaking of Macy's.*

Mr. Lundgren, the Macy's chief, said in an e-mail message that there was no vengeful or ulterior motive in his decision to pull back. "It's no secret that the Liz Claiborne brand's sales performance has been deteriorating for several years," he said."Any adjustments in our orders with any vendor are solely a function of the performance of that merchandise in our stores."

Asked about his "most-favored nation" remark, however, Mr. Lundgren added that "our customers come to Macy's expecting to find merchandise that is not widely available."

(Emphasis added).

95.     In an August 16, 2007, article entitled "J.C. Penney Schools the Competition," writing for *The Motley Fool*, Ryan Fuuhrmann noted that while Macy's just announced difficulty growing its top line, "consumers heading to Penney's are arriving with their wallets open." In particular, "Penney's new labels that are proving popular to consumers include Ambrielle, Liz & Co. and CONCEPTS, in a successful relationship with Liz claiborne."

96.     A March 9, 2008, article in the *New York Times*, "Trading Places: U.S. Designers Shift Store Loyalties," noted the upheaval in the retail industry occasioned by the "democratization of design"—a series of moves and exclusive relationships which resulted, in part, in famous designers creating lines for mid-tier department stores and mass retailers. The author described the impact of the "flurry of designer address changes" on Macy's—and Macy's reactions to them:

> All this activity has raised a bar for traditional retailers like Macy's, which rarely had to fend off competition from below. Its 2005 merger with May Department Stores, which created the largest department store company, was in part an effort to use size to wield more influence over designers.

> The democratization of design forced Macy's to claim exclusives it never before needed and to punish designers who cut deals elsewhere.

> When Wang went to Kohl's, Macy's dropped her popular lingerie line.[1]

> The chain cut orders from Liz Claiborne after the company offered a line called Liz & Co. to Penney.

> If the product is available in 50 different points of distribution in a five-mile driving radius, convenience becomes the No. 1 reason to buy a brand," said Terry J. Lundgren, chief executive of Macy's. "And so we lose."

---

[1] Wang and Lundgren had previously been on very good terms, apparently. "Miracle on 34th Street," the December 2006 *Wall Street Journal* article discussed in ¶54 above, noted: "Mr. Lundgren is, after all, so much the fashion maven that he designed, along with Vera Wang, his second wife's wedding dress ..."

\*       \*       \*

Perhaps the most ambitious, and closely followed, new introduction is at J.C. Penney, where Ralph Lauren began selling a broad collection of fashions and housewares in February.   Because Lauren already sells his Polo collection to virtually every department store—including the prickly Macy's—the collection at .C. Penney is called American Living, with no mention of Polo or Ralph Lauren in the stores.

\*       \*       \*

"It looks just like Polo, even if it doesn't say so," said Ethel De See, 77, who bought American Living leather belts and towels.

\*       \*       \*

Some of the back room sniping over big designers has begun to spill into public view.

Asked about [Ralph] Lauren's line for Penney [American Living], Lundgren, Macy's chief, replied that "no one has ever heard of that brand."

97.      On April 23, 2008, an article entitled "Playing Exclusives Game: Results Can Be Win-Win But Brands Face Pitfalls," published on WWD.com, reported:

[Vera] Wang denied the rumor that Macy's dropped her lingerie line after her deal with Kohl's was revealed . . .

Nevertheless, the speculation reveals one of the major downsides of doing an exclusive line for one store: Another retailer can get upset and drop your other lines.

The Liz Claiborne line lost doors and real estate at Macy's when Liz Claiborne Inc. gave its Liz & Co. and CONCEPTS by Claiborne lines exclusively to Penney's. According to sources, Macy's is also unhappy with the similarities between the American Living line at Penney's and Lauren by Ralph Lauren, which Macy's carries.

"If a brand name we carry suddenly has 1,000 more points of distribution, then that brand will be diluted," Lundgren said.   "There's no question there will be more supply than demand, the business will be transferred out of the existing companies, and our business will be hurt.   We take action because we've seen this movie too many times before.   We're not trying to flex our muscles—we are just trying to get ahead of what history tells us."

