

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELA TYLER, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:09-cv-4147 RJH |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| LIZ CLAIBORNE, INC., TRUDY F. SULLIVAN, AND WILLIAM L. MCCOMB, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Lead Plaintiff James Metz, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Liz Claiborne, Inc. ("Liz Claiborne," "LIZ,"or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Liz Claiborne; (c) review of other publicly available information concerning Liz Claiborne; and (d) interviews with persons with personal knowledge of the fashion industry and/or the events described herein.

## <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.      This is a federal class action on behalf of purchasers of Liz Claiborne's common stock between January 16, 2007, and April 30, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). During the Class Period, Liz Claiborne was engaged primarily in the design and marketing of a broad range

of apparel, accessories, and fragrances.  Liz Claiborne's largest customer was, at all relevant times, Macy's, Inc. ("Macy's").  In the fall of 2006, the Company announced an exclusive, long-term deal with Macy's rival, J.C. Penney Company, Inc. ("JCPenney's").  When investment analysts questioned the effect of the deal on the Company's relationship with Macy's, defendants assured the market that different brands would be sold at Macy's and JCPenney's *and* that both retailers were on board with this concept.  However, in late November 2006, in a face-to-face meeting, Macy's CEO, Terry Lundgren, made it clear to Liz Claiborne's CEO, defendant William McComb, that he was "furious" because products would be sold at JCPenney's that directly competed with those sold at Macy's.  According to McComb, Lundgren slashed Macy's spring season orders a few months later to "teach us [Liz Claiborne] a lesson."  Nevertheless, when repeatedly asked, defendants continued to publicly represent that the Company's relationship with Macy's was not endangered by the JCPenney's deal.  On May 1, 2007, the Company announced catastrophic first quarter 2007 ("Q1'07") results and projected declines in sales of core Liz Claiborne brand items, *inter alia*, for the latter part of 2007 – both of which defendants themselves attributed in large part to deep cuts in Macy's orders as a result of the JCPenney's deal and, purportedly, to other fairly-recent events.  LIZ's share price tumbled by $7.72, more than 17%, in a single day.  Although surprised by the bad news, the market did not believe the factors leading to the crisis were either recent or unforeseeable.  One analyst stated: "Coming from industry, this analyst is extremely skeptical that the confluence of factors all occurred in the past 60 days."  CEO McComb's description of the fateful November 22, 2006, meeting, in subsequent interviews demonstrates that the analyst was correct.  Defendants'

material misrepresentations and omissions during the Class Period injured investors; Lead Plaintiff and the Class are entitled to redress.

2.      Although the Class Period is relatively short, it followed the culmination of several years of major retail industry changes which resulted in Macy's and JCPenney's coming into direct competition.  The most significant event was the blockbuster merger, in the summer of 2005, between department-store industry giants the Federated Group and May Department Stores.  Immediately thereafter, Macy's became the proverbial 800-pound gorilla.  With nearly 900 stores nationwide, Macy's began to flex its muscle with apparel designers.  In particular, Macy's was focused upon exclusivity, with its selling point to shoppers being that Macy's offerings were unique and could not be purchased elsewhere.

3.      One year earlier, starting in 2004, JCPenney's sought to remake its image. Seeking expansion opportunities not tied to the building of new shopping malls, JCPenney's ended its heavy presence in malls by embarking on a campaign to build a new kind of stand-alone store.  Plans were for seven new off-mall sites in 2004 and for the majority of the 75-100 planned new stores in the next few years to be in the new off-mall format as well.  By early 2006, according to an article published by *USA Today* in March 2006, JCPenney's, with a growing presence as a destination department store, was sitting in a sweet spot—ready to pick off customers as several dozen stores were shut down or underwent name changes as a result of the Federated-May merger.  JCPenney's CEO, Myron ("Mike") Ullman, who had been the Chairman and CEO of Macy's from 1992 to 1995, knew just how to do it.

4.      On October 5, 2006, during a month where JCPenney's increased its total number of new format off-mall stores to 45, Liz Claiborne and JCPenney's issued a press release announcing the introduction of a new brand of clothing and accessories for women called "Liz & Co." and one for men called "CONCEPTS by Claiborne," a wide array of merchandise that would be sold exclusively at JCPenney's.

5.      Until several years earlier, when it was absorbed into the core brand, "Liz & Co." had been a "sub-brand" sold at Macy's and other high-end department stores.  For this reason, from the day the deal was announced until the end of the Class Period, the Company fielded questions from analysts and reporters who expressed concern that high-end wholesale customers, such as Macy's, would react negatively to a deal which put Liz & Co. exclusively in JCPenney's. On each occasion, defendants assured investors both that they had explained to the Company's high-end department store customers that the JCPenney's lines would be different from and not in competition with the Liz Claiborne brand sold in department stores *and* that the high-end retailers and JCPenney's were going along with this plan.  This simply was not true.

6.      According to a *Fortune* magazine interview published two years later, on Wednesday, November 22, 2006, defendant McComb went to Macy's Herald Square to meet with Macy's CEO Lundgren.   McComb indicated that Lundgren was "furious" with the Company for "creating a less expensive line for JCPenney's that competed directly with products sold in Macy's stores."  Without stating when it occurred, McComb had earlier discussed this same conversation with the *New York Times*, in July 2007.  He explained that it was the "use of that precious capital 'L' [in 'Liz & Co.'] that made them crazy."   Although Lundgren was

teaching the Company a harsh lesson, defendants did not share what McComb had learned with the public.

7.      The Class Period begins on January 16, 2007.  On that day, *Women's Wear Daily* ran a biographical story on the Company's new CEO, entitled "Meet Bill McComb: Claiborne's New CEO Up For The Challenge."   The story began by describing the JCPenney's deal as having the potential to cause McComb's "first major crisis": Sources told *WWD* that Macy's is purportedly "miffed" that the Liz & Co. and CONCEPTS by Claiborne brands to be sold by JCPenney's could "denigrate" the Liz Claiborne brand and is considering cutting back space or dropping the Liz Claiborne brand.  When asked about this, McComb responded: "You would have to ask Federated, but I would be surprised if that was the case because it is a long-standing and important relationship for both of us."

8.      One month later, during a February 28, 2007, conference call—after the sales launches of the two lines at JCPenney's—defendant Trudy Sullivan, then-Company President, reiterated the Company's public position, stating, *inter alia*: "Our department store partners realize these new launches are geared toward a distinct and separate customer ... They acknowledge our intent to preserve the marked differences in the product offerings ... [They] remain committed to servicing these loyal brand customers."

9.      Three weeks later, defendants continued to make positive statements about higher-end department stores' acceptance of the JCPenney's deal.  At a March 21, 2007, Merrill Lynch Retailing Leaders Conference, when asked about the outlook for the entire year, McComb later admitted that he had led analysts to believe that while "certain pressures had been flagged in

the press around this Liz & Co., Liz Claiborne brand at Federated-Macy's-Penney's situation, ... we didn't anticipate anything scary."  During the conference, when asked whether the high-end department stores were responsive to the Company's strategy, Sullivan replied "absolutely."

10.    Thus, on May 1, 2007, Liz Claiborne shocked the market when the Company reported an approximately 65 percent drop in earnings, forecasted an unexpected decline in annual profit, and disclosed massive cutbacks in orders from Macy's.  Moreover, the Company specifically attributed the very sharp reduction in Macy's orders to the new Liz & Co. and CONCEPTS by Claiborne brands launched at JCPenney's.

11.    On this news, shares of Liz Claiborne declined $7.72 per share on unusually heavy volume, to close on May 1, 2007 at $37.00 per share.  The analyst who questioned defendants' claim that negative events only unfolded over the prior 60 days, stated  "we can't help but think that LIZ saw the writing on the wall" back in October 2006 when it announced the deal with JCPenney's.  In particular, the analyst noted that LIZ had "halted its share repurchase about the same time it launched Liz & Co. at JCP."

12.    Days later, the *New York Post* reported that Macy's had conducted store checks of Liz & Co. and CONCEPTS by Claiborne lines at JCPenney's (which first appeared in January 2007)  and complained that "some of the JCPenney merchandise ... looks too similar to products carried in its Macy's stores."   After detailing areas of similarity, the author noted: "Federated has moved to curtail products that are widely distributed elsewhere, especially in JCPenney's ..." While defendant Sullivan was quoted as (yet again) reiterating that the clothing lines were targeted to different customer groups, the author discussed similarities between a number of

clothing items and accessories—with the JCPenney's offering priced more moderately than its Macy's counterpart.  Expressly noting a greater variation among Liz Claiborne, Jones New York and Charter Club offerings at Macy's, the author stated "To an untrained eye, the Liz Claiborne and Liz & Co. lines could have been more differentiated."  A former Company Vice President (described below as "CW1") agreed, indicating that the two lines looked similar and calling Liz & Co. a "derivative product."

13.     During the Class Period, defendants knew, or recklessly disregarded, that Macy's was significantly cutting orders of Liz Claiborne brand merchandise as a result of the JCPenney's deal.  Rather than coming clean when expressly asked, they continued to assure the market that the Company's high-end wholesale customers understood there were real differences between the Liz Claiborne and the Liz & Co. and CONCEPTS by Claiborne brands.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Additionally, Liz Claiborne maintains its principal executive offices within this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.     Lead Plaintiff James Metz, as set forth in the certification accompanying his motion to be appointed Lead Plaintiff, purchased Liz Claiborne common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  Initial plaintiff Angela Tyler purchased Liz Claiborne common stock during the Class Period and similarly suffered damages.

19.     Defendant Liz Claiborne is a Delaware corporation and maintains its principal executive offices at 1441 Broadway, New York, New York 10018.  During the Class Period, the Company operated in the following business segments: Wholesale Apparel, Wholesale Non-Apparel, and Retail.  The Company trades on the NYSE under the symbol "LIZ".

20.     Defendant Trudy F. Sullivan ("Sullivan") was, at all relevant times, President of Liz Claiborne.   On June 29, 2007, the Company announced that after six years, Sullivan would leave her position at Liz Claiborne to "assume a leadership position at another company."   (Ms. Sullivan  became the CEO of retailer Talbots in August 2007.)

21.     Defendant William L. McComb ("McComb") was, at all relevant times, the Company's CEO and has served as a director of Liz Claiborne since November 6, 2006.

22.     Defendants Sullivan and McComb are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Liz Claiborne's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were either "group-published" information, the result of the collective actions of the Individual Defendants, or oral misrepresentations or omissions that they had a duty to correct.

## SUBSTANTIVE ALLEGATIONS

23.     Liz Claiborne is engaged primarily in the design and marketing of a broad range of apparel, accessories, and fragrances.  During the Class Period, Liz Claiborne's retail business included outlet stores as well as brand name stores, such as Juicy Couture Lucky Brand and Kate Spade.  Wholesale sales of clothing and jewelry, under a variety of brand names, were made to retailers catering to upscale, mid-tier, moderate and contemporary markets.

24.     In the 18 months just prior to the Class Period, the industry was undergoing a sea change.  Two of the country's largest department store chains, Federated Department Stores, Inc. ("Federated") and May Department Stores Company ("May"), merged in 2005 and completely changed the retail shopping landscape.   (In 2007, survivor Federated changed its name to Macy's.)  For years, major metropolitan areas were dominated by local department stores.  Even though numerous stores became associated with one of the larger chains, many retained their names and their regional character.   In the year following the Federated-May merger, that changed: Most of the stores in the May group would become Macy's, which was being branded and marketed as the premier national department store.

25.     Macy's business was very significant to Liz Claiborne.  The Company's biggest customer, Macy's accounted for approximately 22% of Liz Claiborne's 2006 and 24% of its 2005 wholesale sales, (including sales to May group stores prior to the August 2005 merger). Including the Company's retail stores, Macy's accounted for 16% of 2006 and 18% of 2005 total sales.

26.     After the Federated and May merger in late August 2005, with approximately 900 department stores in 49 states and overseas, the $30 billion retail giant became the industry's dominant player.  Within a few months, it became clear that Macy's was, more than ever before, calling all the shots with apparel designers.  Macy's demanded merchandise that was unique or exclusive, items that were not available at other stores.

27.     In a November 21, 2005, article entitled: "Racing to Please Macy's," *Crain's Chicago Business* reported that 100 apparel marketers faced "banishment" from Macy's if they did not "meet Federated's upmarket strategy to differentiate [themselves] from mid-tier retailers, such as J. C. Penney, where their brands are also carried."  A vice president at one such clothing maker, Plugg Jeans, explained: "Macy's management, even before the merger, was starting to scale back vendors with a mid-tier distribution.  And now that Federated is bigger than God, they can stand up even more for what they want."  While Liz Claiborne was singled out as one of the "status brands" that Federated would retain because consumers "expected to see them," a spokesman indicated that Federated was challenging vendors to come up with merchandise that is "new and distinctive to us."

28.     By late November 2005, the article noted, "[r]oughly a third of merchandise sold in Macy's is exclusive to Macy's."  As Macy's market power grew stronger, this trend sharply increased.   In April of 2006, for example, Macy's announced an exclusive arrangement with Martha Stewart Living for an upscale home wares collection to debut in the fall of 2007.  By the end of the Class Period, on May 1, 2007, defendant McComb indicated that the percentage of Macy's-exclusive merchandise had grown to more than 80%.

