UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

ANGELA TYLER, Individually and on Behalf of
All Others Similarly Situated,

                         Plaintiff,

        -against-

LIZ CLAIBORNE, INC., TRUDY F. SULLIVAN,
AND WILLIAM L. MCCOMB,

                     Defendants.

----------------------------------------------------------------

09 Civ. 04147 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Lead Plaintiff James S. Metz brings this putative class action against defendants Liz Claiborne, Inc. ("LIZ"), Trudy F. Sullivan, and William L. McComb, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Exchange Act Section 20(a), 15 U.S.C. § 78t(a).  Plaintiff alleges that between January 16, 2007, and April 30, 2007 (the "Class Period"), defendants fraudulently misrepresented facts relating to LIZ's relationship with Macy's, Inc. ("Macy's") and to LIZ's design of a new line of clothing for J.C. Penney Company, Inc. ("JC Penney").  Defendants now move to dismiss.  For the reasons set forth below, and specifically because plaintiff fails to adequately plead scienter, defendants' motion is GRANTED in its entirety; and this action is dismissed with prejudice.

# I. FACTUAL SETTING

For the purposes of the present motion, the following facts—drawn from the complaint, documents incorporated by reference therein, Securities Exchange Commission ("SEC") public disclosure documents, and documents known to the plaintiffs and upon which they relied in bringing this action[1]—are taken as true.

## A. Background

Plaintiff seeks to represent the class of persons who purchased LIZ's common stock during the Class Period, January 16, 2007, through April 30, 2007. (Second Amended Compl. ("SAC") ¶¶ 1, 18.) LIZ, a Delaware corporation with its principal place of business in New York, designs and sells clothing and other apparel, both wholesale and retail. (*Id.* ¶ 19.) LIZ's stock trades on the New York Stock Exchange under the symbol "LIZ." (*Id.*) As relevant to this action, LIZ designs mid- and high-end clothing, releasing new fashion lines each spring and fall, and sells those lines wholesale to department stores such as non-parties Macy's and JC Penney. (*See generally id.* ¶¶ 1, 6, 19, 25, 35, 40.) Trudy F. Sullivan was the President of LIZ during the Class Period. (*Id.* ¶ 20.) William L. McComb was the CEO of LIZ, and a director of the company, during the Class Period. (*Id.* ¶ 21.)[2]

In 2005, two of the most powerful department store chains, Federated Department Stores, Inc. ("Federated"), and May Department Stores Company ("May") merged. (*Id.* ¶ 24.) Federated operated the department store Macy's. (*Id.*) After the merger, Macy's become one of the United States' largest department stores. (*Id.* ¶¶ 24, 26, 29.) With its new power, Macy's demanded merchandise and fashion lines that were exclusive to

---

[1] *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] Sullivan and McComb are collectively referred to herein as the "Individual Defendants."

Macy's; it desired to sell items not available at other stores.  (*Id.* ¶¶ 26, 28, 31.)  Fashion items designed by LIZ were sold wholesale to, and sold retail by, Macy's under the brand "Liz Claiborne."  (*See id.* ¶¶ 9, 13, 36.)

Macy's was LIZ's largest customer by volume, accounting for eighteen percent of LIZ's total sales in 2005 and sixteen percent in 2006.  (*Id.* ¶ 25.)  However, sales of the Liz Claiborne brand at Macy's had been "slumping for some time," (*id.* ¶ 36); and therefore the relationship between LIZ and Macy's "was already precarious" (*id.*), at the time of the events described herein.  According to CW1[3], a LIZ "Vice President and General Manager," whose "area of responsibility included wholesale sales of the Liz Claiborne brand, and in particular, sales to Macy's" (*id.* ¶ 36), "everyone at [LIZ] knew that Liz Claiborne sales to Macy's had been falling" in the time prior to the Class Period.  (*Id.* ¶ 39.)  In addition, according to the *New York Post*, as part of Macy's reworking of its business model, Macy's "ha[d] been reducing inventory across the board," including, but not only, of LIZ's apparel.  (*Id.* ¶ 95.)

The Federated-May merger rocketing Macy's into the department store stratosphere apparently caused "turmoil" and "confusion" in "the department store landscape."  (*Id.* ¶ 33.)  Taking advantage of the situation, JC Penney undertook a new business strategy of closing down stores located in shopping malls and opening several stand-alone, more traditional department stores.  (*Id.*)  To establish its presence as a "real department store," (*id.*), and to bring in customers, JC Penney needed brand-name merchandise.  It obtained that merchandise by entering into a deal with LIZ under which LIZ would design two new fashion lines branded as "Liz & Co." and "CONCEPTS by

---

[3] The SAC details allegations of two confidential witnesses.  These witnesses are referred to as CW1 and CW2.

Claiborne." (*Id.* ¶ 35.)  JC Penney would sell those lines exclusively at JC Penney stores. (*Id.*)  The deal was announced on October 5, 2006.  (*Id.*)  McComb, who prior to becoming CEO of LIZ was Company Group Chairman at Johnson & Johnson, became CEO of LIZ on November 6, 2006.  (*Id.* ¶ 42.)  Between October 2006 and April 2007, LIZ did not repurchase any of its own stock from the market.  (*Id.* ¶¶ 11, 72, 93a, d.) Allegedly, prior to the fourth quarter of 2006, LIZ had repurchased some of its stock in each quarter for over a year.  (*Id.* ¶ 72.)

Some LIZ employees and some in LIZ management found the new JC Penney deal odd.  For example, CW1 was surprised.  According to CW1, Terry Lundgren, Macy's CEO, "knew that [JC Penney] was becoming a big competitor to Macy's."  (*Id.* ¶ 36)  Thus, explains CW1, Macy's was quite upset with the LIZ-JC Penney deal which allowed JC Penney to sell items branded with the word "Liz."  (*Id.*)  CW2, who "worked in [LIZ's] Fragrance Division"[4] during the class period, "was startled, because Macy's was [LIZ's] biggest customer:  In the world of apparel, if you launch a major line for a competitor, you have to consider how Macy's will react."  (*Id.* ¶ 41.)

Apparently, Lundgren, Macy's CEO, made his displeasure with the LIZ-JC Penney deal known to McComb in November 2006.  According to an article published in *Fortune* on December 4, 2008, on November 22, 2006, McComb had a meeting with Lundgren in which "Lundgren was furious at [LIZ] for creating a less expensive line for [JC Penney] that competed directly with products sold in Macy's stores."  (*Id.* ¶ 54.)  In addition, according to a *New York Times* article from July 31, 2007, Lundgren apparently

---

[4] CW2 is described only as quoted here, and is not mentioned again in the complaint.  It is unclear what position CW2 held or what CW2's job responsibilities were.  It is just as likely that CW2 was an officer or executive in LIZ's "Fragrance Division" as that CW2 spritzed customers as they walked by LIZ perfume kiosks at Macy's or Bloomingdale's.