---

98.     On December 4, 2008, *Fortune Magazine* published an article written by Suzanne

Kapner entitled, "Liz Claiborne's Extreme Makeover." Therein, the story, in relevant part, stated:

> ***Back in 2006, on the Wednesday before Thanksgiving, he left his office at 1441
> Broadway and walked the six blocks to Macy's Herald Square for his first meeting
> with CEO Terry Lundgren. Macy's is Claiborne's largest customer, and Lundgren
> was furious at the apparel maker for creating a less expensive line for J.C. Penney
> that competed directly with products sold in Macy's stores.***
>
> ***No matter that Claiborne's prior management had created the new label, called Liz
> & Co., McComb took the beating.*** A few months later Macy's slashed orders for the
> spring season. That devastated Claiborne's earnings, which plunged 65%, and wiped
> out $785 million in market capitalization overnight. ***"Terry wanted to teach us a
> lesson," McComb says.*** Macy's declined to comment for this story.

(Emphasis added).

99.     On October 8, 2009, *Crain's New York Business.com* announced "Liz Claiborne, JC

Penney Ink Exclusive Deal." The first paragraph of the story underscored the competition between

JCPenney's and Macy's, when the former opened up its first NYC store across the street from

Macy's flagship store location:

> Shoppers searching for the well-known Liz Claiborne brand will soon have to look
> no further than the Manhattan Mall. JC Penney Co., which opened its first Big Apple
> store at the midtown mall in July, entered into an exclusive 10-year licensing
> agreement with Liz Claiborne Inc., the women's apparel company announced
> Thursday. Penney's will be the only retailer to sell Liz Claiborne and Claiborne-
> branded merchandise, which includes about 30 different categories, in the U.S. and
> Puerto Rico, beginning in August 2010.

## CLASS ACTION ALLEGATIONS

100.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Liz

Claiborne's securities between January 16, 2007 and April 30, 2007, inclusive (the "Class Period")

and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

101.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Liz Claiborne's securities were actively traded on New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Liz Claiborne shares were traded publicly during the Class Period on the NYSE and as of April 20, 2007, shortly near the end of the Class Period, the Company had 104,531,967 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Liz Claiborne or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

102.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

103.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

104.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.      Whether the federal securities laws were violated by defendants' acts as alleged herein;

      b.      Whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Liz Claiborne; and

      c.      To what extent the members of the Class have sustained damages and the proper measure of damages.

105.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

106.    The market for Liz Claiborne's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Liz Claiborne's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired Liz Claiborne's securities relying upon the integrity of the market price of the Company's securities and market information relating to Liz Claiborne, and have been damaged thereby.

107.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Liz Claiborne's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make defendants' statements, as

set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Liz Claiborne's business, operations, and prospects as alleged herein.

108. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about Liz Claiborne's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

109. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

110. During the Class Period, Lead Plaintiff and the Class purchased Liz Claiborne' securities at artificially inflated prices. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market were revealed, and/or the risks thereof materialized, causing investors' losses.

## SCIENTER ALLEGATIONS

111.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Liz Claiborne, his/her control over, and/or receipt and/or modification of Liz Claiborne's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Liz Claiborne, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

112.    The market for Liz Claiborne's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Liz Claiborne's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Liz Claiborne's securities and market information relating to Liz Claiborne, and have been damaged thereby.

113.    During the Class Period, the artificial inflation of Liz Claiborne's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during

the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about Liz Claiborne's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Liz Claiborne and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

114.    At all relevant times, the market for Liz Claiborne's securities was an efficient market for the following reasons, among others:

a.      Liz Claiborne stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Liz Claiborne filed periodic public reports with the SEC and the NYSE;

c.      Liz Claiborne regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      Liz Claiborne was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these

reports was publicly available and entered the public marketplace.