---

29.     By 2006, dozens of stores owned by Federated and May prior to the merger hadclosed, a side-effect of the massive merger.   As of September 9, 2006, all of the former May stores would officially become Macy's stores—including such iconic regional department stores as Chicago's Marshall Field and Pittsburgh's Kaufmann's.   As a result, as the title of an article appearing in *USA Today* on August 28, 2006, explained "Competition Grows as Brands Lose Places to Hang Their Wares."   The article noted that "[s]ome of the best known clothing and accessory companies, such as Jones Apparel and Liz Claiborne, are dealing with fewer outlets to sell in, thanks to department store consolidation."   Moreover, department stores "largely control how merchandise is displayed in their stores, how often it is promoted, and at what prices." However, because Liz Claiborne had opened more of its own stores and diversified its brands, reducing the percentage of its revenue derived from department store sales, former CEO Paul Charron downplayed the impact of the Federated-May store closings: "I've got to bite a short-term bullet ... But those were not the best stores ... or the more profitable.  I do not lay awake at night and worry."

30.     Also in late August 2006, fashion designer Vera Wang responded to high-end department store consolidation by entering into a licensing agreement with Kohl's, a mid-tier department store, to create an exclusive line of lingerie, sportswear and accessories.

31.     On September 7, 2006, on the eve of the name change that would add 400 new Macy's stores to the shopping landscape, making it the nation's largest chain, the Chairman and CEO of Federated, Terry Lundgren, was interviewed on PBS's "Nightly Business Report" by Susie Gharib.  When asked about the company's growth strategy, Lundgren responded: "We're

trying to fill our stores with exciting merchandise.  More and more of that merchandise is becoming unique to us because we are the primary seller of department store goods."  Lundgren again emphasized Macy's desire for unique merchandise in the following exchange:

> Gharib:    What about the discounters?  They are continuing to upgrade their image with designer labels, whether you are talking about Target or Chico's or Kohl's that now is teaming up with Vera Wang.  Are you concerned that those discounters are going to eat away at your market share?

> Lundgren:    This has been going on for a long, long time.  And it will continue to go on.  And what we have to continue to do is evolve.  But, ultimately, again, it doesn't really matter what the name of the product is.  There has to be the customer demand.  In our case, I always look at supply and demand.  And if a product is available everywhere, then it is really much less interesting to most consumers.  But if you've got the right product and its uniquely yours, that is a big draw and that is what we have in our stores.

32.    When asked whether the model of an all-purpose department store was outdated, he reiterated the importance of unique product offerings, stating: "And so when you put [national branding] together with the products that we stand for, which are clearly different than most of these other stores that we've talked about, I think that is going to be a magic combination."  In closing, Lundgren stated: "...[P]art of this is to launch the brand in a very big and powerful way. I don't think there is going to be many households around the country, and even around the world in major cities that aren't going to know the name Macy's by the end of December of this year."

33.    By 2006, JCPenney's was well into its resurgence after a period of slumping sales in the early part of the decade.  An article in *USA Today* on March 2, 2006, noted that JCPenney's was the beneficiary of the "retail industry chaos" which followed the Federated-May

and Kmart-Sears mergers in 2005: "J.C. Penney is re-energizing at a time of turmoil in the department store landscape, as two mega-mergers cause name changes and some confusion at malls."  In particular, JCPenney's began expanding its "off mall," stand-alone store presence, because "shoppers are heading for stand-alone stores," where sales per square foot averaged almost $100 more for JCPenney's than in its mall stores.  The article quoted a knowledgeable high-end department store veteran: "'Penney's has gone after a huge chunk of customers that department stores had given away to Wal-Mart and Target,' says Dan Skoda, a retail consultant who used to be president of Marshall Field's. 'They are people who want to shop at a real department store.'"

34.     By late 2006, JCPenney's announced continued expansion plans, including many in its new "off-mall" format.  Seventeen such stores opened in October 2006, bringing the total to 45.  JCPenney's also announced that it would add 50 stores a year in 2007, 2008 and 2009.

35.     On October 5, 2006, Liz Claiborne and JCPenney's issued a press release entitled, "JCPenney to Introduce Exclusive New Brands for Women and Men from Liz Claiborne Inc. Liz & Co. and CONCEPTS by Claiborne Designed to Provide Refined Casual Style and Quality for JCPenney Customers Spring 2007 Introduction in Stores and on JCP.com."  Therein, in relevant part, Liz Claiborne and JCPenney, stated:

> J. C. Penney Company, Inc. (NYSE: JCP) and Liz Claiborne Inc. (NYSE: LIZ) announce the launch of Liz & Co. for women and CONCEPTS by Claiborne for men to be sold exclusively at JCPenney. The new lines, designed for the casual needs of JCPenney's customers, will launch in JCPenney stores and online at jcp.com in spring 2007.
>
> Targeting JCPenney's traditional female customer, Liz & Co. features a range of refined casual, versatile sportswear, along with handbags and fashion jewelry and

accessories. The CONCEPTS by Claiborne line will also feature casual sportswear as well as a collection of suits, suit separates, dress pants, dress shirts, neckwear, belts and outerwear, targeting JCPenney's modern male customer.

"As we continue to refine our merchandise assortments, we see a big opportunity to further expand our traditional and modern lifestyle segments," said Ken Hicks, JCPenney president and chief merchandising officer. "Liz & Co. and CONCEPTS by Claiborne reflect the quality and value our customers have come to expect from JCPenney and will further reinforce us as a key shopping destination for exclusive and private brands."

Trudy Sullivan, president of Liz Claiborne Inc., commented: "The core of our business strategy at Liz Claiborne Inc. is to offer a diverse portfolio of quality brands that meets the widest range of consumers' fashion needs. The new Liz & Co. and CONCEPTS by Claiborne lines are designed to address the style and value preferences of JCPenney customers, and as such, they will be complete lifestyle offerings of refined casual styles in a wide range of merchandise including apparel, accessories and jewelry, all priced approximately 20 percent to 30 percent lower than our Liz Claiborne and Claiborne lines."

36.     CW1 was a former Vice President and General Manager at Liz Claiborne for a number of years, including throughout the Class Period.  CW1's area of responsibility included wholesale sales of the Liz Claiborne brand, and, in particular, sales to Macy's.  CW1 was surprised when Charron and Sullivan announced the JCPenney's deal.  According to CW1, the relationship with Macy's was already precarious, with Liz Claiborne brand sales slumping for some time.[1]  For the Company to allow JCPenney's to use the valuable "Liz" name— diminishing its uniqueness—was simply "the straw that broke the camel's back" as far as Macy's was concerned.  (As explained at ¶¶38 and 54, below, after the class period, McComb publicly

---

[1]During the October 26, 2006 conference call, CFO Michael Scarpa quantified the sales reduction as being "in the high single digits" from 2005 to 2006.  This was likely due in large part to the fact the Company had become slow to the market with new and fresh ideas.  In fact, also during the call, then-CEO Charron discussed LIZ's efforts to "transform our supply chain in order to enable our design teams to make decisions faster and to get product to market more quickly."

admitted that this was true.)  Based upon CW1's relationship with senior personnel at Macy's, CW1 indicated that Lundgren knew that JCPenney's was becoming a big competitor to Macy's.

37.     The history of the brand at issue was also significant.  Liz & Co. was not a new brand.  CW1 indicated that the Liz & Co. "sub brand" was sold at Macy's from 1996 until approximately 2002, during the same time frame, in part, that JCPenney's was selling the Crazy Horse brand (the Liz Claiborne brand planned for phase out as a result of the October 2006 deal). CW1 indicated that the "Liz" name was very important in the fashion world – the equivalent to "Coca Cola" in the soft drink industry.  Suddenly, Liz & Co., a brand that had once sold at Macy's, would be an exclusive to JCPenney's.

38.     In fact, a Prudential Equity Group analyst report dated October 5, 2006, made the same point as CW1:  "We note that LIZ is replacing a long-standing exclusive distribution agreement under the Crazy Horse label with a dormant department store brand.  We are concerned that the core Liz Claiborne's brand image may suffer longer term by having Liz branded product at lower price points in a more moderately priced channel."  After the Class Period, McComb admitted, in a July 31, 2007, *New York Times* article, that this was exactly what happened: "Liz Claiborne had sold clothes to J. C. Penney for years, under the name Crazy Horse. But the new Liz & Co. name sounded an awful lot like the legacy Liz Claiborne brand. 'It was the use of that precious capital "L" that made them crazy,' Mr. McComb said, speaking of Macy's."

39.     CW1 also explained that while there was some degree of corporate arrogance, a notion that Liz Claiborne was too big to fail, everyone at the Company knew that Liz Claiborne

brand sales to Macy's had been falling.  However, combined with sales in other categories, the Company still did very significant business with Macy's.

40.     In the fashion industry, there is usually a six-month period between the time that a new collection is debuted, *e.g.,* at Fashion Week in New York City at the beginning of February and September, and shipments of product to customers.  Following this time line, designers would show the spring season lines in September and customers would place bulk orders at the end of September for deliveries in February, March and April.  For the fall season, industry practice was for new apparel to be shown in February and orders taken that month for deliveries in August, September and October.  CW1 believed that Macy's bulk orders for 2007 followed this pattern, to wit, spring season orders were placed by Macy's by the end of September 2006 and fall season orders were placed by Macy's in February of 2007.  While it was common for Macy's to issue a larger bulk order at the start but to later seek a markdown allowance or to otherwise renegotiate before sending the final EDIs (electronic data interchanges, the functional equivalent to a bill of lading), CW1 recalled that there were "big cuts" (approximately 30%) in the initial bulk orders for the fall season that were received from Macy's in February 2007.  CW1 indicated that this was a ramification of the JCPenney's Liz & Co. deal, *i.e.,* that Macy's CEO Lundgren cut orders in direct response to the deal, with many of the Macy's store branches not ordering any product.

41.     CW2 worked in the Fragrance Division of Liz Claiborne for many years, including during the Class Period.  Although the launch had been rumored for several months, CW2 recalled that the Company held a town hall meeting for employees, just prior to the public

announcement, wherein the details of the deal with JCPenney's were provided.  CW2 indicated that everyone was startled, because Macy's was the Company's biggest customer:  In the world of apparel, if you launch a major line for a competitor, you have to consider how Macy's will react.  CW2 discussed the deal with CW2's immediate supervisor, a Vice President, and the person to whom they both reported.  CW2 recalled they were also concerned about a bad reaction to the Liz & Co. line.

42.     On October 16, 2006, departing CEO Charron introduced the Company's selection for Chief Executive Officer, defendant McComb, who came to Liz Claiborne from Johnson & Johnson, where he was Company Group Chairman, responsible for marketing some of that company's largest-name consumer brands.  McComb would assume his position on November 6, 2006.  While not a fashion-industry insider, McComb explained why he was well-suited for the job stating, *inter alia*, "[M]y branding work has included major repositioning efforts to update or modernize a brand."

43.     Because the relationship with Macy's was so important to Liz Claiborne, even before his official first day at the Company, according to CW1, CEO McComb must have known about the ongoing issues.   McComb's comments during the conference call at which he was introduced confirm his efforts, especially as a fashion-industry outsider, to get up to speed.  Preparing to hit the ground running on November 6, 2006, McComb indicated that he began meeting with his team, with his "immediate priority" to learn about "the organization, including its culture, its relationship with customers, suppliers and other parties and the financial underpinnings of the business."   After stating "I look forward to sitting down with our

customers," McComb added: "I'm particularly interested in the input of our customers and their prospective on how we can continue to work together to develop mutually productive growth strategies, real win-win strategies."

44.     On October 26, 2006, Liz Claiborne held a conference call with analysts to discuss the Company's financial results for Q3'06, announced in a press release issued by the Company that day.  At the outset, former CEO Paul Charron commented: "Of late, we have seen the retail environment begin to improve and consumer confidence increase ... That said, the retail industry still looks to be behaving conservatively in the near-to-mid term as consolidation plays out and retailers focus on inventory management and invest heavily in private-label brands and exclusives."

45.     Also in his initial comments, Charron highlighted the deal struck earlier in the month with JCPenney's:

> We recently announced the launch of two new brands to be sold exclusively at JCPenney beginning in spring 2007, Liz & Co. for women and CONCEPTS by Claiborne for men.  Both lines are designed to be complete lifestyle offerings of refined casual styles in a wide range of merchandise, including apparel, accessories, and jewelry.  This is a big deal with substantial opportunities for volume and profit beginning next year.  It also creates a much more substantial partnership platform from which to launch additional branded initiatives with a retailer like JCPenney, which is winning in today's marketplace.

46.     Defendants Sullivan discussed the success of various retail and wholesale brands during Q3'06:

> In our better area, we continue to be very optimistic about the turnaround of our core Liz Claiborne brand ... Consumers and retailers are responding to our continued efforts to elevate the brand, embracing the noticeably better fabrics and

trims, greater attention to detail, more flattering and consistent fits and markedly enhanced value.

*      *      *

Within the men's world, we have been aggressively managing the impact of the Federated-May integration on our businesses.

47.     Questioners were focused both upon the health of the Liz Claiborne brand and the impact of the JCPenney's deal on the Company's relationship with its high-end customers:

Kate McShane:     With the Liz Claiborne brand it was very encouraging to hear your comments this morning .... How soon can we expect positive growth in 2007 for this brand?

Paul Charron:     ...[T]hings are looking up for the Liz Claiborne brand.  We are not prepared to declare victory on this ... versus calls in the year-ago period .... We are seeing [] progress in the form of receptivity of our key customers to this very important brand.