"told executives at [LIZ]," that "'You have lost your most-favored-nation status.'"  (*Id.* ¶ 55.)[5]

**B.  The Class Period**

### 1.  Alleged Misstatements and Omissions During the Class Period

The Class Period begins on January 16, 2007, and ends on April 30, 2007.  (*Id.* ¶ 1.)  Plaintiff alleges that McComb and Sullivan made fraudulently misleading statements during that period that fall generally into three categories.  The first category consists of statements allegedly indicating that the LIZ-Macy's relationship was strong.  The second is made up of statements to the effect that the LIZ-JC Penney deal would not affect sales to Macy's generally.  The third category is of statements allegedly representing that *Macy's* understood that the "Liz Claiborne" and "Liz & Co." lines were differentiated and appealed to different consumers, and that therefore Macy's was on board with the LIZ-JC Penney deal.

On January 16, 2007—the first day of the Class Period—the trade journal *Women's Wear Daily* published a profile of McComb.  (*Id.* ¶ 57.)  The article suggested that Macy's was "miffed" at LIZ for selling the "Liz & Co." brand to JC Penney, and quoted "[s]ources" as saying that Macy's was "looking to cut back space for the Claiborne brand as [Macy's] focuses more on exclusive collections . . . or it could drop Claiborne's licensed products."  (*Id.*)  When McComb was asked whether Macy's was going to drop LIZ, he responded, "You would have to ask [Macy's], but I would be surprised if that was the case because it is a long-standing and important relationship for

---

[5] The *New York Times* article, Michael Barbaro, <u>At Liz Claiborne, a Bold Fashion Statement</u>, N.Y. Times, July 31, 2007, is available at http://www.nytimes.com/2007/07/31/business/31liz.html.  The article cites to "people who witnessed the conversations."  It does not, however, indicate who was present for these "conversations," or when or where they were held.

both of us."  (*Id.*)  In the same article, a Macy's spokesman stated, "Liz Claiborne will

continue to be an ongoing brand at [Macy's]."  (*Id.*)  Plaintiff alleges that McComb's

statements were false and misleading when made because (1) LIZ's relationship with

Macy's was in fact deteriorating, and apparently thus not important or long-standing;[6] (2)

at some undetermined time before July 31, 2007, Lundgren told executives at LIZ that

LIZ had "lost [its] most-favored-nation status" at Macy's;[7] (3) Macy's wanted to sell only

exclusive merchandise; (4) Lundgren had been "furious" about LIZ's deal with JC

Penney; and (5) LIZ employees had been "surprised" by the LIZ-JC Penney deal.  (*Id.*

¶ 58.a-d.)

Sullivan addressed the differentiation between the "Liz Claiborne" and the "Liz &

Co." lines in her opening remarks on a February 28, 2007 conference call announcing

LIZ's financial results for fiscal year 2006 and the fourth quarter of that year.  (*Id.* ¶¶ 63-

64; *see also* Stern Decl. Ex. A at 7-8.)  She stated, in summarizing the quarterly updates

relating to the Liz Claiborne brand:

> Recently, we announced the launch of Liz & Co. and Concepts by
> Claiborne, which are debuting this spring in JCPenney.  We remain
> focused on maintaining a clear distinction between these core brands and
> the diffusion line . . . .
>
> Our department store partners realize these new launches are geared
> toward a distinct and separate consumer, one who shops in a different

---

[6] Plaintiff does, however, include a footnote indicating that LIZ clothing had sold at Macy's stores for thirty years.  (SAC ¶ 58.a n.3.)

[7] Plaintiff alleges in the SAC that this statement was made at the November 22, 2006 meeting between Lundgren and McComb.  (SAC ¶ 58.b.)  But plaintiff's own cite for these "facts" undermines their accuracy.  The *New York Times* article from which plaintiff takes these allegations says nothing of the sort. It says merely that Lundgren told executives at LIZ that LIZ had lost its "most-favored-nation" status.  It says nothing about when, where, and to whom, specifically, the statement was made.  In addition, the SAC does not allege that either CW1 or CW2 or anyone else actually heard this statement or was witness to its making.  As it is reported in the *New York Times* article, Lundgren's statement could just as soon have been made in November 2006 to McComb as it could have been made in June 2007 to unknown and unnamed LIZ executives not involved in this case.

> venue and in a different price zone.  They acknowledge our intent to
> preserve the marked differences in the product offering, as well as the
> consumer's esteem and desire for both Liz Claiborne and Claiborne in
> store stores [sic].

(SAC ¶ 64; Stern Decl. Ex. A. at 8.)  Plaintiff alleges that Sullivan's statements were

false and misleading when made because (1) Lundgren had been "furious" with LIZ in

November; (2) Macy's had cut its fall season orders earlier in February[8]; (3) JC Penney

had been undertaking a strategy of opening more stand-alone traditional department

stores; (4) the January 16, 2007 *Women's Wear Daily* article cited "[s]ources" as saying

that Macy's believed that the "Liz & Co." brand "denigrate[d] the Liz Claiborne brand";

and (5) McComb stated, on a May 1, 2007 conference call after the Class Period, that

changing the name of the LIZ line sold at JC Penney from "Crazy Horse, a Liz Claiborne

Company" to "Liz & Co.," created a "brand halo" that bolstered business for the "Liz &

Co." brand.  (SAC ¶¶ 65.a-f; *see also id.* ¶¶ 57, 87.)

Later on the same conference call, McComb responded to the question of what his

"takeaway[s]" were from meeting with his "larger customers."  (*Id.* ¶ 66.)  McComb's

lengthy answer included that LIZ's

> customers see the vast capability that we have and our ability to buy
> brands, to market brands, to take them globally, and to build brand power.
> So I see a significant openness and eagerness to partner with our company,
> in spite of any specific tensions that might exist on a given brand or on a
> given issue.

(*Id.*)  Plaintiff alleges that this statement was false and misleading when made, with

respect to Macy's, because in fact Macy's relationship with LIZ had deteriorated and its

CEO, Lundgren, was "furious" with LIZ.  (*Id.* ¶ 67.)

---

[8] *See infra*, § I.B.2; Macy's orders for Liz Claiborne's fall 2007 line, placed in February 2007, were around
thirty percent lower than usual.

Following McComb's statement above, Sullivan was asked about how the "Liz Claiborne" brand was selling at Macy's.  (*Id.* ¶ 68.)  Sullivan responded, "[W]e're pleased with the business we see in the department stores."  (*Id.*)  Plaintiff alleges that this statement was false and misleading when made because Macy's had cut around thirty percent of its fall season orders earlier that February.  (*Id.*)

The last allegedly false and misleading comments on the February 28, 2007 conference call were made by both Sullivan and McComb in response to a question about "concerns over the Liz & Co. launch in Penney's among other department store executives."  (*Id.* ¶ 69.)  Sullivan responded that "[LIZ's] commitment to [the department stores] is that we will have very separate and distinct and elevated lines in department stores . . . ."  (*Id.*)  Later, McComb, responding to the same question, stated that "the Liz Claiborne apparel lines in the traditional department stores have a distinctive and elevated product presentation versus what we're doing with the diffused line."  (*Id.*)  Plaintiff alleges that these statements were false and misleading when made for all the reasons heretofore mentioned, including specifically (1) that at some undetermined time before July 31, 2007, Lundgren told "executives" at LIZ that LIZ had "lost [its] most-favored-nation status" at Macy's; and (2) that McComb stated, after the Class Period, that business for the "Liz & Co." brand was bolstered by the Liz Claiborne "brand halo."  (*Id.* ¶¶ 70.a-b.)