115.    As a result of the foregoing, the market for Liz Claiborne's securities promptly digested current information regarding Liz Claiborne from all publicly available sources and reflected such information in Liz Claiborne's stock price. Under these circumstances, all purchasers of Liz Claiborne's securities during the Class Period suffered similar injury through their purchase of Liz Claiborne's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

116.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Liz Claiborne who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

117.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Liz Claiborne's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

119.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Liz Claiborne's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

120.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Liz Claiborne's financial well-being and prospects, as specified herein.

121.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Liz Claiborne's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Liz Claiborne and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

122.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

123.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Liz Claiborne's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

124.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Liz Claiborne's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Liz Claiborne's securities during the Class Period at artificially high prices and were damaged thereby.

125.    At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff

and the other members of the Class and the marketplace known the truth regarding the problems that Liz Claiborne was experiencing, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Liz Claiborne securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

126. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

127. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

128. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

129. The Individual Defendants acted as controlling persons of Liz Claiborne within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided

with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

130.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

131.    As set forth above, Liz Claiborne and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: April 19, 2010          **GLANCY BINKOW & GOLDBERG LLP**

By: _Robin B. Howald_
                 Robin B. Howald

1430 Broadway, Suite 1603
New York, New York 10018
Telephone: (212) 382-2221
Facsimile:  (212) 382-3944

*Lead Counsel  for Plaintiffs*

**BRAGAR WEXLER EAGEL & SQUIRE, P.C.**
Jeffrey H. Squire
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: (212) 308-5858
Facsimile: (212) 486-0462

*Counsel for Plaintiffs*

## PROOF OF SERVICE BY MAIL

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 885 Third Avenue, Suite 3040, New York, New York 10022.

On April 19, 2010, I caused to be served the following document:

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

upon the following parties:

### SEE SERVICE LIST

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 19, 2010, at ~~Los Angeles~~, ~~California~~. New York, New York

_____
Signature

NATHAN MONROE-YAVNEH

# SERVICE LIST

1:09-cv-04147-RJH Tyler v. Liz Claiborne, Inc. et al
Richard J. Holwell, presiding

Andrew James Ehrlich
Paul, Weiss, Rifkind, Wharton & Garrison
LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3166
212.373-0166 (fax)
aehrlich@paulweiss.com

Representing Liz Claiborne, Inc.
(Defendant)
Trudy F. Sullivan (Defendant), William L.
McComb (Defendant)

Leslie Gordon Fagen
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3231
212-492-0231 (fax)
lfagen@paulweiss.com

Representing Liz Claiborne, Inc.
(Defendant)
Trudy F. Sullivan (Defendant), William L.
McComb (Defendant)

Lionel Z. Glancy
Glancy Binkow & Goldberg
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
(310) 201-9150
310 201 9130 (fax)
info@glancylaw.com

Representing Angela Tyler (Plaintiff)

Michael Max Goldberg
Law Off. of Michael Goldberg
332 E. 73rd St. 4A
NY, NY 10021
(212)-481-0011
(212)-481-4144 (fax)
esquire727@mindspring.com
Representing Angela Tyler (Plaintiff)

Robin Bronzaft Howald
Glancy Binkow & Goldberg LLP
1430 Broadway, Suite 1603
New York, NY 10018
(917) 510-0009
(646) 366-0895 (fax)
hobbit99@aol.com

Representing James S. Metz (Lead Plaintiff)

Howard G. Smith
Smith & Smith
3070 Bristol Pike
Suite 112
Bensalem, PA 19020
(215) 638-4847
215 638 4867 (fax)
Representing Angela Tyler (Plaintiff)

Tobias James Stern
Paul, Weiss, Rifkind, Wharton & Garrison
LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3709
(212)-492-0709 (fax)
tstern@paulweiss.com
Representing Liz Claiborne, Inc.,
(Defendant), Trudy F. Sullivan (Defendant),
William L. McComb (Defendant)