48.     Asked about marketing efforts for the Liz Claiborne brand for spring and summer of 2007, both Charron and Sullivan were extremely positive, with Charron underscoring "improved price value" and Sullivan indicating that the Company was     "encouraged by our retail accounts' reaction ... It is ... thankfully, a positive dynamic situation in that brand right now."

49.     The Company also provided additional information with respect to the JCPenney's deal announced three weeks earlier.  In particular, what the scope of the "big deal" entailed:

Margaret Mager:     [A]bout JCPenney, JCPenney Paul, you said it was a big deal that you were doing Liz & Co.  Can you give us some sense of magnitude?

---

Trudy Sullivan:       It is a big deal from a brand positioning perspective ... [I]t really cleans up or eliminates confusion between Liz Claiborne the department store brand and the brands that are offered into the channel because Crazy Horse had a Liz Claiborne Company notated on the brands ... [W]e have what we think is just a terrific understanding with them in terms of the presentation and the marketing of these brands and their space ...

Paul Charron:        The bottom line, Margaret, is that JCPenney is winning at retail. They are going to be a survivor.  They are going to be a winner, and our approach is to win with the winners ... You should assume this is a long-term commitment .... So we're not looking for fewer people to do business with.  If you believe that JCPenney is a winner, that this enhancement of our standing with JCPenney augurs well for 2007 and 2008, and 2009 and on into the future. So, that is why I said this is a big deal.  And it goes hand in glove with what we are doing in the department stores to differentiate the Liz Claiborne brand.  This is not going to be Liz Claiborne knocked off and done at lower price points ...

50.     Recognizing that traditional wholesale purchasers of the Liz Claiborne brand might not see the JCPenney's deal as portrayed—expansion into new channels with new lines, not in competition with established brands—analysts sought additional details:

Lizabeth Dunn:       Okay. And then my second question is related to the Liz & Co launch. Has there been any—I definitely agree with you that JCPenney is a winner in this landscape as it consolidates and has been tremendously impressed with a lot of things they have done on the brand side.  Has there been any pushback from the better department stores or comments, one way or another, that you are taking a brand that used to sell in Federated to the Penney's level?

Trudy Sullivan:       Liz, we have had a lot of dialogue with our department store partners.  We have explained exactly what our intentions with Liz & Co.  They remembered when we discontinued these brands because we they had very low awareness in their space and we were consolidating to the big brand, which is the Liz Claiborne brand.  We explained at great length our strategy here, in no way does this impede our strategy for the core Liz Claiborne brand. We will continue to elevate and market aggressively and really

treat the Liz Claiborne brand as the premium brand in the better zone in their space, as it deserves to be.  And there are a number of examples. This is not a new event in the firmament. There are a number of brands that have successful businesses, both in the traditional department stores and in the mid-tier laying. And so this is not a new concept in terms of how the industry is performing these days.

51.     When asked whether Liz & Co. would be on a par with the Crazy Horse brand it would replace in the spring of 2007, Sullivan and Charron emphatically stated it would be far bigger:

Trudy Sullivan:            You can assume that the launch of Liz & Co. is a pretty significant launch across multiple categories ... [I]t has a pretty big footprint in the JCPenney stores.  And then hopefully, both JCPenney and Liz Claiborne—hope that it will continue to grow over time.  But it is a pretty compelling brand launch, and we have got some exciting plans for it.

Robert Ohmes:            So Liz & Co. Year One should be bigger than Crazy Horse?

Trudy Sullivan:            Yes.

Paul Charron:             Very definitely.

Trudy Sullivan:            Definitely.

Paul Charron:             And in Year Two and Year Three, much bigger.

52.     Reaction to the portions of the conference call concerning improvements in sales of the core Liz Claiborne brand and the new deal with JCPenney's appeared positive:

a.      In an October 26, 2006, report, analyst Cowen & Co. rated LIZ an "outperform," stating, in part: "we believe the co[mpany] remains poised to drive accelerating rev[enue] and EPS growth in FY07 and l[ong]-term through a greater mix of higher-margin lifestyle brands..."  The analyst also noted "improvements in sell-through

in the core Liz Claiborne brand" and "LIZ's progress in partnering with successful retailers on new brand development (notably JCP and KSS);"

b.      On October 27, 2006, a JP Morgan analyst report rated the stock "neutral," with its positive notes including "we are encouraged by upcoming new product launches;" and

c.      A Morgan Keegan report, dated October 27, 2006, rated LIZ "market perform."  While conservative FY07 guidance due to changes in management and concerns about the Company's retail business "leaves us on the sidelines," the report stated that one reason to "get on board" would be "stabilization in the core brand"— which the analysts believed was, in fact, occurring.

53.      The following week, during a November 2, 2006, Sales Call, Ed Merritt of JCPenney's Investor Relations, discussed the deal with Liz Claiborne and JCPenney's rapid expansion:

> On October 5 with Liz Claiborne, we jointly announced the launch of two new exclusive brands at JCPenney available at spring 2007.  Liz & Co. is our traditional women customers and features a range of refined casual, versatile sportswear, along with handbags, fashion jewelry and accessories.  And CONCEPTS by Claiborne for our modern male customers will feature casual sportswear, as well as a collection [sic] suits, suits and separates, dress pants, dress shirts, neckware, belts and outerwear.  These brands are an ideal complement for their respective customer, and amongst several, we have or will add to our assortments to further enhance our position as the number one choice for the modern customer.  Our Ambrielle intimates line, which we announced in late September, is another example of how we are making this connection with our current customers and working to attract new customers.

*      *      *

This past month was also a period of accelerated store growth for us.  On October 6, we opened 20 new stores of which 17 were in our new off-mall format.  We now operate 45 off-mall stores.  So, in total, we opened 28 new stores this year in markets throughout the United States.

And beginning in 2007, we plan to open about 50 new stores per year through 2009, primarily in our off-mall format.

54.     Defendant McComb's infamous November 22, 2006, meeting with Macy's CEO Lundgren was recounted by McComb in an article which appeared in *Fortune* on December 4, 2008:

> Back in 2006, on the Wednesday before Thanksgiving, [McComb] left his office at 1441 Broadway and walked the six blocks to Macy's Herald Square for his first meeting with CEO Terry Lundgren.  Macy's is Claiborne's largest customer, and Lundgren was furious at the apparel maker for creating a less expensive line for J.C. Penney (JCP, Fortune 500) that competed directly with products sold in Macy's stores.
>
> No matter that Claiborne's prior management had created the new label, Liz & Co., McComb took the beating.  A few months later, Macy's slashed orders for the spring season.  That devastated Claiborne's earnings, which plunged 65% and wiped out $785 million in market capitalization overnight.  "Terry wanted to teach us a lesson"; McComb says.  Macy's declined to comment for this story.
>
> McComb's solution to the Macy's problem was to pluck [Isaac] Mizrahi from Target .... the new Liz line that Mizrahi would create would not be offered at J.C. Penney's ... ensuring that Macy's and a few regional stores would have unique merchandise.   Within an hour of signing Mizrahi, McComb received a congratulatory call from Lundgren.

Whereas Macy's spring season bulk orders had already been placed by the end of September 2006, CEO Lundgren's anger could easily be explained – Macy's treated Liz Claiborne as a

long-standing partner,[2] even though sales had fallen off a bit more recently, and LIZ turned around and sold a "Liz" named line of clothes to an up-and-coming competitor.

55.     The *Fortune* article confirmed statements previously published in a *New York Times* article on July 31, 2007.  Specifically, in addition to the meeting on November 22, 2006, CEO Lundgren apparently made his point on more than one occasion: " 'You have lost your most-favored-nation status' at Macy's, Mr. Lundgren told executives at the clothing company, according to people who witnessed the conversations."  In an email commenting on the situation, CEO Lundgren said "there was no vengeful or ulterior motive in his decision to pull back," that the decision was purely performance-based.  However, when asked to explain the "most-favored-nation status" comment, Lundgren told the *Times* reporter: "[O]ur customers come to Macy's expecting to find merchandise that is not widely available."

56.     Less than one month after he ripped into CEO McComb for launching competitive lines to the Liz Claiborne brand at JCPenney's, Lundgren was interviewed by the *Wall Street Journal*.  On December 17, 2006, in an article entitled "Miracle on 34th Street Terry Lundgren: The Man at the Top of the Retail Heap," Lundgren continued to tie what the author described as "department store revivalism" to brand exclusivity.  Explaining how Macy's would define itself in the next five years, Lundgren stated: "In our case ... it's defined by the brands we carry, and more and more of our brands will be unique to Macy's or Bloomingdale's."  After discussing the exclusive housewares deal with Martha Stewart, the article continues: "These

---

[2]During the October 26, 2006, conference call, then-CEO Charron described the Company's partners as "associates who believe in mutual interdependence and institutional collaboration."

exclusive arrangements are another sign of Macy's resurgence, Mr. Lundgren argues."   The author adds: "The motive behind offering fashionable, exclusive merchandise is, of course, to attract more buyers and move the basis of competition with other stores away from price."   Elsewhere in the article, Lundgren stressed: "We have more fashion than the off-the-mall stores, the discounters, the other guys."   However, Lundgren himself admitted that JCPenney's was hot on Macy's heels.   When discussing the relative hierarchy of department stores, the pecking order was listed as Bloomingdale's and Nieman Marcus, then Nordstrom, Macy's, JCPenney and Kohl's "and so on, down to Wal-Mart."

### Class Period Misstatements and Omissions

57.   On January 16, 2007, a lengthy article was published by *Women's Wear Daily* profiling defendant McComb.   The article's lead concerns big trouble potentially brewing between Liz Claiborne and Macy's:

> After a mere two months in the job, William L. McComb could be facing his first major crisis as the new chief executive officer of Liz Claiborne Inc.   And its involves no less a customer than Federated Department Stores Inc.

> Sources said that the $22.4 billion Federated is miffed that J.C. Penney plans to launch the Liz & Co. brand throughout its stores, which Federated feels denigrates the Liz Claiborne brand.   Starting this spring, the Liz & Co. casual line will be sold exclusively in all 1,021 Penney's stores.   Sources say Federated may be looking to cut back space for the Claiborne brand as the retailer focuses more on exclusive collections and its private label business—or it could drop Claiborne's licensed products.

> When asked in December about whether Federated was considering dropping the Liz Claiborne brand McComb responded: ***"You would have to ask Federated, but I would be surprised if that was the case because it is a long-standing and important relationship for both of us."***   A spokesman for Federated said, "Liz Claiborne will continue to be an ongoing brand at Federated," but declined to comment further.

The industry will be watching closely as to how the ceo uses his marketing background, resounding optimism and team-building philosophy to deal with Federated's pique—and the impact it will have on the company's core Liz Claiborne brand, which has been struggling for several years.

(Emphasis added)

58.     McComb's quote in the *WWD* article  was false and/or materially misleading for the following reasons:

a.     As CW1 explained, the relationship was deteriorating, as sales of the Liz Claiborne brand had been in a slump for some time and the deal with JCPenney's was the "straw that broke the camel's back."  While the Macy's spokesman indicated that the Liz brand would continue to be carried, this was hardly an agreement with McComb's remark about the importance of the relationship to each party.  Rather, CW1 believes that CEO Lundgren had decided to get rid of the Liz Claiborne brand but could not make such a radical change at once without substitute apparel to take the place of the entire line; thus, he cut the number of branches carrying the line;[3]

b.     At the November 22, 2006, meeting, and possibly others, witnesses heard Macy's CEO Lundgren tell McComb "you have lost your most-favored nation status" at Macy's.  As explained in ¶27, above, shortly after the Federated-May merger, Macy's wielded enormous power and decided to cut many designers.  At that time, Macy's had treated Liz Claiborne as a "status brand" that would remain on the selling floor.   Loss of

---

[3]Macy's completed the phase out in 2009.  An August 15, 2010, article in the *Wall Street Journal* indicated that in September 2009, Macy's cut Liz Claiborne distribution (further) from 300 stores to only 28 stores, "effectively dropping the brand after 30 years."

such preferred status meant, *inter alia*, fewer stores would carry the Liz Claiborne line, the line would be displayed in less prominent space within stores, loss of marketing and advertising funds and/or fewer sales persons on the floor.  The fact that Macy's would only state that it would still carry the Liz Claiborne brand – and not immediately eliminate it – was not a ringing endorsement of the parties' relationship;

       c.      CEO Lundgren's public statements made it clear that Macy's was on a mission to differentiate itself by selling exclusive merchandise not found in other stores.  On November 22, 2006, Lundgren was already "furious" about the Company launching new lines that would directly compete with products sold at Macy's.  Specifically, as later admitted by McComb, although Liz Claiborne had the Crazy Horse brand at JCPenney's for years, the "Liz & Co." name was a big problem: "It was the use of that precious capital 'L' that made them crazy."  CW1 made this same point, explaining that the market value of the "Liz" name was the design industry equivalent to "Coca Cola;" and

       d.      As CW2 indicated, Liz Claiborne employees were surprised by the JCPenney's deal as they were concerned about how it would affect the relationship with Macy's.