The final allegedly false and misleading statements made in the Class Period were made by Sullivan and McComb during a question-and-answer session at a March 21, 2007 Merrill Lynch Retailing Leaders Conference.  (*Id.* ¶ 76.)[9]  Therein, in response to a

---

[9] Plaintiff quotes, in full, no fewer than eight paragraphs of answers given by McComb and Sullivan at the Merrill Lynch conference.  But plaintiff does not identify any specific statements in those paragraphs that

question about the "long-term potential" for the "Liz Claiborne" brand, Sullivan stated

"we are extremely pleased with the progress that's made in the Liz Claiborne brand."

(*Id.*)  Then in response to a question about "the opportunities and challenges with

[Macy's]," McComb answered, "I think the real question is how can we help Macy's in

particular?  Macy's, which is the business in the most transition, how can we support

them as a vendor? . . .  I think we as a vendor that has supported them and they've

supported us, I think we need to frame the question that way . . . ."  (*Id.*)  Next, in

response to the question of how she would "characterize [LIZ's] relationship today with

the department stores . . . ?" Sullivan answered that "for the most part they had great

relationships [we're] both on a quest for innovation."  (*Id.* (alteration in original).)

Finally, responding to the question whether "the department stores" were "responsive" to

LIZ's business strategy, Sullivan answered, "absolutely . . . they are fully engaged in

these discussions."  (*Id.*)  Plaintiff claims these statements were false and misleading

when made because (1) in fact LIZ did not have a good business relationship with

Macy's; (2) the department stores were not interested in the Liz Claiborne brand; and (3)

the department stores were not responsive to LIZ's business strategy.  (*Id.* ¶ 77.)

---

are false or misleading.  Accordingly, the Court has attempted to pick out the statements plaintiff is most
likely relying on from analyzing the other statements plaintiff has, to this point in the SAC, identified.

### 2.  Allegations Supporting Scienter

Plaintiff alleges that during the class period, McComb and Sullivan knew or should have known that the statements detailed above were false or misleading for several reasons.  First, plaintiff relies heavily on the December 8, 2008 *Fortune* article which recounted that, at a November 22, 2006 meeting between Lundgren and McComb, Lundgren was furious at LIZ for dealing with JC Penney.  (*See, e.g.*, *id.* ¶¶ 59.a, 67.) Plaintiff also points out that Lundgren had made very well-known Macy's desire to partner only with designers and wholesalers who would supply Macy's with exclusive and unique products.  (*Id.* ¶ 59.b.)  Relatedly, Macy's was LIZ's biggest customer, accounting for around sixteen percent of LIZ's sales during the period in question.  (*Id.* ¶¶ 25, 65.b; *see also* Pl.'s Opp'n at 14-15.)  And at least one article from January 2007 noted that the "Liz & Co." brand sold to JC Penney could have a detrimental effect on the "Liz Claiborne" core brands sold at Macy's.  (SAC ¶¶ 57, 65.d.)  In addition, JC Penney had made known its desire to compete more directly as and against more traditional department stores such as Macy's.  (*Id.* ¶¶ 33, 65.c.)

Plaintiff also points to Macy's spring and fall 2007 season order cuts.  Following standard fashion industry practice, Macy's had placed large bulk orders for LIZ's spring 2007 line in September 2006, and placed orders for LIZ's fall 2007 line in February 2007.  (*Id.* ¶ 40.)  These orders would eventually be scaled back shortly before being filled, also a standard practice in the industry.  (*Id.*)  CW1, however, recalls that there were "big cuts" in Macy's' February 2007 orders for that fall from prior years— approximately thirty percent.  (*Id.*)  CW1 believed the reduction to be a retaliatory response by Macy's due to the LIZ-JC Penney deal.  (*Id.*)  In addition, the December 4,

2008 *Fortune* article asserted that a "few months" after the McComb-Lundgren

November 2006 meeting, Macy's greatly scaled back its spring 2007 orders, originally

placed the previous September.  Quoted in the article on that issue, McComb said that

"'Terry [Lundgren] wanted to teach us a lesson.'"  (*Id.* ¶ 54.)  Plaintiff alleges that

defendants' statements to the effect that the LIZ-Macy's relationship was strong and that

Macy's understood that the "Liz Claiborne" and "Liz & Co." line were differentiated,

were made with scienter because Macy's had scaled back its spring and fall 2007 orders

before many of those statements were made.  (*See, e.g.*, *id.* ¶¶ 65.a, 68, 71.)  Prior to the

*Fortune* article's publication, however, Lundgren had been quoted in the *New York Times*

article of July 31, 2007, flatly denying that any retaliatory motive underlay the order cuts:

> Mr. Lundgren, the Macy's chief, said in an e-mail message that there was
> no vengeful or ulterior motive in his decision to pull back.  "It's no secret
> that the Liz Claiborne brand's sales performance has been deteriorating for
> several years," he said.  "Any adjustments in our orders with any vendor
> are solely a function of the performance of that merchandise in our
> stores."

Michael Barbaro, At Liz Claiborne, a Bold Fashion Statement, N.Y. Times, July 31,

2007; (*see also* SAC ¶ 55.)

Plaintiff additionally relies on the fact that defendants added a risk factor relating

to the LIZ-JC Penney deal in LIZ's 2006 10-K, filed on February 28, 2007.  Though

LIZ's third quarter 2006 SEC quarterly report (the "3Q06 10-Q") did not list under "Risk

Factors" anything specifically relating to the "Liz & Co." or "Concepts by Claiborne"

brands, LIZ's 2006 SEC annual report (the "2006 10-K") did list such a risk.  (*Id.* ¶ 65.f;

*see also* Pl.'s Opp'n at 14.)  The 3Q06 10-Q stated under the heading "Risk Factors":

"There are no material changes from the risk factors previously disclosed in our Annual

Report on Form 10-K for the 2005 fiscal year."  Liz Claiborne, Inc., Quarterly Report for

the Quarterly Period Ending Sept. 30, 2006 (Form 10-Q), at 55 (Nov. 1, 2006).  And LIZ's 2005 Form 10-K did not mention anything about the LIZ-JC Penney deal, as is not surprising since that deal was not announced to the public until seven months after that document's filing.  *See* Liz Claiborne, Inc. Annual Report for the Fiscal Year Ending Dec. 31, 2005 (Form 10-K), at 13-15 (Mar. 1, 2006).  LIZ's 2006 10-K did, however, list as a risk factor: "Risks associated with selling our Liz & Co. and Concepts by Claiborne brands outside of better department stores."  Liz Claiborne, Inc. Annual Report for the Fiscal Year Ending Dec. 31, 2006 (Form 10-K), at 16 (Feb. 28, 2007).  Plaintiff finds suspicious that the LIZ-JC Penney deal was announced in early October 2006 and that the 3Q06 10-Q filed on November 1, 2006, did not contain a relevant risk factor, yet the 2006 10-K did contain one and the red flags from analysts and the Lundgren-McComb meeting intervened between the 3Q06 10-Q and the 2006 10-K.  (*See* SAC ¶¶ 65.f, 71.) Put more explicitly, plaintiff is pointing out that only after red flags were raised did LIZ add a risk factor to its disclosure documents concerning the LIZ-JC Penney deal.