59.    McComb's quote in the *WWD* article was made with scienter because:

       a.      McComb was made aware, in a face-to-face meeting, of Lundgren's fury at the JCPenney's deal.  McComb stated that Lundgren was going to "teach us a lesson;"

       b.      Lundgren, the very public face of Macy's, repeatedly emphasized—for more than a year—that Macy's sought to make its mark with shoppers by carrying

exclusive and unique products.  The percentage of exclusive items carried by Macy's had grown from 30% at the time of the merger (fall 2005) to more than 80% at the end of the Class Period.   It was widely discussed in the media that after the Federated-May merger, that Macy's had become "bigger than God" and was in a position to call all the shots with apparel makers.  *See* ¶¶2, 24, 26-28, and 33 *supra*; and

    c.  McComb indicated when he took the reigns as CEO of the Company that he would learn all about Liz Claiborne's customer relationships.  ¶43, *supra*.  Lundgren made it clear in both his September 2006 interview (¶31:"[I]f a product is available everywhere, then it is really much less interesting to most consumers.  But if you've got the right product and its uniquely yours, that is a big draw and that is what we have in our stores.")  and his December 2006 interview (¶56: "The motive behind offering fashionable, exclusive merchandise is, of course, to attract more buyers and move the basis of competition with other stores away from price.") that Macy's had no interest in selling items that were readily available in many other locations.  The "big deal" the Company made with JCPenney's was going to put competing products in 1,021 JCPenney's locations, *see* ¶¶35, 45, 49, and 51, *supra*—and even more as JCPenney's opened 50 new stores a year from 2007 through 2009 (¶¶3, 34, 53, *supra*).

60.  On February 8, 2007, JCPenney's conducted its January Sales Call.  Therein, Ed Merritt, Manager of Investor Relations, stated: "[W]e're seeing a favorable early response to Liz & Co. in traditional women's apparel and Concepts By Claiborne and men's modern apparel.  Both brands will officially launch in mid-February across stores, jcp.com and catalog."

61.     On February 21, 2007, the Buckingham Research Group published an analyst report a week in advance of the Company's reporting of Q4'06 operating results.  While issuing a "neutral" rating because of the transition to new management, the analyst expected the Company to give initial sales and earnings guidance for 2007 during the conference call.   The analyst expected conservative figures for several reasons, one of which was: "[O]ur industry sources indicate that F[ederated] D[epartment Stores] may start to cut back on the core Liz Claiborne business due to LIZ's decision to sell Liz & Co into JCP."

62.     On February 22, 2007, JCPenney's held its Q4'06 earnings call with investors and analysts.  Highlights included statements from President Ken C. Hicks and Chairman and CEO Mike Ullman which stress both the Liz Claiborne name on new, exclusive product lines and JCPenney's direct competition with Macy's—particularly in the wake of the industry mergers and consolidations in 2005-2006:

Ken C. Hicks:          [W]e have just launched two great exclusive brands for JCPenney with one of the most important lifestyle brands in America, Liz Claiborne and Company.  Liz & Co. is being carried in our women's apparel accessories and shoe areas and Concepts by Claiborne can be found in men's. We are pleased to offer thee two brands, which arrived in stores in mid-February and initial results confirm that our customers think they're great and truly reflect the qualities they told us that they want.

                                 *          *          *

                       Liz Claiborne, Sephora, American Living [an exclusive Polo Ralph Lauren brand], all powerful brands that differentiate JCPenney from our competitors and are integral to our focus on making an emotional connection with our customer.

Mike Ullman:          The addition of Ambrielle, Liz & Co., Concepts by Claiborne, and American Living will further differentiate and solidify JCPenney

as the lifestyle shopping destination for style and quality at smart prices.

... [W]e added 28 new store locations in 2006, mostly in our off-mall format.

Q: Adrianne Shapira:   ...Mike, just looking out to the year can you share with us any thoughts in terms of how you plan to anniversary the closures of some of those Federated doors that clearly helped your comps last year.

A: Mike Ullman:   Well, we feel that we are open every day for business and we'll take customers from any place we can attract them ... We think we have compelling assortments, differentiated ideas, and engaging our associates to have relationships with customers ... will, in fact, differentiate us from most of our competitors.

*       *       *

Q: Jeff Klinefelder:   One quick follow-up in terms of market share gains that you are likely receiving as a result of consolidation .... increasingly, Penneys is being referred as the place that a lot of volume is going, any volume that is lost in the department store channel, traditional department store channel is being picked up by Penney's and maybe a competitor or two ... Any perspective you could add on that would be helpful?  Thank you.

A: Mike Ullman:   There are certainly vendors that were dropped by competitors during consolidation that we have been in close contact for years and wanted to do business with.  And that was a unique opportunity for us to say we have got a lot of customer[s] that really appreciate your products.  And we have seen great responses when we have put it in, make sure we have the sizes and the assortment that they are looking for ...We have comparable quality, comparable style at smarter prices.  So we believe that we can compete effectively with our department store competitors ...

63.   On February 28, 2007, Liz Claiborne held a conference call with analysts to discuss the Company's financial results for Q4'06 and FY'06, amplifying on the figures contained in a press release issued by the Company that day.  (Net sales for Q4'06 and FY2006

both increased year-over-year.)  In that release, the Company noted that not only would it delay full-year guidance to July, but that it would discontinue its practice of providing quarterly guidance.

64.     During the presentation portion of the conference call held on the morning of February 28, 2007, defendants stated, in relevant part:

McComb:     We have been pleased with the performance of our wholesale apparel business and we have taken steps to further improve in this area.  We recently launched our Liz & Co. and CONCEPTS by Claiborne brands exclusively at JCPenney.  Penney stores have consistently performed well in the market place and we believe this new relationship has the potential for tremendous upside.

*     *     *

Sullivan:     Moving to our core Liz Claiborne brand, we continue to be encouraged by the brand's performance.  We sustained the positive momentum from the third quarter with the domestic wholesale apparel business posting low double-digit net sales gain ...

Recently, we announced the launch of Liz & Co. and CONCEPTS by Claiborne, which are debuting this spring in JCPenney. We remain focused on maintaining a clear distinction between these core brands and the diffusion line by continuing to elevate the product offering for department stores, and by enhancing the image of the core brands through greater marketing commitments, both in in-store support as well as a meaningful increase in national advertising.

Our department store partners realize these new launches are geared toward a distinct and separate consumer, one who shops in a different venue and in a different price zone. They acknowledge our intent to preserve the marked differences in the product offering, as well as the consumer's esteem and desire for both Liz Claiborne and Claiborne in store stores. It is precisely for these reasons that our department store accounts remain focused on the performance of these businesses, and remain committed to servicing these brand-loyal consumers.

65.     Sullivan's statements in the last two paragraphs—to the effect that both JCPenney's and high-end department stores were on-board with the idea of selling and marketing distinct product lines for different customer bases—made on behalf of the Company and not corrected by McComb, although he had a duty to do so, were false and materially misleading when made, and made with scienter, because:

a.      As set forth in ¶¶40, 54-55, Macy's CEO, Terry Lundgren, was one department store partner who did not "realize" the launches were geared to separate customers and told McComb that he was furious at Liz Claiborne for launching lines at JCPenney's that competed directly with products sold in Macy's stores.  In fact, as recalled by CW1, by the end of February, Macy's bulk orders for the fall season had already been received and there was already a significant cut, of approximately 30%;

b.      Due to the fact that Macy's was the Company's largest customer, Sullivan and McComb knew or should have known that Macy's CEO Lundgren viewed JCPenney's as a rival.  *See* ¶¶36 and 56;

c.      Having entered into a "big" long-term deal with JCPenney's, a deal with a "tremendous upside," Sullivan and McComb knew or should have known that JCPenney's had stated its intent to use Liz Claiborne and Ralph Lauren product lines, *inter alia*, to compete head-to-head with traditional department stores such as Macy's, particularly after the consolidation arising from the Federated-May merger (*see* ¶¶3, 29, 33, 34, 53, and 62).  At the end of the Class Period, McComb expressly acknowledged this fact (¶85);

      d.      Even assuming that defendants had intended to create and market distinct product lines, analysts (¶¶38 and 61), and an industry publication (¶57) had already expressed concern that the mere use of the former department store "Liz & Co." brand at JCPenney's could be seen as detrimental to the core Liz Claiborne brand;

      e.      As McComb admitted at the end of the Class Period, *see* ¶87, the "front-loaded" advertising campaign for the core Liz Claiborne brand was "designed to support all of the Liz brands, including Liz & Co.," as the Company and Sullivan made the "very smart [decision], in being solid brand managers," to replace "Crazy Horse" with "Liz & Co." and to "make the investments on the floor and create the kind of brand halo that frankly the Liz Claiborne brand deserves to have;" and

      f.      The Company's Form 10-Q, for Q3'06, filed on November 1, 2006 – *after* the JCPenney's deal was struck but three weeks *before* the November 22, 2006, meeting – did not discuss the significant JCPenney's deal (entered into after the statement date but before the filing date) or any potential negative ramifications with higher-end department store customers – despite the high-profile nature of the deal and the fact that analysts were already raising red flags about potential denigration of the Liz Claiborne brand and resulting pushback from the higher-end department stores (¶¶38 and 50).  Even though Sullivan repeated the assurances made during the October 26, 2006, conference call, *i.e.*, about how LIZ's department store partners were on board with the JCPenney's deal, when the 2006 Form 10-K was filed that same day (on February 28, 2007) – months *after* the November 22, 2006, meeting – a "Risk Factor" was suddenly added concerning:

"Risks associated with selling our Liz & Co. and Concepts by Claiborne brands outside
of better department stores."

66.     During the February 28, 2007 conference call, McComb and Sullivan responded
to analysts' questions:

| | |
|---|---|
| Jeffery Edelman: | Bill, a simple question for you—what was your single biggest takeaway after meeting with your larger customers? Are they looking to do more business with you? Is it going to be a struggle to maintain your business relationship? If they want diversification and differentiation, can Liz provide it, or are they going elsewhere? |
| McComb: | I think that our customers—there are always I will call it executional or tactical or even specific strategic issue with one brand or another brand, and there's always attention back and forth about distribution. But by and large, what my biggest takeaway is that our customers see the vast capability that we have and our ability to buy brands, to market brands, to take them globally and to build brand power. So I see a significant openness and eagerness to partner with our company, in spite of any specific tensions that might exist on a given brand or on a given issue. |
| | So I would say that we remain very well-regarded as a partner, and the conversations that I have had are very, very future-oriented and talking about what we can do to power up their particular strategies. I think that that's the way the conversations need to go. |
| | I will say that you do here a strong theme in my conversation with you about the emphasis on building irresistible product. That comes out of the number-one point that our wholesale customers have to say to me is that more than anything, that's what they need our company to do. They want us to deliver strong brand propositions, because that helps deliver customers in their stores. |
| | Unlike the packaged goods environment that I come from, we reinvent our product lines at least five times a year. The product is the brand, and having a very strong capability |

> and culture around product is what the retailers are looking
> for us to do. Therefore, you're seeing that emphasis in the
> conversations that I'm having.

67.     With respect to the relationship with Macy's, this response was materially false and/or misleading when made, and made with scienter, because McComb knew, or should have known, that the problem with Macy's was not merely strategic or a tactical execution issue, there was going to be a struggle to maintain the Macy's relationship with respect to the core Liz Claiborne brand, and the Company was not currently a "well-regarded partner."  As set forth in ¶¶40, 54-55, 58-59, and 65, CEO Lundgren was "furious" about the JCPenney's deal and Liz Claiborne was going to "lose its most-favored nation status," to make room for unique and exclusive fashions on its selling floor.

68.     Sullivan was asked by Kate McShane how the Liz Claiborne brand "is selling in the May stores?  Have you seen an increased penetration in these stores of that brand?"  Sullivan responded: "Currently, we're pleased with the business we see in department stores ... [w]e continue to be quite pleased with what we see happening."   As set forth in ¶¶40, 54-55, 58-59, and 65, this statement was materially misleading and made with scienter because initial bulk orders received from Macy's in February 2007 were down approximately 30%.

69.     Near the end of the call, an analyst again asked defendants about the impact of the Liz & Co. launch on sales of the  Liz Claiborne brand, which had just begun to rebound:

> David Glick:   Just a few follow-up questions on the core Liz Claiborne brand. First of
> all, Trudy, congratulations on the great progress you all made in the Liz
> Claiborne wholesale sales in Q4.
>
> Sullivan:       Thank you David.

---

David Glick:    However, do you have some potential concerns, or are there concerns over the Liz & Co. launch in Penney's among other departments store executives? Can you sustain the same kind of momentum you saw in the Liz Claiborne wholesale business in Q4 throughout 2007?  What is the tone of the—you alluded to it in your opening comments. What's the tone now among other retailers? Are they still concerned, are they over it, are they encouraged by the selling, are there any floor space or quality-of-location issues as potential fallout? I just wanted to get a little more color on that.

Sullivan:    ...[K]ind of all of the above. I think that there's a tremendous, you know, initially, there was a lot of what I would call robust discussion around the wisdom of it. I think our department store accounts are pleased with what they're seeing about Liz Claiborne. They want to see it sustainable over time, as do we, so we are pleased with where we have brought it. They clearly know the esteem and regard that their customers have for both Claiborne and Liz Claiborne, and that has never been in question. ***And so, our commitment to them is that we will have very separate and distinct and elevated lines in department stores that are absolutely suitable for what our customers are telling us they want to find in their stores, and I would say, for the most part, they are tracking right along with us.*** That's a very valuable consumer to them, and they want this consumer well-served. They want us to do a good job in terms of the lines that we put into the market. That's what we're focused on doing, and so I would say that it certainly is our intention to maintain this momentum.