Finally, plaintiff asserts that LIZ's failure to repurchase its own stock from the market during the class period, when it had repurchased stock for several months prior to the class period, supports scienter because it suggests that LIZ knew its stock price would plummet during the class period.  (Pl.'s Opp'n at 13-14.)

**C. Fallout**

The Class Period ends on April 30, 2007.  On May 1, 2007, LIZ released its first-quarter 2007 financials which indicated that first-quarter earnings had dropped sixty-five percent.  (SAC ¶ 79.)  Clothing sales "to chains such as [Macy's] declined 7.4% . . . ."  (*Id*.)  Profits-per-share were also significantly lower than analysts had anticipated.  (*Id*.)

On a conference call to discuss these results, McComb explicitly recognized "ever-growing demands for increased margin [sic] . . . [and a]n increasing demand by retailers for exclusively branded labels for their floors."  (*Id*. ¶ 80.)  McComb also noted that

> Macy's . . . is right-sizing orders for a leaner and more productive inventory management, but it is also taking that further step of reducing the sales plan for the Liz Claiborne apparel brand in the back half.[10]  We believe that our decision to launch Liz & Co. at JC Penney's was a contributing factor to this reduction, regardless of the fact that the Liz & Co. brand offering differs in targeted consumer, product, price point and promotion strategy.

(*Id*.)  On the same call, Sullivan stated that LIZ "remain[ed] committed to maintaining a clear distinction between the ['Liz Claiborne' line and the 'Liz & Co.' line]."  (*Id*.)

Later on the call, McComb responded to an analyst's question regarding whether and when LIZ began anticipating such negative results from the LIZ-JC Penney deal.  McComb stated that at the time of the February 28, 2007 conference call, "certain pressures had been flagged in the press around this Liz & Co. Liz Claiborne brand at [Macy's]-Penney's situation, and we didn't see anything scary at that time coming out of that."  (*Id*. ¶ 86.)  McComb also said that even in "mid-March, that in fact we didn't anticipate anything scary."  (*Id*.)  Finally, when ask about marketing and advertising expenditures, McComb noted that the "brand halo" around the "Liz Claiborne" brand

---

[10] The "back half" apparently refers to the fall 2007 orders.  (*See* SAC ¶ 71 n.4.)

supported not only that brand but also the "Liz & Co." line.  (*Id.* ¶ 87.)  He also noted

that JC Penney should be thought of "more increasingly as a traditional department store,

and in time competing more and more for the same kind of foot traffic."  (*Id.*)

On May 1, after LIZ had released its first-quarter financials and held the above-

detailed conference call, LIZ's share price dropped $7.72 per share, or 17.26%, to close

at $37.00 per share.  (*Id.* ¶ 90.)

On May 16, 2007, a spokesperson for Macy's denied that Macy's had recently

required higher margins than had been historically required for products sold at its stores

across the board, but instead had been requiring higher margins "than what [LIZ

products] have been producing."  (*Id.* ¶ 92.d.)  Later, in the July 31, 2007, *New York

Times* article, McComb was quoted as saying that LIZ was "shocked" by the magnitude

of Macy's scaling back of its spring 2007 orders and reductions in its fall 2007 orders.

(*Id.* ¶ 98.)  McComb also was quoted in the article to say that "the use of that precious

capital 'L' [in 'Liz & Co.'] made [Macy's] crazy."  (*Id.*)  But the article went on to state

that

> Lundgren, the Macy's chief, said in an e-mail message that there was no
> vengeful or ulterior motive in his decision to pull back.  "It's no secret that
> the Liz Claiborne brand's sales performance has been deteriorating for
> several years," he said.  "Any adjustments in our orders with any vendor
> are solely a function of the performance of that merchandise in our
> stores."

(*Id.*)

Plaintiff filed his initial complaint on April 28, 2009.  Plaintiff filed his first

amended complaint on April 19, 2010, and filed this second amended complaint on

August 23, 2010.  Defendants have since moved to dismiss.

## II.  DISCUSSION

### A.  Standard for Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "'enough facts to state a claim to relief that is plausible on its face.'"  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  If the factual averments permit no reasonable inference stronger than the "'mere possibility of misconduct,'" the complaint should be dismissed.  *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S. Ct. at 1950).  Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).  In applying this standard of facial plausibility, the Court accepts all factual allegations as true, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Id*.  On a motion to dismiss, the Court may properly consider documents referenced in or integral to the complaint, as well as public filings with the SEC.  *In re IAC/Interactivecorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007).

**B.  Section 10(b) and Rule 10b-5 Claims**

    **1.  Scienter Requirement**

    "To state a claim under § 10(b) and Rule 10b-5, 'a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'" *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. American Express Co.*, 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)).  Plaintiffs must also "satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires that 'the circumstances constituting fraud . . . be stated with particularity.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  "Thus '[a] plaintiff cannot base securities fraud claims on speculation and conclusory allegations.'" *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

    In addition to Rule 9(b), plaintiffs must also satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").  *ECA and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  "In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *Id.* at 198 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis in original).  For Section 10(b) and Rule 10b-5 claims, "the required state of mind is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Fort Worth*

*Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 314). "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged." *Id.* Thus, the court "must assess 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Local No. 38*, 724 F. Supp. 2d at 458 (quoting *Tellabs*, 551 U.S. at 323). "Moreover, the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *ECA*, 553 F.3d at 198 (citing *Kalnit*, 264 F.3d at 140-41). In the Second Circuit, "[t]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*; *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011).

### a. Motive and Opportunity

To satisfy "motive and opportunity," plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. Motives "common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for the purposes of this inquiry." *Id.*

Instead, "[s]ufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010).  Plaintiffs must allege a "unique connection between the fraud and the [benefit]."  *ECA*, 553 F.3d at 201 n.6.  In other words, the particular fraud alleged must specifically enable the schemes or business plans plaintiffs contend conferred concrete and personal benefits on the defendants.  *Compare ECA*, 553 F.3d at 201 (finding no motive when, *inter alia*, alleged misstatements, which plaintiffs contended were meant to inflate stock price to make eventual acquisition of a target company easier, occurred several years prior to the acquisition and therefore could not reasonably be said to contribute to the ease of that acquisition), *with In re SLM*, 740 F. Supp. 2d at 557-58 (finding motive when imminent merger would have been "torpedoed," costing company $2 billion and individual defendant $225 million, if stock price were to drop below a certain level, and when fraud allegedly kept stock price above that particular level).  In addition, as with the other scienter pleading requirements, "mere conclusory allegations" connecting fraud to benefits for purposes of motive are insufficient.  *Biovail Corp.*, 615 F. Supp. 2d at 225.