McComb:    It does look—reflect back on the Group President realignment, though. I mean, central to this initiative, in theory, is segmentation. ***As Trudy said, the Liz Claiborne apparel lines in the traditional department stores have a distinctive and elevated product presentation versus what we're doing with the diffused line.***

Sullivan:    It's important also to understand that there's a very attractive consumer in the mid-tier world, that shops at a different price level and is in a different consumer segment, and that these brands are strong enough to be able to pursue this kind of segmentation approach. You could certainly look at the market and see that there are other strong brands that have successfully done this as well. So we are equally as excited about the quality of what we're putting into the market under Liz & Co. and Concepts by Claiborne, and we're very committed to the success of those lines for JCPenney as well.

(Emphasis added)

---

70.     Sullivan's and McComb's responses were false and/or materially misleading, each breached their duty to correct the other's misstatement, and the statements were made with scienter, for the reasons set forth in ¶¶40, 54-55, 58-59, 65 and 67, above.  Additionally:

a.     Witnesses heard Macy's CEO Lundgren make the remark to CEO McComb "you have lost your most-favored nation status"—a remark he did not deny making when responding to reporter Michael Barbaro of *The New York Times* (for the July 31, 2007, story discussed herein).  Therefore, defendants knew yet failed to disclose that there was, in fact, a "floor space or quality-of-location" impact at Macy's from the launches at JCPenney's—something they eventually admitted at the end of the Class Period.  Not only would certain Macy's stores not carry the Liz Claiborne brand at all, as indicated by CW1 (¶40), but there would be floor reductions at other Macy's stores as well.  *See* ¶¶80-81; and

b.     Defendants also materially misled the market about using a "segmentation approach" to target the core Liz Claiborne brand and Liz & Co. to different segments of the market; they knew or recklessly disregarded, as admitted at the end of the Class Period, *see* ¶87, that the advertising campaign for the core Liz Claiborne brand was intended to support Liz & Co. sales as well, with the change from "Crazy Horse" to "Liz & Co." intended to create a "brand halo" around the Liz Claiborne brand.

71.     The statements complained of in ¶¶64, 66, 68 and 69, and the February 28, 2007, Form 10-K's addition of a warning noting business: "Risks associated with selling our Liz & Co. and Concepts by Claiborne brands outside of better department stores," were also false and

materially misleading and made with scienter because, as defendant McComb later admitted, in addition to reduced bulk orders for fall season received in February 2007, spring season orders *had already been slashed* by Macy's by the end of February, 2007, "a few months" after the fateful November 22, 2006, meeting. *See* ¶54, above.  Lead Plaintiff so alleges for the following reasons:

a.      Industry custom is to debut collections approximately six months ahead of season, *e.g.,* Fashion Week for spring season 2007 was held in New York City on September 8-15, 2006.  According to CW1, in September, LIZ received Macy's bulk orders for the spring season in September 2006;

b.      During the October 26, 2006, conference call, when asked about the direction of the momentum of the orders already received – *i.e.,* were they trending higher or lower – CFO Michael Scarpa, also the SVP of Finance and Distribution (and soon thereafter the COO) stated: "...[W]e would like to just punt that until January ... when we will have our spring and summer markets completely booked."

c.      Whereas the JCPenney's deal was to commence with spring 2007 apparel (¶35), and those lines, which selectively debuted in January, were being rolled out to all stores by mid-February (¶60), bookings for spring season apparel – and changes thereto – were, as CFO Scarpa had earlier indicated, already completed by the end of January 2007; and

d.      McComb stated in December 2008 that one of the reasons Q1'07  revenues fell short of expectations was a direct result of Macy's slashing the spring season orders it

had initially made (in September, according to CW1) shortly after the November 22, 2006, meeting: "A few months later Macy's slashed orders for the spring season. That devastated Claiborne's earnings, which plunged 65%, and wiped out $785 million in market capitalization overnight."

Whereas the Q1'07 Form 10-Q indicates that LIZ did not recognize revenues in its wholesale operation until title passed and the risk of loss had passed to the customer, the February 2007 reduction in bulk orders for fall referred to by CW1 would not have had an impact upon Q1'07 revenues.  Moreover, the article referred to spring season orders being slashed, not fall season. This was a distinct event which likely occurred by the end of January, per then-CFO Scarpa's statement in October 2006 that bookings would be completed in January.[4]

72.     Analysts' reactions to the Company's operating results announced on February 28, 2007, were cautiously optimistic about LIZ's long-term prospects and looked forward to FY'07 guidance in July.  Morgan Stanley raised its price target by $3 to $43, based upon confidence that changes in 2007 will reap rewards in 2008.  Citing primarily the same reasons, Cowen and Company, rated LIZ an "outperform" "over the next year to year-and-a-half." Cowen noted that the "long-awaited turnaround of the core Liz brand ... should boost mgt credibility."   Also noting improving trends in the core Liz Claiborne brand and expenditures on "power brands" to fuel long-term growth, Credit Suisse raised its price target for LIZ from $42 to $47.  However, Morgan Keegan pointed to a lack of visibility and lack of reliability to only

---

[4]An admission that there were two separate order reductions from Macy's was made on May 1, 2007, when defendant McComb explained: "Macy's too is right-sizing orders for a leaner and more productive inventory management, *but it is also taking that further step* of reducing the sales plan for the Liz Claiborne apparel brand in the back half.  (Emphasis supplied.)

retain a "market perform" rating.   That analyst noted that the Company had not repurchased any of its stock in Q4'06, for the first time in two years.

73.     On March 1, 2007, JCPenney's Chairman and CEO Mike Ullman was featured in a Management Discussion session at the Bear Stearns Retail, Restaurants & Consumer Conference.  When asked whether a JCPenney's core customer would reject Sephora, American Living and Liz & Co. brands, Ullman responded: "[I] think the issue is not about raising the price.  The issue is style, quality, price, balance and earning it ... [Our] success for the last couple of years kind of validates that customer is willing to pay more when we get it right."

74.     The questioner noted that during JCPenney's turnaround period, one key competitor was Kohl's and asked who JCPenney's was currently benchmarking against.  Ullman responded: "[T]o do the same thing that Kohl's does is really not an objective.  I think putting the attractions in the store, the difference is I think Sephora inside JCPenney .... American Living will turn out to be, across the store, the single biggest branded lifestyle statement in the store and we'll be distinctive and different than you'll find in our key competitors.  I think Macy's is probably a great idea to be combined to [sic] companies and have 800 plus stores across America ... We compete with everybody..."

75.     On March 2, 2007, JCPenney's conducted its February sales call.  Investor Relations Manager Ed Merritt reported the early success of the two new lines: "Customer response [to] Ambrielle, our new private brand in lingerie, and our new Liz Claiborne lines, Liz & Co. in women's and Concepts [by] Claiborne in men's which all launched in February have been very strong where sales are way ahead of our expectations..."

76.     On March 21, 2007, Liz Claiborne participated at the Merrill Lynch Retailing Leaders Conference and made a presentation to research analysts, investors, and other market participants.  Therein, in relevant part, defendants McComb and Sullivan, stated:

Q:      I was asking about the Liz Claiborne brand and the thing I want to get a sense from you guys as how you revitalizing it—I meant still selling through department stores? What is the long-term potential for this brand?

Sullivan:   No, we are extremely pleased with the progress that's made in the Liz Claiborne brand ... But the response to the upgrades, I know a number of you who at the channel sector is hearing the same thing we had some incredibly positive feedback on what is happening with the Liz brand right now so we tend to keep going.

*       *       *

Q:      Going back to the wholesale channel, can you just discuss some of the opportunities and challenges with Federated, now that they're such a big part of the department store world?

McComb:   Yes. I think that we probably said, and you have heard over and over, that their integration of the May stores was significant and nothing else—no other consolidation like it in its history. And as they go through the process of integrating, as their partner, we and all of our other wholesale competitors go through those ups and downs. I think that—I'll tell you—I may give you a slightly different answer—I think the real question is how can we help Macy's in particular? Macy's which is the business in the most transition, how can we support them as a vendor? How can we continue to engineer a supply chain and deliver brand propositions to them that help them with their goal of driving more traffic into stores? And doing in effect for Macy's what we plan to do in our doing with our own specialty retail stores.

And so I think that there are opportunities to have some pretty compelling conversations and the deployment of our own resources to step away from this model that we've had historically that can be win/lose or lose/win, and talk about really helping them even more accelerate their front-end consumer goals by bringing to the table what we can bring to the table, which is product flow and speed, quality of product and design, and brand power. And that's what we're doing. I think that they—the department store world, I think if I traced analysts' reports of that industry going back

to the 90s, early 90s, every quarter looks the same, there's a tremendous amount of challenge from other channels, it's an industry in flux, there's no question. But Macy's is now on a pretty special strategy that's tied to their brand power and national advertising. I think we as a vendor that has supported them and they've supported us, I think that we need to frame the question that way that I just did, and that's what we're doing.

And that's the Macy's Federated piece. We feel the same way about Belk, about Bon-Ton Carsons, and Dillards, and those principals are very engaged in those conversations with us and we care a lot about their businesses and we want to know—I mean, Dillards has a great vision for their company and we want to be right there supporting it. And doing it in a different way than we have before.

So I will tell you that the real answer to your question, it's about innovation and it's not about tricky margin management or those games that we've been playing in the past.

Q:      Just following on that, Trudy, how would you sort of characterize your relationship today with the department stores and the national chain? Are you —how would you characterize the relationship? Is it improving? There's a case to be made out there that they're all going vertical, where they want special stuff and that's just to mediate [phonetic] the historical big guys. Can you talk a little bit about it?

Sullivan:      Bill's comments are exactly right on. We're looking to continue to innovate with—these are tremendous trading partners for us. And for the most part they had great relationships [we're] both on a quest for innovation, we're both on a quest to really delight consumer that is go into those spaces. We think we have tremendous brand capabilities we can bring whether it's to a JCPenney or a Macy's. So I think we're on a quest to innovate and to continue to grow our businesses together.

We would like to evolve away from the classic buy/sell model that has been so characteristic of this industry and we believe that we have insights from our direct-to-consumer experience that we can bring over into this world, as well as our brand development capabilities. In every case, we work on big, successful brands with a number of these partners. So we are really on a quest to continue and actually increase the pace of innovation and how we actually conduct business together. That's a very exciting topic.

---

> Q:       Are they more responsive to that message?
>
> Sullivan:   I'd say absolutely as a—potentially a principal on high-level absolutely.  I
> mean they are fully engaged in these discussions with us since.  And these
> are, big cultural changes and it takes [indiscernable] in order to bring it to
> there.

77.     The statements contained in ¶76 were materially false and/or misleading when

made because defendants gave the false impression that: (1) they were working well with

Macy's, "supporting" Macy's with its "very special strategy that's tied to their [sic] brand power

and national advertising;"   (2) that the Company's relationships with national chains were

"great;" (3) that department stores are "absolutely" responsive to the Company's innovative

approach to growing their businesses together; and (4) that there was renewed interest in the core

Liz Claiborne brand at department stores.

78.     The false and/or materially misleading statements contained in ¶76 were made

with scienter for the reasons set forth in ¶¶70-71.  In addition, defendants ultimately attributed a

substantial part of the Company's disastrous Q1'07 and declining orders for the second half of

2007 to significant cutbacks by Macy's for both the spring and fall seasons.  For the reasons set

forth in ¶71, by March 21, 2007, ten days before the end of the quarter, defendants knew or

should have known the extent to which Macy's Q1'07 Liz Claiborne brand orders had already

been cut – as Macy's CEO Lundgren had months earlier indicated to McComb would occur.

(Indeed, when defendants finally admitted what had happened, they claimed that the various

negative events occurred in the last 60 days, *i.e.*, between the February 28th and May 1st

conference calls.  With respect to Q1'07 sales – spring season orders which were booked from

fall 2006 through no later than January, for shipments beginning in February, however, almost the entire quarter had elapsed by the time of the Merrill Lynch conference on March 21st.)

<u>**Disclosures at the End of the Class Period**</u>

79.     On May 1, 2007, Liz Claiborne shocked investors when it issued a press release entitled, "Liz Claiborne Inc. Reports 1st Quarter Sales and EPS."  The Company reported that its first-quarter earnings had plunged approximately 65% and forecasted an unexpected decline in annual profit.  For the first-quarter, Liz Claiborne reported net income of $16.2 million, or $0.16 per share, a significant decline from $46.9 million, or $0.45 per share, reported a year earlier. The Company said that clothing sales to chains such as Federated Department Stores Inc.'s Macy's declined 7.4% and that first-quarter sales fell 1.6% to $1.15 billion.  Excluding some expenses, profit was $0.22 per share, well below the consensus estimate of analysts for a profit of $0.60 per share on sales of $1.26 billion.  The Company forecasted profit for 2007, excluding restructuring costs, between $1.90 and $2.05 per share, which was well below the average estimate of $3.13 per share among eight analysts surveyed by Bloomberg.  In the press release, Defendant McComb, in relevant part, stated:

> Clearly, we wish we could have reported better first quarter earnings and provided a stronger outlook for the year. Our first quarter results reflect significant challenges in our domestic wholesale business, partially offset by improved direct to consumer performance. Results were driven by lower than anticipated domestic wholesale re-orders, higher levels of markdowns across the domestic wholesale channel and changes in the retail calendar that shifted some shipments into the second quarter. Beyond these first quarter results, we have seen an acceleration of many of the negative trends that have impacted our wholesale business over the past few years, resulting in Fall orders that are substantially below those levels originally discussed with several of our major retail partners. Due to this increasing pressure in our domestic wholesale business, we now expect a

significant shortfall in projected 2007 earnings compared to both our internal plan and last year's results.