"[M]otive can be shown, however, 'when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.'"  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010) (quoting *ECA*, 553 F.3d at 198). "However, the mere fact that insider stock sales occurred does not suffice . . . , [instead][p]laintiffs must establish that the sales were 'unusual' or 'suspicious.'"  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (internal

quotation marks and citation omitted).[11]  Plaintiffs must allege not only the insider

defendants' selling activity during the relevant period, but also those defendants' *net*

*profits* as opposed to *gross proceeds*, as well as overall percentage changes in defendants'

holdings.  *See In re eSpeed Sec. Litig*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) ("The

Complaint also omits necessary information concerning (1) the percentage increase in

each defendants' holdings during the class period; and (2) the profit from defendants'

sales.  In particular, plaintiffs plead that Amaitis and Noviello realized 'gross proceeds'

of $2.8 million, but the Complaint does not disclose whether either made any *profit* from

the sales.").

###### b.  Strong Circumstantial Evidence

"Where motive is not apparent, it is still possible to plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater."  *In re Citigroup*, 753 F.

Supp. 2d at 233.  Under this theory, "a plaintiff must show that the defendant's conduct is

at the least[] conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either

known to the defendant or so obvious that the defendant must have been aware of it."

*Gissin v. Endres*, 739 F. Supp. 2d 488, 503 (S.D.N.Y. 2010) (internal quotation marks

omitted).

---

[11] Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendants' sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001); *In re SLM*, 740 F. Supp. 2d at 557-58; *In re Gildan Activewear*, 636 F. Supp. 2d at 270-72; *In re AXIS Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006).

For purposes of this action plaintiffs must "specifically allege defendants'
knowledge of facts or access to information contradicting defendants' public statements."
*Id.*[12]  Plaintiffs "must *specifically identify* the reports or statements that are contradictory
to the statements made," or must "provide specific instances in which Defendants
received information that was contrary to their public declarations."  *Plumbers &
Steamfitters*, 694 F. Supp. 2d at 299 (emphasis in original) (internal quotation marks
omitted).  The allegations must show both "(1) *specific* contradictory information [that]
was available to the defendants (2) *at the same time* they made their misleading
statements."  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y.
2009) (emphasis in original).  Thus, "broad reference to raw data," and "generalized
forecasting and speculation" in the media is insufficient.  *Plumbers & Steamfitters*, 694 F.
Supp. 2d at 299, 300 ("Although a plaintiff may use [news articles] in pleadings, 'the
news articles cited still must indicate particularized facts about a defendant's conduct.'"
(quoting *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 585 (S.D.N.Y. 2007))).  Likewise,
allegations that "information was the sort of [data]" that "would have been reviewed by
the Individual Defendants are too speculative to give rise to a strong inference of
scienter."  *Local No. 38*, 724 F. Supp. 2d at 462 (stating that such "bland
assertions . . . offer nothing concrete and are not allegations of fact"); *see also In re
PXRE*, 600 F. Supp. 2d at 538 ("Here, Plaintiff argues that the individual Defendants
*must have known* of Matusiak's concerns, due to their positions in PXRE, and due to
PXRE's 'intimate corporate culture.'  The Court finds that such allegations fail to support
an inference that Defendants knew, or had access to, Matusiak's concerns." (emphasis in

---

[12] A plaintiff may also allege that defendants engaged in deliberate misconduct, *see In re Citigroup*, 753 F.
Supp. 2d at 233, or that "defendants failed to check information they had a duty to monitor," *Gissin*, 739 F.
Supp. 2d at 503; but plaintiffs here make no such allegations or arguments.

original)).  Finally, plaintiffs cannot rely on information generally known or available to the public to support circumstantial scienter allegations.  *See In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595-96 (S.D.N.Y. 2010) ("Any allegation that Defendants' statements and omissions were made recklessly because Defendants were aware of the housing market crisis fails . . . . Plaintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information to sell their stock as the price declined.").

On the other hand, specific identification of reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity suggests an inference of scienter strong enough to survive a motion to dismiss.  *See, e.g.*, *In re Citigroup*, 753 F. Supp. 2d at 237 (strong inference of scienter satisfied when, *inter alia*, plaintiffs identified a specific "March 2007 report from Citigroup's quantitative credit strategy and analysis group allegedly describ[ing] the risks the subprime meltdown posed to the holders of CDO super senior tranches."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481-82 (S.D.N.Y. 2010) (finding scienter when the complaint "identifie[d] specific reports or documents that would have indicated that The Officers' public statements regarding the wells and Canadian Superior's inability to meets its financial obligations beginning late 2008 were inaccurate").  Alternatively, a plaintiff may highlight inconsistencies between defendants' corporate activity and alleged misstatements.  *See In re Citigroup*, 753 F. Supp. 2d at 237-38 ("[T]he Complaint details a number of actions Citigroup took that indicate awareness of the CDO risk. . . . [Plaintiffs'] claims concern a series of statements denying or diminishing Citigroup's CDO-exposure and the risks associated with it. . . . This incongruity between word and deed establishes a strong

inference of scienter.").  But consistency between defendants' corporate activities and public statements will cut against the inference of scienter.  *See In re Sec. Capital Assurance*, 729 F. Supp. 2d at 596 (finding inference of fraudulent intent undermined when complaint alleged that insider defendants were taken by surprise by financial analysts' inquiries into subject matter of alleged misstatements and thereafter conducted extensive investigations into the truth of those statements; i.e., surprise that statements might be misleading combined with investigations into the truth of those statements created inference that defendants did not believe the statements to be false when made).

### c.  Competing Inferences Requirement of *Tellabs*

Finally, the law is clear that whichever path plaintiffs pursue to plead scienter, plaintiffs must plead an inference of scienter that is at least as strong and compelling as "any competing inferences rationally drawn from all the facts alleged, taken collectively."  *ECA*, 553 F.3d at 198.  In other words, the pleadings must satisfy both (1) either the "motive and opportunity" or the "strong circumstantial evidence" requirement; and (2) *Tellabs*' requirement that the inference drawn from the facts is at least as compelling as any other rational inference.  *Biovail Corp.*, 615 F. Supp. 2d at 225 ("Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." (internal quotation marks omitted)); *In re PXRE*, 600 F. Supp. 2d at 528.

**2. Application to This Case**

  **a. Motive and Opportunity**

  Plaintiff's only allegation going to motive and opportunity is that LIZ did not purchase its own stock in the market during the Class Period after doing so for several quarters prior.  (*See* Pl.'s Opp'n at 13.)  While true that unusual insider sales during the Class Period can establish motive, *see Gildan Activewear*, 636 F. Supp. 2d at 270, the converse does not appear to be true.  First, the argument plaintiff makes, that the corporation's failure to *purchase* stock establishes scienter, hardly follows from the rule that insider *sales* can, if unusual, establish scienter.  The same logical failure exists in plaintiff's argument that a corporation's failure to repurchase stock can establish motive because "[c]ourts have repeatedly held that substantial share repurchases by a corporate defendant during a class period may negate a finding of scienter . . . ."  (Pl.'s Opp'n at 13.)  That is so, but plaintiff cannot identify a single case holding that the converse— a corporation's failure to purchase stock during the class period—is sufficient to establish motive.  Nor can the Court find a case supporting this argument.  And even if plaintiff's theory were viable, plaintiff omits much of the information required for a serious analysis of the issue including, most importantly, whether LIZ's "suspension" of stock repurchases led to any profits.  *See In re eSpeed*, 457 F. Supp. 2d at 290.  If plaintiff had pled facts indicating, for example, that after the May 1, 2007 price drop, LIZ had again begun purchasing stock in the market, thus saving $7.72-per-share, then despite the argument's lack of legal support, it would at least be factually cogent.  In other words, then plaintiff might have at least alleged the "unique connection between the fraud and the [benefits]," *ECA*, 553 F.3d at 201, required to adequately plead motive.  But plaintiff

does not allege such facts, and the Court cannot write them in to support plaintiff's theory.