McComb continued, "At the same time, we have many bright spots in our portfolio, including retail sales growth in the mid-teens for the quarter, reflecting strong results from our Juicy Couture and Lucky Brand businesses, as well as our newly acquired Kate Spade business. We also benefitted from improved margins in our outlet and Mexx Europe business and the highly successful launch of Liz & Co. at J C Penney, which is trending ahead of plan and is an emerging growth brand."

Mr. McComb concluded, "It is clear that these projected results mark a sea change in how we must run our wholesale business. We must evolve our operating platform to deal with near-term challenges and achieve sustainable growth. We expect to build on our strengths, particularly our high-potential brands and rapidly growing retail segment. The actions we are taking are aimed at building the business not for one quarter but for the long haul."

80.    On May 1, 2007, Liz Claiborne held a conference call with analysts to discuss the

Company's financial results for Q1'07 announced in the press release issued that day.  Therein,

in relevant part, the Company stated:

McComb:    It's clear from this analysis that we have a tale of two cities on our hands. There are some remarkable bright spots in our portfolio; lifestyle brands that span men's and women's, multiple product classifications in multiple geographies, brands that are growing and have significant profit potential. At the same time, ***the pressure on our Wholesale portfolio from industry trends has intensified significantly***. It's time we take action to address these issues head on, swiftly and intelligently.

*          *          *

The outlook in our Wholesale portfolio has changed since our business plan was developed last fall and refined in the first quarter of this year. In the past 60 days, we have seen an acceleration in many of the negative trends which have impacted our department store business over the past few years. The result is fall 2007 orders that are substantially below those levels originally discussed with several of our major retail partners during the end of the year and even during our market meeting. ***These negative trends within the wholesale space include a greater reliance on private***

*brands magnified by retail consolidation*; a squeeze on moderate brands like Emma James, J.H. Collectibles and Tapemeasure; a *reduction in sales plans and consumer demand for the traditional* and bridge *brands, like* Sigrid Olsen, *Liz Claiborne*, Ellen Tracy and Dana Buchman; and ever-growing demands for increased margin. But there are other burning issues in the channel that are impacting our business model with greater urgency and intensity than ever before requiring a sea change in how we operate this Wholesale business, and these include an aggressive call to action from the retailers to improve inventory turns and natural margins on branded goods. This would mean less reliance on an end of season check to achieve artificial profitability. *An increasing demand by retailers for exclusively branded labels for their floors*, coupled with a reduced reliance on more broadly distributed lines. *Specifically Macy's, their stated strategy is to continue to raise the penetration of private, exclusive and limited distribution brands which they have indicated already exceeds 80% of their sales.*

*     *     *

*Macy's too is right-sizing orders for a leaner and more productive inventory management, but it is also taking that further step of reducing the sales plan for the Liz Claiborne apparel brand in the back half. We believe that our decision to launch Liz & Co. at JC Penney's was a contributing factor to this reduction, regardless of the fact that the Liz & Co. brand offering differs in targeted consumer, product, price point and promotion strategy. The combined impact at Macy's accounts for approximately 50% of our overall reduced fall bookings corporately.*

Notwithstanding this news, we believe Liz Claiborne apparel can remain an important brand for Macy's, a view supported by consumer research that shows that some of Macy's most loyal and valuable shoppers favor the Liz Claiborne brand. We realize, however, that we will have to make changes in how we do business. To that end, we are rethinking our market cycles, we're refining our sales and shipping models and reviewing our product strategy again. While it will take time to adapt our Wholesale business model, these changes will enhance our ability to serve that retailer. And in the mean time, our product must deliver and we will focus intently on making that happen.  We will have more to say in July about the role the Liz Claiborne brand will play in our portfolio.  That said, we will continue to support the  successful Liz & Co. initiative which is going exceedingly well; even in investment mode, Liz & Co. will be profitable in 2007.

But as I said at the beginning of the discussion, this is a tale of two cities.

\* \* \*

Moving forward to meet the challenges and demands of the transforming department store business head on, we will revamp our structure and management of the channel. If we're going to be effective trading partners, we have to help the wholesale accounts deliver best-in-class inventory turn and margin performance.

\* \* \*

Sullivan: In our Liz Claiborne brand, we continue to elevate the product and positioning and are pleased to see the progress we're making this quarter ....But, as Bill discussed earlier, we are now faced with significant new challenges as retailers raise the bar on margin, turn, and sell-through requirements. So despite the progress we've made, this business is projected down in the back half of 2007.

Notwithstanding these pressures, retailers acknowledge the role that well-known national brands such as Liz Claiborne plays with our loyal customers in their stores. Our ultimate objective is to have our brand well represented ... across all of the channels in which we are represented today, Macy's included. We will continue to partner across our account base to ensure we provide this loyal consumer with the newness she wants and products she can't resist.

A testament to the consumer's affinity for this brand has been the success of our newly launched Liz & Co. exclusive with JCPenney. We remain committed to maintaining a clear distinction between the two lines, offering irresistible product for two different consumers shopping in two different channels.

(Emphasis added)

81. Defendants finally acknowledged to investors what they knew privately ever since McComb's meeting with Macy's CEO Terry Lundgren in late November 2006: The sharp reduction in both Macy's spring season and fall season orders of the Liz Claiborne brand was due to the launch of Liz & Co. at JCPenney's. Not coincidentally, right after each defendant

spoke about the fate of the Liz Claiborne core brand at Macy's both brought up the successful launch of Liz & Co. at JCPenney's. Despite the assurances that they gave—and continued to give—that both retailers were on board with the concept that the lines were different and the target customers were different, they were forced to admit that Macy's never saw it that way. (As McComb's remarks about JCPenney's during the question and answer portion of the call reveal, *see* ¶84, below, neither did JCPenney's.)

82.     In addition to the stark admission that the Liz & Co. line at JCPenney's cost the Company dearly with Macy's on sales of the Liz Claiborne core brand, which defendants had been seeking to revitalize, the truth about other false and/or materially misleading statements was revealed in defendants' prepared remarks. For example, McComb's statement on March 21, 2007, that "it's about innovation and it's not about tricky margin management" (¶76) was proved incorrect, as Sullivan was forced to admit: "If we're going to be effective trading partners, we have to help the wholesale accounts deliver best-in-class inventory turn and margin performance." Other true facts came to light during the question and answer portion of the call.

83.     Right off the bat, questioners were very concerned about the situation with Macy's. The first question, was from Margaret Mager with Goldman, Sachs:

> Mager:     I have a question on what's going on with your wholesale business and Federated. Can you talk about how this is coming about in terms of executing the reduction in the business? Are you going to be actually exiting some doors or do you stay in all the doors and you just reduce the amount of product in every door? Can you give a little more color around what is exactly going on at Federated? And then, secondly, the rollout at JCPenney and the offset there, could we interpret this as a bit of timing difference as you curtail Federated you ramp up JCPenney and the outlook for 2008 could be more favorable in the Wholesale business ...?

Sullivan:        First of all, talk to you about Macy's.  As we look at Macy's refining their really sales [sic] to receipt plans ... we will be exiting a small number of doors at the very bottom end of the performance range ... The stores that we're staying in, which is the majority of them, we really don't have any serious dislocation or space issues that we're dealing with as well.

                              *        *        *

McComb:        I think that, Margaret, the right-sizing of the Liz Claiborne brand sales plan reflects the change in how they intend for the resource to perform for them.  Of course, our product has to perform.  There is no discussion about significantly decreased retail pad space in the average Macy's store. I think that's an important point to add that gets to what you're asking.

Mager:          It's painful medicine, but it sounds like you're doing what you have to and I wish you the best going forward.

84.     Previously, when asked on February 28, 2007, whether there was any floor space or quality-of-location fallout from the JCPenney's deal, defendants maintained the party line, *to wit,* they were committed to working with their department store partners on an elevated Liz Claiborne line.  *See* ¶66.  However, defendants knew since November 2006 that the Company had lost its "most-favored nation" status on Macy's selling floor.  Only during this conference call did defendants finally admit that the Liz Claiborne brand would exit some stores and that space in the average store would be decreased (albeit not "significantly").  CW1 confirmed the loss of floor space in Macy's branches, indicating that cuts to the fall season bulk order in February 2007 reflected a number of branches that did not order any product.  *See* ¶40.

85.     When asked about the future with Macy's, defendants finally painted a realistic picture, revealing that they were not equal partners trying to "grow our businesses together" (¶76). Rather, having lost its "most-favored nation status," defendants admitted that they would

now have to convince Macy's—by working on door-by-door assortments—that customers will

still come to Macy's to purchase Liz Claiborne brand merchandise:

> Mager:  One last question on the JC Penney-Federated situation. As JC Penney rolls up, would we expect, or should we expect, that there will be further reductions in the amount of business done with Federated, or do you think that this is the bottom in terms of your business levels with Federated? Thanks.

> Sullivan:  You know, it's difficult to project whether this is the bottom. I have to say, we're taking the opportunity with Federated to do things in a much more evolved fashion in terms of how we handle the Liz Claiborne brand. We are actually partnering with them on door-by-door assortments, Margaret. I think there's a very good open dialogue. What we have asked is that the brand be well represented in their stores, and so let the consumers vote and so far we have been seeing, even with the launch of Liz & Co. at JC Penney, we have been seeing improving metrics at Federated.  So we think there is definitely a wisdom here regardless of anybody's brand that we try to leave the days where we're trying to force into that channel two and three times receipts to sales. It just doesn't promote profitability and we're taking every step we can at this stage to approach this in a much more rational manner with a brand that by everybody's affirmation, their research and our research, has tremendous regard for the customer that shop in their store.

86.    Defendants stated that they had not planned to take such a large hit on second half

orders.  In the following colloquy with a Merrill Lynch analyst, defendants claimed to have been

blind-sided by Macy's move:

> V. Genereux:  Trudy, you said that sort of 50% of the planned wholesale reduction was Federated and then I think you mentioned another 20% was Dillard's. Did you have those businesses planned flat or up? Can you tell us where you thought they were going to be?

> Sullivan:  We actually thought they would be flat to slightly less than flat because we see retailers really tightening up the inventory requirements as it relates to sales. And we have actually seen—Bill mentioned is opening remarks, we've seen Dillard's has been on this bandwagon for a little bit longer and has actually gotten some

|  | positive results from it. So they are—not accelerating, but they continue to see how they can continue to improve on already-improving inventory metrics. |
|---|---|
| McComb: | But we were planning, Virginia, traditional first-half/second-half type splits. |
| Sullivan: | Right.  Exactly. |
| Michael Scarpa, COO: | And, obviously, we look at where the spring bookings came in and the conversations that our sales executive and general management has with the retailers would indicate that the bookings we received were—obviously was a bit of a surprise to us. |
| V. Genereux: | Tell me about that, Mike, because that's—I feel like this business is, everybody has less visibility these days, but deterioration in sort of the last six weeks, Bill, you mentioned it. ***I feel like in our conference, you guys sort of said, the outlook for the year is not going to be scary. And can you just walk us through what happened in sort of last six weeks, 60 days, and what do you think is driving that? Is it Federated saying, we don't like Liz & Co. at JC Penney? It is Federated saying, we have to get more margin focus for the back half because sales may not be as robust?*** |
| McComb: | You're giving a pretty good answer to a little bit of all of those. I think that, first, let me acknowledge that I ***did say at that March conference, which was mid-March, that in fact we didn't anticipate anything scary.*** This was in response to queries from the audience that—those that were yearning for guidance. But to be frank, we said in February, on February 28, that we needed to— I said that I wanted to do and conduct a pretty significant analysis of the business to understand what was happening and that we had flagged certain pressures, ***certain pressures had been flagged even in the press around this Liz & Co. Liz Claiborne brand at Federated-Macy's- Penney's situation, and we didn't see anything scary at that time coming out of that.*** I will tell you, as I laid out in my presentation just a few minutes ago this morning, if you want to bucket the pressures. Number one, we said, Dillard's began it a year ago, Macy's is now doing it more aggressively maybe in part because of the consolidation and the opportunity that |

comes from consolidating a big operator like May, but a focus on inventory productivity. And we are hearing that that focus is being applied to vendors beyond Liz Claiborne Inc. ***And it certainly is being applied to brands across our portfolio, not just the Liz Claiborne apparel brand. For that reason, we don't believe that that is a punitive pressure.*** We believe that that is a—let's make business work more efficiently. ***The conversations around that are, we expect your product to deliver a natural margin that is higher,*** and that should result in lower end-of-season checks or [assisted] profitability from an end-of-season vendor reconciliation perspective.

I will be honest and tell you, I personally embrace that. I embrace it because it does not make sense to significantly over-shift goods just for the measure of collecting receipts, and that creates a real pressure on the 2007 P&L. But honestly, Virginia, you asked the question that's on everybody's mind—what changed, what changed? ***We said that when buyers were in our showrooms and even prior to that at end of year last year, we were getting signals for a receipt pattern that not only mirrors the same front-half/back-half splits that we've seen in previous years, but one that was very close to what our plan was calling for.*** When the actual final orders came in and we had visibility to them across the line for fall, we went through the process of anticipating additional markdowns, and frankly, having to project what holiday could look like to close the whole second half. And it was at that point that we realized that we either needed to go down the path of going on a major receipt kick in trying to drive additional orders or draw a line in the sand and own into the fact that we're going to run this businesses as healthy as it can be and put all of our management and people's attention into chasing the winners when we're in-season and optimizing these sales once we get in there and not pushing and going back to the showrooms and driving harder and harder and harder for what I will call—it would be the wrong leading metric.