### b. Strong Circumstantial Evidence

In his brief, plaintiff supports his argument for scienter based on strong circumstantial evidence on three grounds.[13]  These are (1) that Lundgren's meeting with McComb in November 2006 and Macy's February 2007 order cuts indicated to defendants that their assertions concerning the strength of LIZ's relationship with Macy's were false; (2) that the addition of a warning factor in the 2006 10-K about the "Liz & Co." and "Concepts by Claiborne" brands after Macy's had cut orders in February 2007 shows that defendants knew that Macy's did not, in fact, realize that "Liz & Co." was targeted at different consumers than those who shopped at Macy's, and that, again, the relationship between the companies was not satisfactory; and (3) that Macy's was LIZ's "core business," comprising sixteen percent of LIZ's total sales in 2006.  (Pl.'s Opp'n at 12-15.)  The Court addresses each allegation in turn, before considering them all in their entirety as per the requirement of *Tellabs*.

---

[13] Plaintiff asserts that "[t]here is no fixed formula for pleading scienter.  Non-exclusive examples include that defendants (1) benefitted in a concrete and personal way . . . ; (2) engaged in deliberately illegal behavior; (3) knew or had access to information that their public statements were not accurate; (4) failed to check information . . . ; or (5) ignored obvious signs of fraud."  (Pl.'s Opp'n at 12.)  Plaintiff lists accurate factors; however, but for the first factor, which is simply motive and opportunity, these are the factors courts look to in judging scienter under the strong circumstantial evidence prong—they are not themselves separate tests for scienter.  *See In re Lehamn Bros Sec. & ERISA Litig.*, ___ F. Supp. 2d ___, 2011 WL 3211364, at *21 (S.D.N.Y. July 27, 2011); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 348, 351 (S.D.N.Y. 2011) (noting that these factors, though "an alternate [five]-part formulation," have not changed the Second Circuit's "the two-prong scienter standard . . . , mindful that litigants need not rely on magic words such as 'motive and opportunity' with respect to intent." (internal quotation marks omitted)); *In re SLM*, 740 F. Supp. 2d at 559 (court considering factors (2) through (5) in discussion of strong circumstantial evidence); *see also supra*, note 12.

### i.  Lundgren's Statements and the Order Cuts

Plaintiff argues that "McComb's face-to-face confrontation with Lundgren [on November 22, 2006] and, later, Macy's February [2007] order cutbacks (for both spring and fall seasons), are directly at odds with Defendants' public statements portraying LIZ as continuing to have a *strong* relationship with Macy's despite the JCPenney's deal." (Pl.'s Opp'n at 12 (emphasis supplied; internal citations omitted).) [14]  A careful reading of plaintiffs complaint, however, reveals that LIZ executives never touted the Macy relationship as "strong," or anything like it.  Most of their comments related generally to LIZ's relationship with "our department store partners" (SAC ¶ 64), not with Macy's in particular.  *See id.* ¶ 50 ("[W]e have had a lot of dialogue with our department store partners.  We have explained exactly what our intentions [are] with Liz & Co."); *id.* ¶ 69 ("[I]nitially, there was a lot of what I would call robust discussion [with the department store accounts] about the wisdom of [Liz & Co.]); *id.* ¶ 66 ("our customers see the vast capability that we have . . . so I see a significant openness . . . to partner with our company, in spite of any specific tensions that might exist on a given brand or on a given

---

[14] Plaintiff does not mention Lundgren's alleged "you have lost your most-favored nation" statement in arguing for scienter in his brief.  (*See* Pl.'s Opp'n at 12-13.)  The Court would not have considered it on this point anyway, for the reasons stated *supra* in note 7.  The quotation is taken from a July 31, 2007 *New York Times* article that does not indicate where, when, and to whom Lundgren's statement was made.  Michael Barbaro, At Liz Claiborne, a Bold Fashion Statement, N.Y. Times, July 31, 2007.  Nor does the SAC allege that any other witness, including the confidential witnesses, was present when and where Lundgren apparently made this remark.  Accordingly, to the extent plaintiff is attempting to plead that Lundgren's "most-favored nation" remark put defendants on notice of the falsity of their assertions, Lundgren's remark is not plead with particularity and the Court will not consider it.  *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 412-13 (S.D.N.Y. 2007) ("Plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required [fraudulent intent]. . . .  To establish recklessness, Plaintiffs must specifically allege [ ] defendants' knowledge of facts or access to information contradicting their public statements.  And, generally, where plaintiffs contend defendants had access to contrary facts, [plaintiffs] must specifically identify the reports or statements containing this information."  (internal quotation marks and citations omitted)).

issue"); *id.* ¶ 76 ("[Department stores] are tremendous trading partners for us.  And for the most part they had great relationships [we're] both on a quest for innovation . . . .") The one prominent statement by LIZ's CEO about Macy's came in response to a question about whether Federated (Macy's) was considering dropping the Liz Claiborne brand entirely.  His response was "You would have to ask Federated, but I would be surprised if that was the case because it is a long-standing and important relationship for both of us." (*Id.* ¶ 57.)  To which a Federated spokesperson responded, "Liz Claiborne will continue to be an ongoing brand at Federated."  (*Id.*)  Precisely how this particular exchange was misleading is never spelled out.  The remaining public statements, however, are alleged to be false because a confidential witness "believed" that Macy's fall season orders were placed in February of 2007 and "recalled that these were 'big cuts' (approximately 30%)."  The referenced public statements were made by LIZ executives in late February and March of 2007 and, plaintiffs allege, were false in that the executives were by then aware of Macy's order cuts.

      "'Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'"  *Brecher v. Citigroup Inc.*, ___ F. Supp. 2d ___, 2011 WL 2209145, at *11 (S.D.N.Y. June 7, 2011) (quoting *Novak*, 216 F.3d at 309); *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 359 (S.D.N.Y. 2011) ("[A] finding of reckless disregard based on access to contrary facts must specifically identify the contradictory information available at the time of the alleged misstatement.").  Plaintiff's only factual assertion concerning the timing of the order cuts comes from a recollection of a confidential witness.  (*See* SAC ¶

40.)  Even crediting CW1's assertion however,[15] that allegation would not suffice to support an inference of scienter.  Plaintiff cites no case, and the Court can find none, indicating that plaintiff can plausibly allege a speaker's knowledge of, or access to information based on the unsupported belief or recollection of a confidential witness. *See, e.g.*, *In re Wachovia*, 753 F. Supp. 2d at 360 (plaintiff cannot rely on confidential witness assertions that certain information contradicting defendants' public statements was "openly considered . . . within the company" without allegation that such information was "reported to senior management"); *Local No. 38*, 724 F. Supp. 2d at 461 (allegations insufficient in "the absence of any allegation that such data had been presented to management . . . [and in] not establish[ing] what specific contradictory information the Individual Defendants received or when they received it."); *In re Citigroup*, 753 F. Supp. 2d at 245 ("[p]laintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding" of scienter).  Here, plaintiff does not assert that either Sullivan or McComb, LIZ's quoted spokespersons, knew of Macy's order cuts in February of 2007; indeed, plaintiff does not even allege that the existence of these order cuts was known or common knowledge within the company. This is perhaps not surprising as the July 31, 2007 *New York Times* article on which the