(Emphasis added).   CW1 strongly disagreed with McComb's claim that back in mid-March, LIZ

was not seeing anything scary with respect to Macy's, calling such a statement "crazy."

Recalling the 30% cut to fall season orders, CW1 indicated that the ramifications of the JCPenney's deal on the Macy's relationship were quickly felt.

87.     Additionally, despite repeatedly representing that the Liz Claiborne brand and Liz & Co. were being designed for and marketed to different target consumer groups, *see* ¶¶50-51, 64 and 66, when asked about marketing and advertising expenditures, McComb admitted that the Company's strategy was not to have a "clear distinction," as previously represented, but a "brand halo" effect from the Liz Claiborne brand to Liz & Co.   McComb also acknowledged that, contrary to earlier class period representations, *e.g.*, ¶¶64 and 69, JCPenney's was competing with Macy's for the same customers:

> The spending on the Liz Claiborne brand was front-loaded, I will call it with a focus in print advertising, with a campaign that would support all of the Liz brands, including Liz & Co.
>
> \*        \*        \*
>
> [A]s a guy that came after the decision was made, I can tell you one of the things that was very smart about it, in ***being solid brand managers these folks no longer wanted to have "Crazy Horse, a Liz Claiborne Company" be the statement for a Liz Claiborne brand.  And by going Liz & Co. it has given them permission to do, to make the investments on the floor and create the kind of brand halo that frankly the Liz Claiborne brand deserves to have***.  With that though came, what I would call a strategic plan that was inspiring.  I wouldn't be looking to the Crazy Horse footprint to measure how big Liz & Co. can get.  I think that the more interesting question, which was asked earlier, is how big could it get relative to the Liz Claiborne Apparel brand in some of the light department stores.  I think one of the things you all need to focus on is what are the dynamics with Penney over the course of the next five years.  I mean we categorize them as a mid-tier player, but the reality I think when you listen closely to Mike Ullman and Ken Hicks's vision, in fact where their stores are located and who they go up against in malls, ***I in fact would argue that it is possible to think about them more increasingly as a traditional department store, and in time competing more and more for the same kind of foot traffic.***  So, I think that we are in this period

where there is a real—a dynamic of let's call it a transition between who you categorize in what channel.

(Emphasis added)

88.     The "earlier question" (and answers) referenced above presaged things to come:

| | |
|---|---|
| J. Black: | [I]t appears as though—that your Penney's business could actually be much greater than all of the Federated Liz business longer term? Is that a fair comment. |
| McComb: | Yes, it is. |
| Sullivan: | Yes, it is. |
| McComb: | It is a fair comment. |

89.     In October 2009, as set forth in more detail below, the Liz Claiborne core brand became exclusive to JCPenney's.

90.     On the missed estimates and significantly lowered guidance, shares of Liz Claiborne declined $7.72 per share, or 17.26%, to close on May 1, 2007 at $37.00 per share, on unusually heavy volume.  As reported by *The Wall Street Journal*, the steep decline contrasted with the general market: "As the Dow Jones Industrial Average closed at a record [13,136, up 72],  . . . Liz Claiborne . . . moved sharply lower."

91.     Analysts' take-aways from the conference call were consistent.  Negative reaction to the Liz & Co. launch and higher margin requirements decimated both the first quarter and fall orders.  Importantly, they did not believe that all of this occurred in the past 45-60 days, with no prior notice to defendants.

92.     Buckingham Research, on May 2, 2007, reported:

---

a.    "LIZ reports Q1 results which are a huge disappointment; initial FY 2007 guidance also comes in dramatically below expectations."

b.    "FD [Macy's] and DDS [Dillard's] account for 70% of LIZ's top line erosion in 2007 as these retailers look to increase turns, margin requirements, and pull back on core Liz Claiborne business in response to LIZ launch of Liz & Co. at JCP."

c.    "While we expected that an adverse reaction to the JCP launch could negatively impact second half earnings as retailers cut Fall 2007 plans in the core Liz Claiborne brand, we are surprised that the first quarter deteriorated as dramatically as it did, particularly since LIZ reported Q4 earnings on February 28th (two months into Q1) without giving investors any visibility to the challenges they were facing early in the fiscal year."

d.    "The impact of these challenges is a reduction of $150 million in sales and a $150 in operating income in 2007, of which 50% is coming out of FD.  While the company cited higher turnover and margin requirements as the source of these challenges, clearly these retailers desire to pull back on the Liz Claiborne due to the Liz & Co. launch was a contributing factor."   Soon thereafter, Macy's confirmed the analyst's belief that the Company's claim that margin requirement increases would be a significant cause of sales declines in 2007, more so than the Liz & Co. deal, was incorrect.  In a conference call held several weeks later, on May 16, 2007, when asked to comment upon Liz Claiborne's statement that Macy's was requiring higher margins, Federated flatly denied it:

---

FD:"I don't think they've said that we're requiring higher margins.  We're requiring higher margins than their product has been producing.  But that doesn't mean higher margins from what we've always expected.

Q: Okay, interesting.  Their press release just said that retailers are demanding higher margins.

FD: Well we are than what they have been producing.

Q: Okay, not historic levels?

FD: Correct.

      e.      "LIZ attributed the lower guidance to a number of factors, most notably the changing landscape and demands of retailers ... including: (1) Department stores are focusing more and more on private and exclusive brands .... (3) FD and DDS pulling back on sales and receipt plans (as well as cutting doors) in Liz Claiborne due to LIZ launch of Liz & Co. in J.C. Penney.  FD has publicly been very clear about their drive to increase the penetration of private, exclusive and limited distribution merchandise.  By utilizing the Liz name on JCP exclusive LIZ brand, Liz Claiborne is unlikely to be a pure "limited distribution" brand.  We would not rule out the possibility of the Liz Claiborne brand ultimately being phased out of many "better" department stores, particularly, FD."

93.      In an analyst report entitled "LIZ: The Worst of Times" Morgan Keegan reported, on May 2, 2007, that it was "shocked by the magnitude of the revision."  However, the analysts clearly believed that defendants knew that this was coming, possibly as early as the fall of 2006:

      a.      "The list of reasons for the revision (increased private label, decreases in moderate, traditional and bridge brands, and increased turnover requirements) are far from new, and we can't help but think LIZ saw the writing on the wall as the company

---

halted its share repurchase about the same time it launched Liz & Co. at JCP and underwent numerous management changes.   Given this analyst's background in department store merchandising, we're hesitant to believe all of the above issues came to roost over the past 60 days;"

   b.  "...[W]e're not completely convinced that the deterioration that allegedly occurred over the past 60 days wasn't seen coming by LIZ's management team ... In our view, the decision to launch Liz & Co. at JC Penney ... was the catalyst FD needed to more aggressively cut orders of the core brand.  We believe FD tried to treat LIZ as a partner, somewhat ignoring the fact that the core brand had been underperforming the department for some;"

   c.  "Coming from industry, this analyst is extremely skeptical that the confluence of factors all occurred over the past 60 days.  From our experience, the buying function is much more dynamic than this time frame suggests.  We remember walking booths at the MAGIC show in February and talking to industry contacts that suggested rockiness existed in the LIZ-FD relationship.  We can't believe that the moderate and private label issues occurred out of left field..."   (Indeed, CW1 indicated that the fall season cuts were known by February 2007; per McComb's admission in ¶54, the spring season reductions were likely known by the end of January, when the bulk orders were "slashed" "a few months" after the November 22, 2006, meeting.)

   d.  "Last year, at that start of October, LIZ announced the launch of Liz & Co. at JCP.  After buying back [approximately] 7 mm shares for well in excess of

$260mm over the TTM, the company halted its repurchase after the October quarter[5] ... We don't think all of these issues are a coincidence, and we have a really hard time believing they came up over the past 60 days.  That said, we think management is about as smart as they come in the apparel industry, and we can't help but believe they understood the long-term potential at JCP with Liz & Co. was greater than the long-term potential at FD with the core brand."

### Disclosures After the Class Period

94.    Although defendants tried to spin the Macy's cuts as higher margin requirements on all of the Company's brands, and not a punitive measure for the JCPenney's deal (something the industry, investors and analysts did not believe, even before Macy's flatly denied it several weeks later),  the truth was quite the contrary—and was repeatedly confirmed over time.

95.    On May 10, 2007, the *New York Post* published a story written by Suzanne Kapner entitled, "MACY'S, LIZ FIZZLE":

> **The relationship between Liz Claiborne and its largest customer, Federated Department Stores, has grown increasingly strained over the apparel-maker's decision to launch a new line with J.C. Penney.**
>
> The tensions underscore the difficulties facing clothing manufacturers as they try to expand in the face of demands for exclusivity from increasingly powerful department stores.

---

[5]During the October 26, 2006, conference call, then-CEO Charron indicated that $229 million remained outstanding in the share repurchase plan authorization at the end of Q3'07. LIZ's Form 10-Q for Q1'07, filed on May 1, 2007, reported that as of April 20, 2007, $229.2 million in buyback authorization remained.  Thus, the analyst was correct that no share repurchases occurred in the period between the time the JCPenney's deal was announced and 10 days before the end of the Class Period.

*Federated executives have privately complained that some of the J.C. Penney merchandise, sold under the Liz & Co. name for women and Concepts by Claiborne for men, looks too similar to products carried in its Macy's stores.*

Store checks turned up several similarities, including an almost identical eyelet pattern; button-down linen shirts with a distinctive rolled sleeve; an abundance of seersucker; and the recurrence of a similar black and white floral print.

Federated has moved to curtail products that are widely distributed elsewhere, especially in J.C. Penney and Kohl's, which cater to a slightly less affluent customer than do Macy's stores.

Federated spokesman Jim Sluzewski declined to comment on the company's relationship with Liz Claiborne.

Liz Claiborne President Trudy Sullivan said the lines were targeted to different customer groups.

Liz & Co. is more casual and uses less expensive fabrics like linen and nylon blends, so the clothes cost less.

Liz Claiborne merchandise commands higher prices, because of richer fabrics and more career items like blazers.

"That doesn't mean that Macy's is 100 percent happy about this," Sullivan said.

When Liz Claiborne reported a 63 percent drop in earnings last week, it blamed a chunk of the shortfall on cutbacks by Macy's. The retailer has been reducing inventory across the board, not just of Liz Claiborne items. Still, the apparel maker told analysts that the "decision to launch Liz & Co. at J.C. Penney's was a contributing factor to this reduction."

To an untrained eye, the Liz Claiborne and Liz & Co. lines could have been more differentiated.

Though a Liz Claiborne shirt is made of 100 percent linen and sells for $59, while the Liz & Co. version, made of a linen/nylon blend, was on sale for $21.99 (originally $44), both share a key design element: The sleeves are rolled up and fastened with a buttoned-down flap.

> A distinctive eyelet fabric is used for a Liz Claiborne jacket ($59) as well as a J.C. Penney sleeveless top ($44).
>
> Sullivan countered that linen and eyelet lace are common fabrics in spring and summer collections.
>
> Yet, a walk through of labels that sit near Liz Claiborne in Macy's stores, such as Jones New York and Charter Club, turned up a greater amount of variation on these themes.
>
> Other items that drew scrutiny were men's dress shirts, of which about half the styles sold at J.C. Penney seemed very close to those at Macy's.
>
> Macy's stores in the Midwest were spotted carrying a near identical faux croc bag sold at J.C. Penney for $45.

(Emphasis added).

96.     On May 17, 2007, JCPenney's held its Q1'07 conference call with investors and investment analysts.  In addition to reporting a department stores sales increase of 4.4%, the company reported its 16th straight quarter of increased comparable stores sales.  Liz & Co. and CONCEPTS by Claiborne were described as "off to a strong start and performing above initial expectations."  When asked if there was any slowdown in the business originally generated in markets where Federated closed stores in 2006, Myron Ullman responded: "Just getting started ... Federated has 850 stores that are open so we are willing to compete in those markets and we think we compete very well."

97.     On May 18, 2007, the *New York Post* published a story written by Suzanne Kapner entitled, "CLOTHING DRIVE."  Therein, the story, in relevant part, stated:

> Liz Claiborne's gamble might just pay off.
>
> **The large apparel maker made a bet that it could increase sales with J.C. Penney by offering a new line called Liz & Co., even at the risk of hurting its**

*relationship with Federated Department Stores, which sells Liz Claiborne sportswear at its Macy's stores.*

That calculation seemed to bear out yesterday, when J.C. Penney reported a 13 percent increase in first-quarter sales and raised its annual earnings forecast, largely because of strong sales of new lines such as Liz & Co. among others.

Manufacturers like Liz Claiborne have been forced to walk a tightrope as they balance department store demands for exclusive merchandise with their need to grow by launching new lines.

*Federated executives were not happy about Liz Claiborne's partnership with J.C. Penney. When Liz Claiborne reported a shortfall in earnings recently, reduced orders from Federated were largely to blame.*

Manufacturers are typically loath to cross Federated, which became the nation's second-largest department store chain behind Sears with its 2005 purchase of the May Department Stores Co., although that is changing as J.C. Penney and Kohl's close the gap.