---

[15] To credit information from confidential sources, those sources "must be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. . . .  Indeed, even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-90 (S.D.N.Y. 2011) (internal quotation marks and citations omitted). What is more, "[i]t appears that a split exists in this District as to whether the use of confidential witnesses to plead securities fraud cases remains viable following the Supreme Court's decision in *Tellabs*."  *Id.* (comparing *In re MRU*, 769 F. Supp. 2d at 516, with *In re PXRE*, 600 F. Supp. 2d at 526).  The Court need not decide here (A) whether confidential witness testimony in securities fraud cases is still viable, or (B) whether CW1 has been sufficiently described, because the Court has determined that even crediting CW1's assertions, plaintiff has failed to plead scienter.

SAC heavily relies, stated that Macy's order cuts occurred in *April* 2007, not in February of that year.  Michael Barbaro, <u>At Liz Claiborne, a Bold Fashion Statement</u>, N.Y. Times, July 31, 2007 ("In mid-April, as orders for fall clothing began pouring into the headquarters of Liz Claiborne . . . executives paid unusually close attention to one buyer, Macy's . . . . Executives expected small cuts in Macy's orders for fall . . . but what arrived 'shocked us,' said new chief executive of Liz Claiborne, William L. McComb.")  Read as a whole, therefore, the SAC does not give rise to a strong inference of scienter.

Nor does Lundgren's November 22, 2006 meeting with McComb give rise to such an inference.  First of all, the SAC does not even plead what was said at that meeting, and neither does the *Fortune* article from which the SAC takes the allegation.  (*See* SAC ¶ 54 (". . . Lundgren was furious at the apparel maker . . . .").)  It is hard to say that plaintiff has plead a contrary statement with particularity when plaintiff has not plead any specific statement at all.  *See Plumbers & Steamfitters*, 694 F. Supp. 2d at 299 (plaintiff "must *specifically identify* the reports or statements that are contradictory to the statements made" (emphasis in original, internal quotation marks omitted)).

Second, assuming *arguendo* that Lundgren actually told McComb he was furious about the LIZ-JC Penney deal, it is not clear how Lundgren's displeasure over a certain deal McComb's predecessor had made with JC Penney provided McComb or Sullivan with the information that their public statements were inaccurate.  Those statements included (1) that Macy's and LIZ had a longstanding and important relationship; (2) that LIZ's "larger customers" were eager to do business with LIZ "in spite of any specific tensions that might exist on a given brand or on a given issue"; and (3) that the department stores had a good relationship with LIZ.  (*See* SAC ¶¶ 57, 66, 76.)  That

Lundgren was "furious" about the LIZ-JC Penney deal does not appear to contradict or undermine any of those statements.  This is especially so considering that in the winter of 2007 LIZ hired fashion icon Isaac Mizrahi to design a new Liz Claiborne line exclusively by Macy's; *i.e.*, Macy's clearly *was* still eager to do business with LIZ.  (*Id.* ¶ 54); *see also* Suzanne Kapner, <u>Liz Claiborne's extreme makeover</u>, Fortune (Dec. 4, 2008) (available at http://money.cnn.com/magazines/fortune/fortune_archive/2008/12/08/ 105757740/index.htm).[16]  And plaintiff's two-sentence *ipse dixit* argument—"McComb's face-to-face confrontation with Lundgren . . . [is] directly at odds with Defendants' public statements . . .   Defendants recklessly misled investors by their public statements while they possessed facts to the contrary" (Pl.'s Opp'n at 12-13)—does not convince the Court otherwise.

Finally, even if (1) Lundgren actually *told* McComb he was furious about the LIZ-JC Penney deal; and (2) that statement of displeasure contradicted public statements about the longstandingness of the Macy's-LIZ relationship or the eagerness of department stores to buy from LIZ at the time of the Lundgren-McComb meeting, plaintiff still would have failed to establish a strong inference of scienter based on that meeting.  Close to two months passed between the meeting and McComb's first allegedly misleading statement, and close to four months passed between the meeting and the final

---

[16] It was Macy's customers' rejection of Mizrahi's Liz Claiborne line that eventually caused Macy's to essentially drop LIZ. *See* Rachel Dodes, <u>Targeting Younger Buyers, Liz Claiborne Hits Snag</u>, Wall Street Journal (Aug. 15, 2010) ("[Mizrahi' LIZ] collection launched in the middle of the recession.  Claiborne's core baby boomer consumers rejected it, forcing aggressive markdowns. . . .  Mr. Mizrahi's looks, such as a gingham dress with a big crinoline slip attached, confused Carol Orsborn, a 62-year-old author and marketing consultant who used to wear Liz Claiborne. . . .  Mr. Mizrahi declined to comment. . . .  In September, Macy's told Liz Claiborne that it was cutting distribution to 28 stores from 300, effectively dropping the brand after 30 years. People familiar with Macy's thinking say that the collection was too fashion forward to appeal to Claiborne's consumer base.").  Both the *Fortune* article and the *Wall Street Journal* article were incorporated by reference in the SAC (*see* SAC ¶¶ 54, 58.a n. 3), and are therefore properly considered on this motion.

misleading statements.  That Lundgren was upset in November does not mean that the

Macy's-LIZ relationship was rocky the following February.  *Cf. In re PXRE*, 600 F.

Supp. 2d at 536 (plaintiff must allege "(1) *specific* contradictory information [that] was

available to the defendants (2) *at the same time* they made their misleading statements"

(emphasis in original)).  Especially without any report or specific statement allegedly

made known to the Individual Defendants, a conclusion that defendants were "highly

unreasonable" or acted in "an extreme departure from the standards of ordinary care,"

*Gissen*, 739 F. Supp. 2d at 503, by making statements that could be read to imply that

Macy's relationship with LIZ was strong in January, February, and March, after

Lundgren's November fury, is one the Court cannot reach.  Accordingly, Lundgren's

November 2007 meeting with McComb fails to give rise to a strong inference of scienter.