In another move that displeased Federated, designer Vera Wang is launching a lower-priced line to be sold at Kohl's under the Simply Vera Vera Wang name.

Sales of Liz Claiborne sportswear at Macy's stores have languished for years. *Sources said that Liz Claiborne considered it worth the risk to potentially alienate Federated if it could jump-start sales at J.C. Penney*.

J.C. Penney has been in an expansion mode with plans to open 250 stores over the next five years. Sales and earnings have rebounded as the company adds more branded merchandise such as Bisou Bisou and Nicole Miller. This summer, J.C. Penney will introduce a line of jeans by Chip & Pepper that will sell for roughly one-fifth of the typical $160 price tag commanded at upscale stores like Barneys New York.

In contrast, Federated reported on Wednesday that first-quarter sales and earnings came in shy of analyst estimates as it struggles to improve business at the former May stores.

(Emphasis added).

98.     On July 31, 2007, *The New York Times* published a story written by Michael Barbaro entitled, "At Liz Claiborne, a Bold Fashion Statement."  Therein, the story, in relevant part, stated:

> In mid-April, as orders for fall clothing began pouring into the headquarters of Liz Claiborne—the apparel giant behind Juicy Couture, Kate Spade and Lucky Brand Jeans—executives paid unusually close attention to one buyer, Macy's.
>
> ***Liz Claiborne's decision to develop a new product line for J. C. Penney had infuriated Macy's chief executive, Terry J. Lundgren, company officials said. Executives expected small cuts in Macy's orders for fall—punishment, in their eyes, for cheating on their biggest client—but what arrived "shocked us," said the new chief executive of Liz Claiborne, William L. McComb***.
>
> Macy's slashed orders for the Liz Claiborne brand by millions of dollars. ***"You have lost your most-favored-nation status" at Macy's, Mr. Lundgren told executives at the clothing company, according to people who witnessed the conversations.***
>
> The impact was disastrous. Liz Claiborne's first-quarter earnings plunged 65 percent and Wall Street pummeled the stock, knocking it down more than 17 percent, to $37 from $45.[6]
>
> *       *       *
>
> In 2005, the nation's two biggest department stores, Federated and May, merged, turning local chains like Marshall Field's and Filene's into Macy's, which had been under the Federated umbrella. The combined company, now called Macy's Inc., closed dozens of stores, leaving Liz Claiborne with fewer places to sell its wares.

---

[6]Keeping with the industry's six-month window from February debut to August shipment of fall season apparel, CW1 recalled that Macy's made its initial fall season bulk order in February, not April.  While orders might roll in for later delivery, a mid-April order by a company's biggest customer could not first be received that late in the year to ensure shipment by August.  Indeed, the author's timing appears suspect because a cut in orders purportedly received in mid-April for delivery in the fall season could not have any impact on Q1'07 earnings as suggested.  Based upon the information alleged above, the two distinct cuts referred to in this article likely occurred in late January or during February.

The flagship Liz Claiborne clothing brand, a nearly $2 billion business within the company, was hard hit by the merger. Weak sales of the classic-looking clothing had left it vulnerable, and the agreement last year to develop a line for J. C. Penney's, called Liz & Co., appeared to worsen matters.

Liz Claiborne had sold clothes to J. C. Penney for years, under the name Crazy Horse. But the new Liz & Co. name sounded an awful lot like the legacy Liz Claiborne brand. ***"It was the use of that precious capital 'L' that made them crazy," Mr. McComb said, speaking of Macy's.***

Mr. Lundgren, the Macy's chief, said in an e-mail message that there was no vengeful or ulterior motive in his decision to pull back. "It's no secret that the Liz Claiborne brand's sales performance has been deteriorating for several years," he said."Any adjustments in our orders with any vendor are solely a function of the performance of that merchandise in our stores."

Asked about his "most-favored nation" remark, however, Mr. Lundgren added that "our customers come to Macy's expecting to find merchandise that is not widely available."

(Emphasis added).

99.    In an August 16, 2007, article entitled "J.C. Penney Schools the Competition," writing for *The Motley Fool*, Ryan Fuhrmann noted that while Macy's just announced difficulty growing its top line, "consumers heading to Penney's are arriving with their wallets open."  In particular, "Penney's new labels that are proving popular to consumers include Ambrielle, Liz & Co. and CONCEPTS, in a successful relationship with Liz Claiborne."

100.    A March 9, 2008, article in the *New York Times*, "Trading Places: U.S. Designers Shift Store Loyalties,"  noted the upheaval in the retail industry occasioned by the "democratization of design"—a series of moves and exclusive relationships which resulted, in part, in famous designers creating lines for mid-tier department stores and mass retailers.  The

author described the impact of the "flurry of designer address changes" on Macy's—and Macy's

reactions to them:

> All this activity has raised a bar for traditional retailers like Macy's, which rarely had to fend off competition from below.  Its 2005 merger with May Department Stores, which created the largest department store company, was in part an effort to use size to wield more influence over designers.

> The democratization of design forced Macy's to claim exclusives it never before needed and to punish designers who cut deals elsewhere.

> When Wang went to Kohl's, Macy's dropped her popular lingerie line.[7]

> The chain cut orders from Liz Claiborne after the company offered a line called Liz & Co. to Penney.

> If the product is available in 50 different points of distribution in a five-mile driving radius, convenience becomes the No. 1 reason to buy a brand," said Terry J. Lundgren, chief executive of Macy's. "And so we lose."

> *      *      *

> Perhaps the most ambitious, and closely followed, new introduction is at J.C. Penney, where Ralph Lauren began selling a broad collection of fashions and housewares in February.  Because Lauren already sells his Polo collection to virtually every department store—including the prickly Macy's—the collection at .C. Penney is called American Living, with no mention of Polo or Ralph Lauren in the stores.

> *      *      *

> "It looks just like Polo, even if it doesn't say so," said Ethel De See, 77, who bought American Living leather belts and towels.

> *      *      *

---

[7]Wang and Lundgren had previously been on very good terms, apparently.   "Miracle on 34th Street," the December 2006 *Wall Street Journal* article discussed in ¶54 above, noted:  "Mr. Lundgren is, after all, so much the fashion maven that he designed, along with Vera Wang, his second wife's wedding dress ..."

---

Some of the back room sniping over big designers has begun to spill into public view.

Asked about [Ralph] Lauren's line for Penney [American Living], Lundgren, Macy's chief, replied that "no one has ever heard of that brand."

101.    On April 23, 2008, an article entitled "Playing Exclusives Game: Results Can Be Win-Win But Brands Face Pitfalls," published on WWD.com, reported:

[Vera] Wang denied the rumor that Macy's dropped her lingerie line after her deal with Kohl's was revealed . . .

Nevertheless, the speculation reveals one of the major downsides of doing an exclusive line for one store: Another retailer can get upset and drop your other lines.

The Liz Claiborne line lost doors and real estate at Macy's when Liz Claiborne Inc. gave its Liz & Co. and CONCEPTS by Claiborne lines exclusively to Penney's.  According to sources, Macy's is also unhappy with the similarities between the American Living line at Penney's and Lauren by Ralph Lauren, which Macy's carries.

"If a brand name we carry suddenly has 1,000 more points of distribution, then that brand will be diluted," Lundgren said.  "There's no question there will be more supply than demand, the business will be transferred out of the existing companies, and our business will be hurt.  We take action because we've seen this movie too many times before.  We're not trying to flex our muscles—we are just trying to get ahead of what history tells us."

102.    On December 4, 2008, *Fortune Magazine* published an article written by Suzanne Kapner entitled, "Liz Claiborne's Extreme Makeover."  Therein, the story, in relevant part, stated:

*Back in 2006, on the Wednesday before Thanksgiving, he left his office at 1441 Broadway and walked the six blocks to Macy's Herald Square for his first meeting with CEO Terry Lundgren. Macy's is Claiborne's largest customer, and Lundgren was furious at the apparel maker for creating a less expensive line for J.C. Penney that competed directly with products sold in Macy's stores.*

> ***No matter that Claiborne's prior management had created the new label, called Liz & Co., McComb took the beating.*** A few months later Macy's slashed orders for the spring season. That devastated Claiborne's earnings, which plunged 65%, and wiped out $785 million in market capitalization overnight. ***"Terry wanted to teach us a lesson," McComb says.*** Macy's declined to comment for this story.

(Emphasis added).

103.    On October 8, 2009, *Crain's New York Business.com* announced "Liz Claiborne, JC Penney Ink Exclusive Deal."   The first paragraph of the story underscored the competition between JCPenney's and Macy's, when the former opened up its first NYC store across the street from Macy's flagship store location:

> Shoppers searching for the well-known Liz Claiborne brand will soon have to look no further than the Manhattan Mall.  JC Penney Co., which opened its first Big Apple store at the midtown mall in July, entered into an exclusive 10-year licensing agreement with Liz Claiborne Inc., the women's apparel company announced Thursday.  Penney's will be the only retailer to sell Liz Claiborne and Claiborne-branded merchandise, which includes about 30 different categories, in the U.S. and Puerto Rico, beginning in August 2010.


## CLASS ACTION ALLEGATIONS

104.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Liz Claiborne's securities between January 16, 2007 and April 30, 2007, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Liz Claiborne's securities were actively traded on New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Liz Claiborne shares were traded publicly during the Class Period on the NYSE and as of April 20, 2007, shortly near the end of the Class Period, the Company had 104,531,967 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Liz Claiborne or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

107.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.    Whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      Whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Liz Claiborne; and

c.      To what extent the members of the Class have sustained damages and the proper measure of damages.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

110.    The market for Liz Claiborne's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Liz Claiborne's securities traded at artificially inflated prices during the Class Period.  Lead Plaintiff and other members of the Class purchased or otherwise acquired Liz Claiborne's securities relying upon the integrity of the market price of the Company's securities and market information relating to Liz Claiborne, and have been damaged thereby.

111.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Liz Claiborne's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make defendants'

statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Liz Claiborne's business, operations, and prospects as alleged herein.

112.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about Liz Claiborne's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

113.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

114.    During the Class Period, Lead Plaintiff and the Class purchased Liz Claiborne' securities at artificially inflated prices.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein

to have been concealed from the market were revealed, and/or the risks thereof materialized, causing investors' losses.

## SCIENTER ALLEGATIONS

115.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Liz Claiborne, his/her control over, and/or receipt and/or modification of Liz Claiborne's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Liz Claiborne, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

116.    The market for Liz Claiborne's securities was open, well-developed and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, Liz Claiborne's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Liz Claiborne's securities and market information relating to Liz Claiborne, and have been damaged thereby.

117.    During the Class Period, the artificial inflation of Liz Claiborne's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about Liz Claiborne's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Liz Claiborne and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

118.    At all relevant times, the market for Liz Claiborne's securities was an efficient market for  the following reasons, among others:

a.      Liz Claiborne stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Liz Claiborne filed periodic public reports with the SEC and the NYSE;

c.      Liz Claiborne regularly communicated with public investors *via* established  market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as oral communications with the financial press and other similar reporting services;

d.      Liz Claiborne was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

e.      The market for Liz Claiborne's common stock promptly digested current information regarding Liz Claiborne from all publicly available sources and reflected such information – either the revelation of the truth with respect to material facts earlier misrepresented or omitted or the materialization of concealed risks – in Liz Claiborne's share price.

119.    As a result of the foregoing, under these circumstances, all purchasers of Liz Claiborne's stock during the Class Period suffered similar injury through their purchase of Liz Claiborne's stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

120.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Liz Claiborne who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

121.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

122.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Liz Claiborne's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

123.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Liz Claiborne's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

124.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Liz Claiborne's financial well-being and prospects, as specified herein.

125.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Liz Claiborne's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Liz Claiborne and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

126.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives

and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

127.     The defendants had actual knowledge of the misrepresentations and/or omissions of  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, and/or correct a misstatement of those facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Liz Claiborne's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge

by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

128.    As a result of the dissemination of the materially false and/or misleading information  a failure to disclose material facts, and/or a failure to correct misstated facts, as set forth above, the market price of Liz Claiborne's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Liz Claiborne's securities during the Class Period at artificially high prices and were damaged thereby.

129.    At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Liz Claiborne was experiencing, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Liz Claiborne securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

130.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

131.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the  other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

132.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133.    The Individual Defendants acted as controlling persons of Liz Claiborne within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

134.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

135.    As set forth above, Liz Claiborne and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: August 23, 2010

**GLANCY BINKOW & GOLDBERG LLP**

By: _Roder B Howald (RBH03)_

Robin B. Howald
1430 Broadway, Suite 1603
New York, New York 10018
Telephone: (212) 382-2221
Facsimile:  (212) 382-3944

*Lead Counsel for Plaintiffs*

**BRAGAR WEXLER EAGEL & SQUIRE, P.C.**

By: _Raymond A. Bragar (RB1789)_

Raymond A. Bragar
Lawrence P. Eagel
Jeffrey H. Squire
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: (212) 308-5858
Facsimile: (212) 486-0462

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2010, a true copy of the foregoing SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS was served by first class mail, postage pre-paid, on:

Andrew James Ehrlich, Esq.
Leslie Gordon Fagen, Esq.
Tobias James Stern, Esq.
Paul, Weiss, Rifkin, Wharton& Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019

Howard G. Smith
Smith & Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020

Nathan Monroe-Yavneh