### ii.  The Addition of the "Liz & Co." Warning Factor in the 2006 10-K

LIZ's 2006 10-K contained as a risk factor: "Risks associated with selling out Liz

& Co. and Concepts by Claiborne brands outside of better department stores."  Liz

Claiborne, Inc. Annual Report for the Fiscal Year Ending Dec. 31, 2006 (Form 10-K), at

16 (Feb. 28, 2007).  Plaintiff argues that because the 2006 10-K contained that risk factor

yet no prior financial statement did so, the defendants must have known that their

statements "about the segmented Liz Claiborne/Liz & Co. sales plan . . . going well"

were false when made.  (Pl.'s Opp'n at 14.)  Plaintiff's brief does not identify the specific

statements from the SAC, but the statements apparently include (1) Sullivan's February

28, 2007 conference call statement that "[o]ur department store partners realize these new

launches are geared toward a distinct and separate consumer . . . .  They acknowledge our

intent to preserve the marked differences in the product offering . . . ." (SAC ¶ 64); (2)

Sullivan's later statement on the same call that "[LIZ's] commitment to [the department stores] is that we will have very separate and distinct and elevated lines in department stores . . . ." (*id*. ¶ 69); (3) McComb's statement on that call that "the Liz Claiborne apparel lines in the traditional department stores have a distinctive and elevated product presentation versus what we're doing with the diffused line." (*id*.); and (4) Sullivan's assertion in late March that "[the department stores] are fully engaged in . . . discussions [about LIZ's business strategy]." (*id*. ¶ 76.)  None of these statements are rendered false by the contemporaneous addition of a warning factor related to a risk broadly discussed in the press and by management.  And whether the warning was adequate, as plaintiff now argues (Pl.'s Opp'n at 14), adds nothing to the issue of whether defendants statements were either false or made with scienter.

### iii.  The Core Operations Doctrine

Plaintiff argues that because sales to Macy's constituted eighteen-percent of LIZ's business in 2005 and sixteen-percent of LIZ's business in 2006, "it is thus reasonable to infer that defendants . . . were aware that the Liz & Co. deal would have serious repercussions with Macy's . . . ."  (Pl.'s Opp'n at 15.)

Recently this Court dealt with a similar "core operations doctrine" argument in *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011).  There the Court noted:

> It is questionable whether the "core operations" doctrine has survived the PSLRA at all.  *Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Arbitron, Inc.,* 741 F.Supp.2d 474, 490 (S.D.N.Y.2010) (Koeltl, J.) ("Whether a plaintiff may rely on the core operations doctrine in light of the PSLRA has not been decided by the Court of Appeals for the Second Circuit.  Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations." (internal citation omitted) (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1000 (9th Cir. 2009) (rejecting "core

operations" doctrine); *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 867 (5th Cir. 2003) (same))).

*The9*, 772 F. Supp. 2d at 596 n.17.  And since the Court's decision in *The9*, the thrust of the case law indicates continued movement away from the doctrine.  *See, e.g.*, *In re Wachovia*, 753[17] F. Supp. 2d at 353 (Sullivan, J.) ("Based on the trajectory of 'core operations' law in this and other circuits, the Court ventures to suggest that the future of the doctrine may be tenuous.  Indeed, the plain language of the PSLRA, which requires facts supporting the scienter inference to be 'state[d] with particularity,' would seem to limit the force of general allegations about core company operations.  15 U.S.C. § 78u–4(b)(1).  In the absence of Circuit guidance, the Court considers 'core operations' allegations to constitute supplementary but not independently sufficient means to plead scienter."); *Brecher*, ___ F. Supp. 2d ___, 2011 WL 2209145, at *13 (Stein, J.) ("Plaintiffs cannot get around the need to plead particularized facts by relying, as they do—and this only in their opposition memorandum—on the fact that the alleged fraud was billions of dollars in magnitude and reached to the core of the firm's operations.  In light of the PLSRA's heightened pleading standards, imputing knowledge based simply on the fact that the fraud concerned a firm's core operations is highly doubtful." (internal citation omitted)).

In any event, that an allegedly fraudulent statement concerned "core operations," standing alone, is insufficient to support strong circumstantial evidence of scienter.  Rather, the "core operations doctrine" bolsters the strength of the inference of scietner when plaintiff has already adequately alleged facts indicating that defendants might have

---

[17] The Court notes that *The9* appears in volume 772 of the Federal Supplement Second while *In re Wachovia* appears in volume 753 of that reporter.  Yet *The9* was released on March 28, 2011, while *In re Wachovia* was released on March 31, 2011, and cites to *The9*.

known their statements were false.  *See In re Reserve Fund Sec. and Derivative Litig.*, 732 F. Supp. 2d 310, 323 (S.D.N.Y. 2010) (in discussing "core operations" argument, noting requirement that "accurate information . . . that contradicts or undermines Defendants' assurances as outlined in the Complaint" be "apparent" to the individual defendants "at the time the alleged false statements and omissions took place."); *In re eSpeed*, 457 F. Supp. 2d at 294 ("even if [the product in question] was sufficiently significant that knowledge of its true prospects can be imputed to the individual defendants, plaintiffs must still adequately allege that defendants lacked a reasonable basis for their optimism about [it].")  Here none of plaintiff's other allegations support an inference of scienter, and thus the "core operations doctrine" cannot bolster it.

Finally, even if the "core operations doctrine" could apply, it appears that Macy's business was not sufficiently "core" to LIZ so that that doctrine would apply.  Sales to Macy's represented sixteen percent of LIZ's business in 2006.  But courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the "core operations doctrine."  *Compare In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004) (concealment sufficient for "core operations doctrine" because revelation caused company to declare bankruptcy), *and In re Cell Pathways Sec. Litig.*, No. 99-725, 2000 WL 805221, at *1, *7 (E.D. Pa. June 20, 2000) (fraud concerned company's only product), *with In re Federated Dept. Stores, Inc., Sec. Litig.*, 00 Civ. 6362, 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (subsidiary worth ten percent of defendant's business's assets insufficiently core because "not essential to the survival" of the company).  Here plaintiff has made no showing that Macy's business was essential to LIZ's corporate survival—and indeed

history has shown it is not—and therefore even if the "core operations doctrine" were still viable it would not give rise here to a strong inference of scienter.[18]

## C.  Section 20(a) Claims

Plaintiff also brings claims against the Individual Defendants pursuant to the Exchange Act Section 20(a).  Such claims require "(a) a primary violation by a controlled person, (b) actual control by the defendant, and (c) the controlling person's culpable participation in the primary violation."  *In re Security Capital Assurance*, 729 F. Supp. 2d at 602.  Because plaintiff here has failed to allege a primary violation, these claims are also dismissed.

## D.  Leave to Replead

"[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *In re eSpeed*, 457 F. Supp. 2d at 298.  However, as plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation.  *See Biovail*, 615 F. Supp. 2d at 233 ("Because plaintiff has already amended its complaint once . . . dismissal is with prejudice."); *In re PXRE*, 600 F. Supp. 2d at 548 ("In light of the fact that the PSAC constitutes Plaintiff's fourth attempt at pleading this matter, the dismissal is with prejudice."); *Treppel v. Biovail Corp.*, No. 03 Civ. 3002, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless."); *see also Harris v. Westchester Cnty. Med. Ctr.*, No. 08 Civ. 1128, 2011 WL 2637429, at *4 (S.D.N.Y. July 6, 2011) (dismissing third amended complaint with prejudice on defendants' first motion to dismiss).

---

[18] Because the Court finds that plaintiff has not alleged facts establishing strong circumstantial evidence supporting an inference of scienter, it need not undertake a competing inference analysis under *Tellabs*.

### III. CONCLUSION

For the reasons stated above, defendants' motion to dismiss is GRANTED in its entirety, and this action is dismissed with prejudice.  The Clerk of the Court is directed to close this motion [30] and close this case.

SO ORDERED.

Dated: New York, New York
      September 29, 2011

                                    Richard J. Holwell
                              United States District Judge

35